## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

SANDRA E. FLUCK,                          )
                                          )
      Plaintiff,                          )
                                          )    C. A. No. 06-188-GMS
      v.                                  )
                                          )
BELLA VISTA DEVELOPMENT, LLC,             )
a Virginia corporation, BELLA VISTA       )    TRIAL BY A JURY DEMANDED
TOWNHOME CONDOMINIUM                      )
ASSOCIATION, INC., a Delaware             )
Corporation, RESORT REALTY GROUP,         )
INC.,a Delaware corporation, WILLIAM J.   )
MITCHELL, individually, and WAYNE         )
MITCHELL, individually,                   )
                                          )
      Defendants.                         )

## APPENDIX TO DEFENDANT RESORT REALTY GROUP, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

FERRY, JOSEPH & PEARCE, P.A.

/s/Robert K. Pearce
ROBERT K. PEARCE, ESQ. (I.D. No. 191)
THOMAS R. RIGGS, ESQ. (I.D. No. 4631)
824 Market Street, Suite 904
Wilmington, DE 19899
(302) 575-1555
rpearce@ferryjoseph.com
Attorneys for Defendant
Resort Realty Group, Inc.

Dated: June 21, 2007

## TABLE OF CONTENTS

Portions of the transcript of the deposition of Wayne L. Mitchell
dated May 11, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Portions of the transcript of the deposition of William J. Mitchell
dated March 16, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-17

Certificate of Compliance and/or Occupancy dated May 20, 2004 . . . . . . . . . . . . . . A-21

*Exclusive Listing Agreement between Defendant Remax Realty Group
and CHD Associates*, dated October 14, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22

Report of Lawrence C. Dinoff dated April 30, 2007 . . . . . . . . . . . . . . . . . . . . . . . . A-24

COPY

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SANDRA E. FLUCK, an individual,　　）
　　　Plaintiff,　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　　）
　　　　　　　　v.　　　　　　　　　　）　C.A. No.
　　　　　　　　　　　　　　　　　　　　）　06-188-GMS
BELLA VISTA DEVELOPMENT, LLC, a　）
Virginia corporation, BELLA VISTA　）
TOWNHOME CONDOMINIUM ASSOCIATION,　）
INC., a Delaware corporation,　　）
RE/MAX REALTY GROUP, a Delaware　）
franchise, WILLIAM J. MITCHELL,　　）
Individually, and WAYNE MITCHELL,　）
Individually,　　　　　　　　　　　）
　　　Defendants.　　　　　　　　　）

　　　　　　　Deposition of **WAYNE L. MITCHELL**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Doroshow, Pasquale, Krawitz & Bhaya,
911 South DuPont Highway, Dover, Delaware, on
Friday, May 11, 2007, beginning at 12:00 p.m.

APPEARANCES:

　　　DOROSHOW, PASQUALE, KRAWITZ & BHAYA
　　　BY:　ANDREA GREEN, ESQUIRE
　　　213 East DuPont Highway
　　　Millsboro, Delaware　19966
　　　Attorney for Plaintiff.

　　　　　　　　　　　　　(Appearances Cont'd...)

ORIGINAL RETAINED BY ANDREA GREEN, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware　19903
(302)674-8884

1  particular business name?

2        A.    Depending on what deal I'm in; I mean right

3  now, this one is Bella Vista, LLC.

4        Q.    Okay.  What is your relationship with Bella

5  Vista, LLC?

6        A.    I'm one-third owner.

7        Q.    Who are the other owners?

8        A.    Manuel Serra.

9        Q.    Can you spell that last name?

10        A.    S-E-R-R-A, and Basilio Ciccio.

11        Q.    That's B-A-S-I-L-I-O?

12        A.    Right.

13        Q.    And how do you spell that last name?

14        A.    C-I-C-C-I-O, I think.

15        Q.    C-I-C-C-I-O?

16        A.    Yes.

17        Q.    Okay.  And where do they live?

18        A.    Virginia.

19        Q.    Where in Virginia?

20        A.    I would have to look it up in my book.  I'm

21  sorry.  McLean, one lives in McLean, and the other lives

22  in -- I don't know.  I mean when I phone them,

23  everything is all -- you just push the button.

24        Q.    So you have their phone numbers sort of on

Wayne Mitchell - Green                          6

1    speed dial on your phone?

2          A.    Yes.

3          Q.    And you don't have either of their addresses

4    at hand?

5          A.    Not with me, no.

6          Q.    Okay.  But you would be able to give --

7          A.    Yes.

8          Q.    -- those to us if we needed them?

9          A.    Not a problem.

10         Q.    Okay.  You said that you are a one-third

11   owner of Bella Vista, LLC.  Who was responsible or is

12   responsible for the day-to-day operation of the

13   business?

14         A.    I was.

15         Q.    And you have been at all times?

16         A.    Yes.

17         Q.    When was Bella Vista, LLC formed?

18         A.    2001 -- I'm not sure.  I think you have a

19   copy of the affidavit in there.  It's formed in

20   Virginia, a Virginia LLC.

21         Q.    Okay.

22         A.    I mailed that to your office, I think.

23         Q.    And Bella Vista, LLC, was it formed solely

24   with respect to the building and operation of Bella

Wayne Mitchell - Green                          7

1    Vista Townhomes in Rehoboth?

2          A.    Yes.

3          Q.    Okay.  And when you said that you are

4    responsible or you have been responsible for running the

5    LLC since 2001, tell me what that entails.

6          A.    Sales, construction, and day-to-day

7    maintenance.

8          Q.    Okay.  Let's start with construction, since

9    I think that is kind of the first thing in the process.

10         A.    Uh-huh.

11         Q.    What would be involved in the construction?

12   Where did you start?

13               MR. CASARINO:  Do you mean what was

14   involved?

15   BY MS. GREEN:

16         Q.    What was involved in the construction of

17   Bella Vista Townhomes in Rehoboth?

18         A.    At what point do you want --

19         Q.    Well, when you first conceived of the idea.

20         A.    Well, you hire an engineer.  You hire an

21   architect.  You get all of your permits from different

22   state agencies and the county.

23         Q.    And you were intimately involved in the

24   day-to-day workings of doing those things?

Wayne Mitchell - Green                              8

1          A.    Yes.

2          Q.    Hiring the engineer?

3          A.    Yes.

4          Q.    Hiring the architect?

5          A.    Yes.

6          Q.    How about if I tell you one more ground

7     rule --

8          A.    Right.

9          Q.    And that is make sure that I finish asking

10    the question before you answer.  And I'm not saying that

11    to be rude.  I'm just saying that because the court

12    reporter can't take down two people speaking at the same

13    time.  Okay?

14         A.    Okay.

15         Q.    When you are talking about hiring the

16    architect, is that the architect who would come up with

17    the plans, including the plans that you produced in your

18    responses to the Request for Production?

19         A.    Yes.

20         Q.    Okay.  And I have in front of me a copy of

21    the Bella Vista Townhomes site plans, and it's a series

22    of pages.  I think it's maybe about somewhere between

23    ten and 15 pages.  I'm just going to show that to you.

24    That is what you are talking about in terms of the

1          MR. CASARINO:  So I guess you gather from

2   that that he is also a real estate --

3   BY MS. GREEN:

4          Q.    Do you actually have a real estate license?

5          A.    Yes.

6          Q.    Are you a broker?

7          A.    No.

8          Q.    So you are an agent?

9          A.    Yes.

10         Q.    And have you been employed by any particular

11  company as an agent?

12         A.    RE/MAX Realty Group.

13         Q.    And working for RE/MAX Realty Group, have

14  you worked with them as an actual employee?

15         A.    No.  I'm an agent with them.  I'm not an

16  employee.  They don't pay me.  I just generate my own

17  funds.

18         Q.    So you worked with RE/MAX, but not as an

19  employee?  As an independent contractor?

20         A.    An independent contractor, yes.

21         Q.    Have you given any recorded or written

22  statements to anybody in connection with this particular

23  incident that we are involved with today?

24         A.    No.

Wayne Mitchell - Green                     16

1    third floor having two bedrooms, two full baths, and the

2    laundry area.  There is a small deck on the back on the

3    first floor.

4         Q.    Now, that was a description of each

5    individual unit.  How many units total are there?

6         A.    36.

7         Q.    How many buildings?

8         A.    There are six buildings, one with four, four

9    with six, and one with eight.  Did I add them right?

10        Q.    I'm sorry.  You said one building with four

11   units?

12        A.    Yeah, one with eight and four with six.

13        Q.    Okay.  And the building at which this fall

14   occurred was building A.  Is that the building with --

15        A.    Six units.

16        Q.    Six units.  Okay.  And the accident happened

17   at unit 5; is that right?

18        A.    Unit 5.

19        Q.    And unit 5, if you are looking at the plans,

20   is it correct that unit 5 would be the door that is

21   second from the right?

22        A.    Facing the building.

23        Q.    If you are facing the building.  Okay.  As

24   you pull into the area, if you are driving to these

1      A.    When we needed an elevation, we needed a

2  step, and we decided that was the kind of step we were

3  going to put in.

4      Q.    Okay.  Did somebody tell you you needed a

5  step, or you knew it?

6      A.    You know it by code.

7      Q.    Because what was the problem?

8      A.    It was more than probably seven and a

9  quarter inches.  I think it was seven and a quarter.

10  Don't hold me to the seven and a quarter.  I'm pretty

11  sure that's what it is.

12      Q.    Okay.  So your recollection is if it's over

13  seven and a quarter inches from the ground --

14      A.    From the ground step.

15      Q.    -- from the ground surface up to the surface

16  of the porch --

17      A.    You'd never pass code.

18      Q.    Okay.  So you knew because of the

19  measurement that you needed some type of a step there?

20      A.    Yes.

21      Q.    Okay.

22      A.    Some units required it; some units did not.

23      Q.    Okay.  Because of the grade of the ground?

24      A.    Yes.

Wayne Mitchell - Green                    46

1    Q.    And this was at some point before you got a

2    certificate of occupancy.  And was Ronnie Baker out

3    there anyway, doing some of the landscaping work?

4    A.    Putting the pavers in.

5    Q.    Okay.  The pavers in other areas, not the

6    steps, because you hadn't discussed with him the steps

7    yet?

8    A.    Putting these pavers in right here.

9    Q.    You are talking about --

10    A.    From one end to the other; you start from

11    the middle and work your way to the buildings.

12          MR. CASARINO:  So we are not confused, why

13    don't we refer to the pavers, as he has, as the ground

14    level, and steps, as he has, as the concrete steps?

15          MS. GREEN:  Well, he has referred to it as a

16    large landscaping paver.  And it is the same, exact kind

17    of landscaping paver that is used along the retaining

18    wall.

19    BY MS. GREEN:

20    A.    Those aren't steps along the retaining wall,

21    are they?

22          MR. CASARINO:  It wasn't for that purpose.

23    I'm just saying so we don't get confused when we are

24    saying what one thing is when another thing is --

Wayne Mitchell - Green                    47

1          THE WITNESS:  I've seen people step on them,

2    yeah.

3    BY MS. GREEN:

4          Q.    But that is a retaining wall; is that right?

5          A.    Right.

6          Q.    That is a retaining wall.

7          A.    But I've seen people step on them.  I mean

8    it's not a step.  They are not a step, maybe, but I have

9    seen people step up there.  So maybe it's a step.

10         Q.    Okay.  So the items that you utilized as

11   steps are the same kind of pavers as Terra Scapes used

12   at the top of the retaining wall?

13         A.    Yes.  A lot of people go in there without

14   falling down, too.  You want to hear that?

15               MR. CASARINO:  Let's --

16               THE WITNESS:  Sorry.  Sorry.

17   BY MS. GREEN:

18         Q.    Okay.  At some point you went out there to

19   the property as the ground level pavers or the

20   cobblestone area was being placed, and you knew that you

21   needed some type of a step; is that right?

22         A.    Yes.

23         Q.    And did you consider putting in the poured

24   concrete step?

1      A.    No.

2      Q.    Okay.  So the only thing you did was you

3  discussed with Ronnie Baker from Terra Scapes what kind

4  of a step he could put in there?

5      A.    Yes.

6      Q.    Okay.  And to the best of your recollection,

7  can you tell us the contents of your conversation with

8  Ronnie Baker about those steps?

9      A.    Let's put them in.

10      Q.    Okay.  Let's put what in?  Did you discuss

11  with him what you wanted?

12      A.    Yes.

13      Q.    Okay.  Did you say:  Do you have any

14  suggestion?  Or did you say to him:  This is what I

15  want?

16      A.    No.  I had suggestions, yes.

17      Q.    And what were your suggestions?

18      A.    Let's put in a good step that matches the

19  pavers for a nice curb appeal.

20      Q.    And was that kind of about as much design

21  work as you did, and then he said:  This is what we can

22  do?

23      A.    Yes.

24      Q.    Okay.  What did he describe to you that he

Wayne Mitchell - Green                          49

1   could do?

2          A.    Well, we did one.  And then we said:  Let's

3   do it.

4          Q.    You said you did one.  Do you recall which

5   unit --

6          A.    Six.

7          Q.    You put in the step at unit 6 --

8          A.    Right.

9          Q.    -- which is one of the photographs we looked

10  at already?

11         A.    Yes.

12         Q.    And you liked the way it looked?

13         A.    Yes.

14         Q.    Did you talk to him about what size it had

15  to be?

16         A.    We had six -- We actually had the guy come

17  down and measure them, and he agreed to them, I think.

18  I think -- I'm pretty sure that's what happened.  We

19  didn't put them all in the same day.  We put in like

20  one, measured it, it passed code, let's go for it.

21         Q.    You said you measured it and it passed code.

22  What code are you talking about?

23         A.    The Sussex County Code, the building code.

24         Q.    Do you know what portion of the code it

Wayne Mitchell - Green                            50

1   matched?

2        A.    I have no clue.

3        Q.    Do you know who it is that came down and

4   measured it and looked at it?

5        A.    Charlie.

6        Q.    Charlie who?

7        A.    I don't know Charlie's last name.

8             MR. COATES:  Not me.

9             THE WITNESS:  No, Charlie with Sussex County

10  Code inspection.

11  BY MS. GREEN:

12       Q.    And did you discuss with Terra Scapes what

13  you would pay them for the work that they were doing?

14       A.    Unfortunately, no.

15       Q.    Okay.  So that was the genesis of the

16  problem that you had with the invoice that we have

17  discussed earlier?

18       A.    Yes.  Now, that invoice is not for the

19  steps.  You read the invoice.

20       Q.    Okay.  So that invoice is just for pavers

21  around new concrete stoops?

22       A.    Steps.  What his invoice says --

23       Q.    Okay.  I'm just reading what it says.

24       A.    -- because you have a big time differential

Wayne Mitchell - Pearce                    67

1        A.    Correct.

2        Q.    RE/MAX Realty Group had nothing to do with

3   the hiring of the engineer or architect, did they?

4        A.    Did not.

5        Q.    Okay.  With regard to the design of the

6   porch step, RE/MAX had nothing to do with that, did

7   they?

8        A.    Did not.

9        Q.    With regard to the selection of contractors

10  for the porch step -- and when I say porch, I mean porch

11  and step --

12       A.    Okay.

13       Q.    -- RE/MAX was not involved in that decision

14  ever?

15       A.    No.

16       Q.    With the decision to hire Terra Scapes and

17  Henlopen Masonry, RE/MAX was not involved in that

18  decision, were they?

19       A.    No.

20       Q.    With regard to the decision to put in this

21  paver step or porch, RE/MAX was not involved in that

22  decision, were they?

23       A.    No.

24       Q.    And the decision to change from that paver

1    step to a concrete step, RE/MAX was not involved in that

2    decision, were they?

3         A.    No.

4         Q.    Was RE/MAX involved at all in any part of

5    the construction of the project?

6         A.    No.

7         Q.    Was RE/MAX involved at all in any part of

8    the maintenance of what was in existence at the time of

9    the accident?

10        A.    No.

11        Q.    Other than you and your son, was anybody

12   from RE/MAX involved at all in this project?

13        A.    No.  Back -- sometimes we were out of town

14   and we would have somebody sit there.  My son-in-law,

15   he's a RE/MAX agent, as well.  We've got a whole family

16   full of them.

17        Q.    And that was --

18        A.    Just as an agent.

19        Q.    Is it fair to say that RE/MAX had no

20   involvement in this case at all, other than acting as

21   the sales agent for the project?

22        A.    Correct.

23        Q.    And with regard to the open house that was

24   being held on the day of the accident, that was set up

Wayne Mitchell - Coates                    69

1   by you and your son; is that correct?

2        A.    Correct.

3        Q.    You didn't report to RE/MAX about that, did

4   you?

5        A.    We don't ask.  We just did it.

6        Q.    Did you ever speak to RE/MAX about --

7        A.    I don't talk to anybody at RE/MAX.

8        Q.    Would you give me just a second?

9        A.    Yeah.

10            MR. PEARCE:  Thanks.  I don't have anything

11   further.

12   BY MR. COATES:

13        Q.    Mr. Mitchell, I'm Charlie Coates, and I am

14   here for Carol Antoff on behalf of the condo

15   association.  Are you individually associated with the

16   condo association?

17        A.    Yes.

18        Q.    What is your capacity with respect to the

19   condo association?

20        A.    I guess I'm president.  I guess I am

21   president.

22        Q.    Can you tell me when the condo association

23   was incorporated?

24        A.    '04, sometime probably, I would think,

COPY                    1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SANDRA E. FLUCK, an individual,    )
        Plaintiff,                 )
                                   )
            v.                     ) C.A. No.
                                   ) 06-188-GMS
BELLA VISTA DEVELOPMENT, LLC, a    )
Virginia corporation, BELLA VISTA  )
TOWNHOME CONDOMINIUM ASSOCIATION,  )
INC., a Delaware corporation,      )
RE/MAX REALTY GROUP, a Delaware    )
franchise, WILLIAM J. MITCHELL,    )
Individually, and WAYNE MITCHELL,  )
Individually,                      )
        Defendants.                )

        Deposition of **WILLIAM JOSEPH MITCHELL**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Doroshow, Pasquale, Krawitz & Bhaya,
213 East DuPont Highway, Millsboro, Delaware, on
Friday, March 16, 2006, beginning at 1:00 p.m.

APPEARANCES:

        DOROSHOW, PASQUALE, KRAWITZ & BHAYA
        BY:  JENNIFER S. DONAHUE, ESQUIRE
        213 East DuPont Highway
        Millsboro, Delaware  19966
        Attorney for Plaintiff.


                        (Appearances Cont'd...)



        ORIGINAL RETAINED BY JENNIFER S. DONAHUE, ESQUIRE
_____

                ANTHONY REPORTING
                    PO Box 234
                Dover, Delaware  19903
                  (302)674-8884

1          Q.    Let me just finish my question.

2          A.    I'm sorry.

3          Q.    -- cemented down to the ground level or

4     whether they were just placed there?

5          A.    I don't know.

6          Q.    Was this unit open to the public before

7     those paver steps were placed there?

8          A.    Not to my knowledge.

9          Q.    Did those paver steps ever move, or did you

10    ever have to adjust them in any way?

11         A.    No.

12         Q.    Do you know how long this unit, this unit 5,

13    was open to the public with those paver steps?

14         A.    As long as the CO was available.

15         Q.    Do you know when these paver steps were

16    removed from the premises?

17         A.    I don't know.

18         Q.    So you don't know when --

19         A.    I don't know the date.

20         Q.    Okay.  Do you recall who removed them?

21         A.    I don't know.

22         Q.    What is in their place now?

23         A.    Concrete step.

24         Q.    Permanent concrete step?

William Mitchell - Pearce                    42

1    design of any of that, correct?

2        A.    Correct.

3        Q.    All right.  And was anyone at RE/MAX, other

4    than yourself and your father, involved in this open

5    house?

6        A.    No.

7        Q.    You said that Jim Kelleher was the broker of

8    record.  But he didn't have anything to do with the open

9    house or anything else at Bella Vista, did he?

10       A.    Well, at that time he wasn't even with

11   RE/MAX.

12       Q.    Okay.  Who was the broker of record at the

13   time?

14       A.    At that time, from what I recall, it was Joe

15   Reed.

16       Q.    Bob Reed?

17       A.    Joe Reed.

18       Q.    Joe Reed.

19       A.    Joe Reed owned RE/MAX Realty Group at that

20   time.  And I think within that year, it was sold to Bob

21   Reed.

22       Q.    Do you remember, at the time of this

23   accident, the owner?

24       A.    Joe Reed.

William Mitchell - Pearce                    43

1        Q.    Did Joe Reed or Bob Reed have anything to do

2    with it, other than being the broker --

3        A.    No.

4        Q.    -- and the owner?

5        A.    No.

6              MR. AKIN:   It is best to wait until the

7    question is finished before you give your answer --

8              THE WITNESS:   I'm sorry.

9              MR. AKIN:   -- just to make a clearer record.

10   Thank you.

11   BY MR. PEARCE:

12       Q.    And you said DC Group was the architect, and

13   I think you said your father was involved in hiring that

14   architect.  Did I understand you correctly?

15       A.    Correct.

16       Q.    Again, that would be wearing his hat for

17   Bella Vista, LLC and not RE/MAX; would that be fair to

18   say?

19       A.    Correct.

20       Q.    And who obtained the certificate of

21   occupancy?  Was that done through Bella Vista, LLC?

22       A.    I guess I'm not real clear what you are

23   asking.

24       Q.    Okay.  The certificate of occupancy was

CERTIFICATE OF COMPLIANCE AND/OR OCCUPANCY
PER
BUILDING CODE DEPARTMENT AND/OR
PLANNING & ZONING DEPARTMENT
SUSSEX COUNTY, DELAWARE

Date of Issue 3-30-04 _____ Expiration Date _____

(Temporary Permit)   Tax Map & Parcel 3-34 19 170.00

This certifies that the (structure) (premises) described in Permit Number 214803 _____ conforms to and complies with the requirements of the Chapter 52 (Building Code) and Chapter 115 (Zoning Code) for Sussex County, Delaware, and may be occupied as of the above date.

Approved Use _____ multi-family _____

Approved By _John Mulligan_
Building Code Department for
Certificate of Occupancy

Applicant's Name CMS Assoc.
Address 112 Westwood Dr. NE
_____ Vienna, VA 22180 _____

Approved By _____ Sir Kan _____
Planning & Zoning Department
for Certificate of Compliance

N/A: Non-Applicable Building Site Bldg A Units 145
per site plan

---



CERTIFICATE OF COMPLIANCE AND/OR OCCUPANCY
PER
BUILDING CODE DEPARTMENT AND/OR
PLANNING & ZONING DEPARTMENT
SUSSEX COUNTY, DELAWARE

6/9/04

Date of Issue 6-9-04 _____ Expiration Date _____

(Temporary Permit)   Tax Map & Parcel 334 19 170.02

This certifies that the (structure) (premises) described in Permit Number 214803 _____ conforms to and complies with the requirements of the Chapter 52 (Building Code) and Chapter 115 (Zoning Code) for Sussex County, Delaware, and may be occupied as of the above date.

Approved Use _____ Multi-Family _____

Approved By _Jon Mulligan_
Building Code Department for
Certificate of Occupancy

Applicant's Name CMS Assoc.
Address 1307 Vincent Place
_____ McLean, VA 22102 _____

Approved By _Wm Jackson_
Planning & Zoning Department
for Certificate of Compliance

Per Site Plan
N/A: Non-Applicable Belle Vista Bldg A Units 253

A-21



### RE/MAX Realty Group
### 317 Rehoboth Avenue
### Rehoboth Beach, Delaware 19971
### TEL: 302 227-4800 or 800 955-6350

Supplied By The Sussex County Association of REALTORS®, Inc.
Revised August 1993, Form #2, Copyright

REALTOR    EQUAL HOUSING
OPPORTUNITY

## EXCLUSIVE LISTING AGREEMENT

1. PROPERTY DESCRIPTION AND AGENCY RELATIONSHIP:   RE/MAX REALTY GROUP
hereinafter referred to as Broker, in consideration of diligent services to be performed is granted the exclusive right from this date to
sell my/our property, identified as follows: District  3-34   Map  19   Parcel  170  ; and
identified as: Bella Vista Townhomes, 30 units Sussex County, Lewes & Rehoboth,
Hundred opp State Rt. 273A AKA Bay Vista Road.
Sale to include the following items:

Furnishings: If sold furnished, the following items do not convey:   NO

2. LEASE CONDITION: Is Property sold subject to any existing lease/rental agreements.  Yes _____   No  X

3. LISTED PRICE: The listing price of the property is:  $  N/A

4. POSSESSION: Possession is to be conveyed at time of settlement or on such other date agreed to by seller(s) and buyer(s).

5. TERMINATION: This contract will expire at midnight  Dec. 31 , 20 07

6. CANCELLATION: Either party may cancel this agreement upon  90  days written notice after  90  days from effective date.

7. BROKERAGE FEE: Seller(s) agrees to pay Broker a commission of  5  (% &/or $) of the selling price for services rendered,
if, during the term of this contract (or extension), (1) Broker produces buyer(s) ready, willing and able to purchase subject property
at the listed price/terms or other price/terms acceptable to Seller(s); or (2) subject property is sold or exchanged by any other broker
or person whomsoever including seller(s).

The Brokerage Fee will also be due Broker in the event subject property is sold, conveyed, or otherwise transferred by Seller(s)
within  90  days after termination of this agreement to a buyer introduced to subject property by broker during the term of this
agreement.  (This provision does NOT APPLY in the event subject property is listed with another broker at time of sale).

8. CO-OPERATION: Broker is authorized to offer cooperation and compensation to other brokers on the following basis.  (Seller(s)
please initial your choice(s) below.)
   1. Subagents: Broker/Agents representing you through our agency.
      Yes _____ No _____
      Compensation to subagents  2  ($ and/or %)

   2. Buyer Agent: Broker/Agent representing the purchaser(s) of property.
      Yes _____ No _____
      Compensation to buyer agents  2  ($ and/or %)

   3. Disclosed Limited Dual Agents: Yes _____   No _____

   If yes, Seller(s) acknowledges that Broker/Agent has provided a full disclosure on company's dual agency policy.  Seller(s)
also acknowledges that from time to time real estate licensees of Broker may elect to represent buyers and may represent both the
buyer and the seller in a transaction but only with the knowledge and written consent of both the buyer and the seller.  If
Broker/Agent obtains written consent to represent both buyer and seller, there is a limitation on the Broker's ability to represent
either party fully and exclusively.  For example, information obtained within the confidentiality and trust of the fiduciary
relationship with one party must not be disclosed to the other party without the prior consent of the party adversely affected by the
disclosure.

9. EXCLUSIVE RIGHT TO SELL: During the term of this agreement, or any extension(s) thereof, Seller(s) agree not to sell or
negotiate for the sale of subject property, except through Broker designated herein, nor give any other broker, firm, or person
authorization to sell or negotiate for the sale of subject property.

10. DISPOSITION OF DEPOSIT MONIES: Seller(s) understands and agrees that, in the absence of a provision in the contract of
sale, rental lease, option Agreement, or other similar type of document to the contrary, if a dispute arises between the parties to the
transaction as to the disposition of funds escrowed with Broker, the Broker shall:
   A. Hold these funds until Broker has a release signed by all parties to the transaction authorizing disposition of the funds;  OR
   B. File a bill of interpleader in the proper court, thereby causing these funds to be deposited with the court;  OR
   C. Hold these funds until such time as one of the parties to the transaction files suit and the court orders the disbursement of these
funds.

11. SELLER(S) REPRESENTATION: Seller(s) warrants that the information on this Agreement is true and correct to the best of their knowledge and belief, and may be used as a basis for presenting the Property to prospective Buyers. Seller(s) shall indemnify and hold Broker harmless from any claim, damages, judgment, and costs, expressly including reasonable attorney fees, arising out of or from any occurrence incident to any mistake, exaggeration, omission, inaccuracy of said information, or escrow dispute. Broker will furnish a copy of this Agreement to Seller(s). Seller(s) hereby agrees to conduct all negotiations pertaining to the sale of the Property through the Broker and cooperate with the Broker fully in the Broker's efforts to sell the Property. Seller(s) further understands and agrees that they and not the Broker(s) is responsible for the care and physical condition of the Property, its management, maintenance, and repair. Seller(s) warrants that they are the owner(s) and/or has the authority to sign this Agreement.

12. SELLER'S OBLIGATIONS:
A. Seller(s) agrees to execute any agreement, deed, leasehold interest assignment or other document(s) necessary to fulfill this agreement. As appropriate, such documents will contain covenants of warranty conveying good and marketable title to Buyer(s). Evidence of marketable title may be in the form of Policy of Title Insurance obtained at expense of Buyer(s). In the event a title examination discloses title is imperfect and marketable title cannot be delivered by Seller(s) within a reasonable time, Broker will nevertheless be entitled to the full agreed commission provided herein.
B. Seller(s) agrees to furnish to Broker, deed records, proof of ownership, tax records, property income/expense records, existing rental/lease agreements and such other documents as necessary and reasonable to bring about the sale of subject property and give this information to prospective purchaser(s).
C. Taxes, special assessments, water, sewer, and other public charges, ground rent, condominium fees, rental monies, fuel, public utility charges and other fixed charges are to be prorated as of date of settlement unless otherwise designated herein. Seller(s) acknowledges realty transfer tax obligation as applicable.
D. Seller(s) agrees to grant Broker access to property and will supply Broker a set of keys.
E. Seller(s) agrees to refer to Broker all inquiries of brokers, agents or others expressing interest in Seller's property.
F. Seller(s) has ___✓___ has not _____ filled out a Property Disclosure Statement and hereby acknowledges the information contained therein is accurate and has made no deliberate misrepresentation or omissions as to the known condition of the property. Seller(s) authorizes Broker to convey this information to prospective purchasers.

13. BROKER'S AUTHORITY:
A. Seller(s) authorizes Broker to accept and hold in escrow a deposit to apply towards purchase price. In the event the deposit is forfeited, one-half will be paid to Seller(s) and one-half paid to Broker as compensation, provided Broker's share does not exceed agreed commission amount.
B. Broker, at his expense, is authorized to advertise property for sale and to place a "For Sale" sign on the premises.
C. If property is sold under this agreement, Broker may display a "Sale Pending/Sold" sign on property until date of final settlement. Broker agrees to remove all signs upon termination of this agreement.
D. Seller(s) authorizes Broker to submit listed property to any Multiple Listing Service in which Broker is a participant.
E. Seller(s) agrees ___✓___ disagrees _____ to authorize Broker to put a lock box on the property and agrees to indemnify and hold Broker, his associates, cooperating brokers, their associates and the Sussex County Association of REALTORS® harmless from and against any and all claims, damages, costs, expenses and attorney's fees arising out of the use of said lockbox and key, including but not limited to, claims or damages for injury to persons or property.

14. BROKER'S OBLIGATION:
A. Broker agrees to diligently utilize the marketing resources of Broker to obtain a qualified buyer.
B. To obtain descriptive and factual information from seller(s) about seller(s) property and to update such information as warranted.
C. To advertise Seller's property as Broker deems advisable.
D. Seller(s) agrees that Broker is not responsible for fire, vandalism, theft, damage or destruction of any nature caused by others during term of this listing agreement.

15. FAIR HOUSING: Seller(s) agrees to comply with all Fair Housing and Civil Rights laws in the sale of this property and further agrees specifically not to discriminate against any person because of RACE, COLOR, CREED, SEX, RELIGION, AGE, MARITAL STATUS, NATIONAL ORIGIN, HANDICAP OR FAMILIAL STATUS.

16. HEIRS AND ASSIGNS: This agreement is binding upon the parties' respective heirs, personal representatives, successors and assigns.

17. ENTIRE AGREEMENT: This contract constitutes the entire terms and provisions of this Exclusive Listing Agreement between Seller(s) and Broker and may be used as a basis for presenting the property to prospective purchasers. If this agreement is signed by more than one person, it shall constitute the joint and several obligations of each. This Agreement contains the entire Agreement of the parties and cannot be changed except by their written consent. This Agreement shall survive execution and delivery of the Agreement of Sale and closing documents and shall not be merged therein.

18. SPECIAL TERMS: *Prices to be Assessed @ a later Date —*
*NO Commission to be Pd. on Upgrade —*
*Commission to be Pd. at "Subtotal" only.*

19. ACKNOWLEDGMENT: I/we as Seller(s) acknowledge receipt of a copy of and agree to this Exclusive Listing Agreement.

Owner(s) Name: *CHS Associates* _____    Effective Date *Oct. 14*, 20 *02*

Address: *1307 Vincent Place* _____    Owner _____ (SEAL)

*McLean, Virginia 22101* _____    Owner _____ (SEAL)

Social Security # _____    Listing Agent *Wayne Mitchell* (SEAL)
*703-848-1747*

Res. Phone *703-981-1578* Office Phone _____    Broker Acceptance _____ (SEAL)

*302-226-0100*



April 30, 2007


Andrea G. Green, Esq.
Doroshow Pasquale Krawitz & Bhaya
213 E. Dupont Highway
Millsboro, DE 19966
VIA FAX: 302 934 8400


Re:    Sandra Fluck fall

Dear Attorney Green:

On June 27, 2004 Sandra Fluck was viewing a model home at the Bella Vista Townhome and
Condominium development in Rehoboth Beach, Delaware. While exiting, she fell at the edge of
the unit's exterior stair to grade, and she was injured. You asked that I determine if the building
conditions were dangerous in a manner that caused Fluck's fall. I've reviewed the Amended
Complaint, Sandra Fluck's deposition and photographs of the area. I understand additional
material, including the deposition of the builder, will be gathered in the future. After reviewing
that material, I may supplement this report.


## BACKGROUND

The front door of the model unit exited onto a concrete platform which is substantially level with
the interior floor level. The platform was raised about 9" above grade and it served as the top
landing of the egress stair connecting the unit to grade. When Fluck visited this model, the
condominium project was still under construction. The exterior stair had not been completed,
and while the model was being shown, three landscaping blocks had been placed to create a
temporary two-riser stair down to grade.

Two columns flank the outer edge of the platform and define the landing width. Only three 14"
wide landscaping blocks were placed, and the temporary stair was much shorter than the
platform edge between the columns. The gap along the right edge was about 24" wide. There
were no handrails at the stair nor were there any rails, guards, planters or other means to define
and protect the parts of the platform edge where there was no stair.

Fluck was 57 years old and in good health. The weather was nice, and she was wearing shorts, a
top and boat shoe loafers. She and her companion saw a sign advertising the open model and
spent about 20 minutes viewing the unit. As they exited, her companion preceded her and
walked across the landing and down the stair. Fluck then walked across the platform and,
believing the stair extended the full width of the platform edge, she descended to the right of the

354 North Prince Street
Lancaster, PA 17603
Phone: 717.293.9050
Toll-Free: 800.813.6736
Fax: 717.293.1195
www.robsonforensic.com

platform's center. She stepped down the first riser with her left foot onto the stair tread. She intended to step down to the same tread with her right foot; however the stair didn't extend far enough. Her right foot came down unsupported, and she lost her balance. There were no handrails and she was unable to recover her balance. She fell, twisting her left foot and she was injured.

## DISCUSSION

Fluck fell because conditions at the platform led her to believe the stair was the same width as the platform edge, but it was much narrower. There were no rails, planters or other devices placed to delineate the actual safe exit width. The stair lacked handrails which, had they been present, would have unambiguously delineated the safe width of egress and would also have provided Fluck with a means to maintain her balance and avoid falling.

Short flight stairs such as the one where Fluck fell are associated with increased falls because their low height impairs the ability of users to reliably identify their presence and nature. ASTM/ANSI F1637, Standard Practice for Safe Walking Surfaces, is a nationally accepted practice for fall prevention. F1637 directs that stairs with three or fewer risers "shall be avoided where possible" and:

> In situations where a short flight stair or single step transition exists or cannot be avoided, obvious visual cues shall be provided to facilitate improved step identification. Handrails, delineated nosing edges, tactile cues, warning signs, contrast in surface colors, and accent lighting are examples of some appropriate warning cues.

In cases where owners rely on color to delineate tripping hazards, F1637 guides them to follow the national standard ANSI-Z535.1, Safety Color Coding. Z535 identifies safety yellow as the national standard color for identifying tripping hazards. There were no yellow markings where Fluck fell.

Handrails act as necessary safety equipment at stairs, and rails should have been installed at this stair. Rails delineate the location, boundaries and character of a stair, assist users to descend safely and also act as a grab bar to assist users to recover their balance when needed. Since 1978, the Consumer Product Safety Commission's Guidelines for Stair Safety cautioned:

> IF:        there are no handrails on one or both sides of an interior or exterior flight of stairs, or:
>
> THEN:   install a properly positioned guardrail, with an attached handrail, for the entire length of the flight.

Bella Vista's model was an attached single-family townhome. The National Life Safety Code, NFPA-101 is a nationally accepted standard that includes requirements for one and two-family dwellings. This stair was required to conform to:

Stairs and intermediate landings shall continue with no decrease in width along the direction of egress travel (7-2.2.3.2)

Stairs and ramps shall have handrails on both sides (7.2.2.4.2)

The <u>International Residential Code for One and Two-Family Dwellings</u> is a well established national safety standard for the design and construction of single family residences. It is also adopted by Sussex County. Section 315, Handrails, required:

Handrails... shall be provided on at least one side of stairways. All required handrails shall be continuous the full length of the stairs with two or more risers from a point directly above the top riser of a flight to a point directly above the lowest riser of a flight (R315.1).

## FINDINGS

Within the bounds of reasonable architectural certainty, and subject to change if additional information becomes available, it is my professional opinion that this stair violated applicable standards, and created a deceptive and dangerous condition that caused Fluck's fall.

If you require anything else, please let me know.

Lawrence C. Dinoff, A.I.A.

A-26