## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SANDRA E. FLUCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 06-188-GMS |
| v. | ) | |
| | ) | |
| BELLA VISTA DEVELOPMENT, LLC, a | ) | |
| Virginia corporation, BELLA VISTA | ) | TRIAL BY A JURY DEMANDED |
| TOWNHOME CONDOMINIUM | ) | |
| ASSOCIATION, INC., a Delaware | ) | |
| corporation, RESORT REALTY GROUP, | ) | |
| INC., a Delaware corporation, WILLIAM J. | ) | |
| MITCHELL, individually, and WAYNE | ) | |
| MITCHELL, individually, | ) | |
| | ) | |
| Defendants. | ) | |

### APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT RESORT REALTY GROUP'S MOTION FOR SUMMARY JUDGMENT

DOROSHOW, PASQUALE, KRAWITZ, & BHAYA

/s/ Andrea G. Green
ANDREA G. GREEN, ESQ. (I.D. No. 2487)
JENNIFER S. DONAHUE (I.D. No. 4700)
213 E. Dupont Highway,
Millsboro, Delaware 19966
302-934-9400
Attorney for Plaintiff
Sandra E. Fluck

Dated: July 9, 2007

## TABLE OF CONTENTS

Page

Deposition of Wayne L. Mitchell, May 11, 2007…………………………………... ....A-1

Deposition of Wayne L. Mitchell, May 11, 2007, page 13……………………………A-2

Deposition of Wayne L. Mitchell, May 11, 2007, page 61……………………………A-3

Deposition of Wayne L. Mitchell, May 11, 2007, page 5……………………………...A-4

Deposition of William Mitchell, March 16, 2006, page 15…………………………… A-5

Deposition of William Mitchell, March 16, 2006, page 19…….. ….………………… A-6

Deposition of Wayne L. Mitchell, May 11, 2007, page 79……………………………A-7

Deposition of Wayne L. Mitchell, May 11, 2007, page 45……………………………A-8

Deposition of Sandra E. Fluck, March 16, 2007, page 34…………………………….. A-9

Deposition of Sandra E. Fluck, March 16, 2007, pages 22 and 23…………………….. A-10

Report of Lawrence C. Dinoff, dated April 30, 2007…………………………………A-11

Amended Complaint, June 16, 2006……………………………………..………....... A-14

Not Reported Cases…………………………………………………………………...A-23

6

1  speed dial on your phone?
2      A.  Yes.
3      Q.  And you don't have either of their addresses
4  at hand?
5      A.  Not with me, no.
6      Q.  Okay.  But you would be able to give --
7      A.  Yes.
8      Q.  -- those to us if we needed them?
9      A.  Not a problem.
10     Q.  Okay.  You said that you are a one-third
11  owner of Bella Vista, LLC.  Who was responsible or is
12  responsible for the day-to-day operation of the
13  business?
14     A.  I was.
15     Q.  And you have been at all times?
16     A.  Yes.
17     Q.  When was Bella Vista, LLC formed?
18     A.  2001 -- I'm not sure.  I think you have a
19  copy of the affidavit in there.  It's formed in
20  Virginia, a Virginia LLC.
21     Q.  Okay.
22     A.  I mailed that to your office, I think.
23     Q.  And Bella Vista, LLC, was it formed solely
24  with respect to the building and operation of Bella

7

1  Vista Townhomes in Rehoboth?
2      A.  Yes.
3      Q.  Okay.  And when you said that you are
4  responsible or you have been responsible for running the
5  LLC since 2001, tell me what that entails.
6      A.  Sales, construction, and day-to-day
7  maintenance.
8      Q.  Okay.  Let's start with construction, since
9  I think that is kind of the first thing in the process.
10     A.  Uh-huh.
11     Q.  What would be involved in the construction?
12  Where did you start?
13         MR. CASARINO:  Do you mean what was
14  involved?
15  BY MS. GREEN:
16     Q.  What was involved in the construction of
17  Bella Vista Townhomes in Rehoboth?
18     A.  At what point do you want --
19     Q.  Well, when you first conceived of the idea.
20     A.  Well, you hire an engineer.  You hire an
21  architect.  You get all of your permits from different
22  state agencies and the county.
23     Q.  And you were intimately involved in the
24  day-to-day workings of doing those things?

8

1      A.  Yes.
2      Q.  Hiring the engineer?
3      A.  Yes.
4      Q.  Hiring the architect?
5      A.  Yes.
6      Q.  How about if I tell you one more ground
7  rule --
8      A.  Right.
9      Q.  And that is make sure that I finish asking
10  the question before you answer.  And I'm not saying that
11  to be rude.  I'm just saying that because the court
12  reporter can't take down two people speaking at the same
13  time.  Okay?
14     A.  Okay.
15     Q.  When you are talking about hiring the
16  architect, is that the architect who would come up with
17  the plans, including the plans that you produced in your
18  responses to the Request for Production?
19     A.  Yes.
20     Q.  Okay.  And I have in front of me a copy of
21  the Bella Vista Townhomes site plans, and it's a series
22  of pages.  I think it's maybe about somewhere between
23  ten and 15 pages.  I'm just going to show that to you.
24  That is what you are talking about in terms of the

9

1  architect's design; is that right?
2      A.  Yes.
3      Q.  Okay.  And that is for the Bella Vista
4  Townhomes, which is the property that we are dealing
5  with in connection with the incident that happened on
6  June 24, '04; is that right?
7      A.  Yes.
8      Q.  So the architect that you hired was Design
9  Delmarva?
10     A.  Yes.
11     Q.  And you dealt in particular with Stephen
12  Wagner?
13     A.  Yes.
14     Q.  All right.  You dealt with the architect in
15  getting the plans.  And once the plans were approved by
16  the County, what, if any, involvement did you then have
17  in the actual construction work?
18     A.  Physical, zero; hiring different companies,
19  we did it as a group, the three of us.  I mean I
20  didn't -- we would get three bids in, and we would pick
21  each bid, meaning me and my two partners.
22     Q.  Okay.  So all three of you were involved in
23  hiring --
24     A.  Yes.

Fluck v. Bella Vista Development, LLC, et al.

---

**10**

1    Q. -- the individual subcontractors that were
2    hired to do the work that is described in the plans?
3    A. Yes, no question.
4    Q. Did you divide it? Like somebody was going
5    to hire the framer --
6    A. No.
7    Q. -- somebody was going to hire the masonry?
8    A. No. I got all the bids.
9    Q. Okay. So you got the bids. But then all
10   three of you together decided on who was the
11   subcontractor you were going to hire for each particular
12   portion of the work?
13   A. 95 percent of the time.
14   Q. How long have you been doing this kind of
15   work?
16   A. 15 years.
17   Q. Okay. So you have built other --
18   A. Yes. Oops.
19   MR. CASARINO: Remember the rule.
20   THE WITNESS: Remember the rule.
21   BY MS. GREEN:
22   Q. So you have built other projects, including
23   other townhomes?
24   A. Yes.

---

**11**

1    Q. And others that are in Rehoboth or in Sussex
2    County?
3    A. Yes.
4    Q. Can you name some of the developments that
5    you have built?
6    A. Part of Eagles Landing; Sussex Street
7    Townhouses in the City of Rehoboth Beach; The Glade in
8    Rehoboth, which would be more lot sales, not
9    construction; Rehoboth Beach Gardens; that's probably
10   about it.
11   Q. Forgive me if you have said this before.
12   You have been doing this, you said, for 15 years?
13   A. Say 20, sometime.
14   Q. What kind of work did you do before that?
15   A. I think I was in Draper King Cole.
16   Q. Draper King Cole? What did you do for them?
17   A. Pack peas.
18   Q. Okay. Is that the only position you had
19   with Draper?
20   A. I got all of my fingers, so I had a good
21   job. That's all I know.
22   Q. So you got out of there with your body parts
23   intact?
24   A. Yes.

---

**12**

1    Q. What kind of education do you have?
2    A. I graduated from Rehoboth High School, '62,
3    and that was about it.
4    Q. Okay. Any continuing education programs or
5    anything else that would prepare you for employment,
6    say, as a developer or working as a developer?
7    A. Hard knocks.
8    Q. Okay. So this --
9    A. I went to real estate school.
10   Q. Where did you go to real estate school?
11   A. Sussex County, Delaware, Del Tech.
12   Q. And how many classes did you have to take?
13   A. I don't remember.
14   Q. How long ago was that?
15   A. I don't remember.
16   Q. Okay.
17   A. Sorry.
18   Q. All right. Any other continuing education
19   since you took those classes at --
20   A. Your every two year upgrade, continuing ed.
21   Q. So you take some continuing ed --
22   A. Yes.
23   Q. -- in order to keep your license?
24   A. Yes.

---

**13**

1    MR. CASARINO: So I guess you gather from
2    that that he is also a real estate --
3    BY MS. GREEN:
4    Q. Do you actually have a real estate license?
5    A. Yes.
6    Q. Are you a broker?
7    A. No.
8    Q. So you are an agent?
9    A. Yes.
10   Q. And have you been employed by any particular
11   company as an agent?
12   A. RE/MAX Realty Group.
13   Q. And working for RE/MAX Realty Group, have
14   you worked with them as an actual employee?
15   A. No. I'm an agent with them. I'm not an
16   employee. They don't pay me. I just generate my own
17   funds.
18   Q. So you worked with RE/MAX, but not as an
19   employee? As an independent contractor?
20   A. An independent contractor, yes.
21   Q. Have you given any recorded or written
22   statements to anybody in connection with this particular
23   incident that we are involved with today?
24   A. No.

---

4  (Pages 10 to 13)

A-2

58

1    Q.   Who removed the original step that consists
2    of the large, flat pavers?
3        A.   I would probably say Baker, Terra Scapes.
4        Q.   Ronnie Baker, who you referred to earlier?
5        A.   Yes.
6        Q.   Okay. Do you know what the dimensions are
7    of the large, flat landscaping pavers that were used as
8    the step originally?
9        A.   I do not.
10       Q.   Okay. Did you receive a bill for the
11   removal of the original steps at building A?
12       A.   I don't recall. I'm sure if he did it, I
13   got one.
14       Q.   Okay. And you would have that in your
15   records, you think?
16       A.   I doubt it. I could. I don't know. I
17   could look. He did a lot of work for me, so I might
18   have told him he had to eat it. Who knows?
19       Q.   And it was your testimony that there was no
20   other proposal or contract entered into with Henlopen
21   Masonry, other than the one that has been attached as
22   Exhibit 2; is that right?
23       A.   No. George gave me a bill for the steps,
24   but it was a time and material job.

59

1    Q.   Okay. So just the invoice, that would be
2    the only thing you have?
3        A.   Right.
4        Q.   And there was no other contract entered into
5    with Terra Scapes in connection with the steps at
6    building A --
7        A.   No.
8        Q.   -- or the removal of the steps at building
9    A?
10       A.   No, ma'am.
11       Q.   Just, again, an invoice or maybe two
12   invoices?
13       A.   I would say that's probably correct.
14       Q.   Okay. And other than Terra Scapes and
15   Henlopen Masonry, there are no other contractors who
16   were involved in the construction of the porch or the
17   steps at building A and, in particular, unit 5 --
18       A.   No.
19       Q.   Is that right?
20       A.   Right, right. You are right, correct.
21       MS. GREEN: We will attach the Terra Scapes
22   packet of documents as Wayne Mitchell Exhibit 4, and I
23   think that will conclude my questioning.
24       (Wayne Mitchell Exhibit Number 4 was marked

60

1    for identification and attached to the record.)
2    BY MR. AKIN:
3        Q.   Just a few questions, sir. I represent
4    William Mitchell in this litigation. Are you related to
5    William Mitchell?
6        A.   Father.
7        Q.   Okay. Let me ask you some questions about
8    William Mitchell. Back when this accident occurred,
9    which I believe was June of '04 -- Is that correct,
10   Counsel?
11       MS. GREEN: Yes, June, I think, 27th.
12   BY MR. AKIN:
13       Q.   -- what was William Mitchell's employment,
14   if you know?
15       A.   B. J. just kind of -- he did the real estate
16   sales.
17       Q.   When you use the initials B. J., you are
18   referring to your son?
19       A.   That is my son, I'm sorry, William.
20       Q.   You said he was involved with sales. Sales
21   of what sort?
22       A.   The townhomes under RE/MAX.
23       Q.   So was he the sole agent for the selling of
24   Bella Vista units?

61

1        A.   Wayne Mitchell, you mean?
2        Q.   No. Was B. J. the sole agent for the
3    selling of the Bella Vista units?
4        A.   We did it together.
5        Q.   Okay. Did you have some sort of a business
6    relationship with your son?
7        A.   Yes. We are both RE/MAX agents.
8        Q.   Okay. So when this accident occurred in
9    June of '04, B. J. or William was a RE/MAX agent; is
10   that correct?
11       A.   Yes.
12       Q.   And was he also an independent contractor
13   rather than a full-time employee of RE/MAX?
14       A.   Yes.
15       Q.   Okay. All right. You've testified today at
16   some length about your involvement in securing an
17   architect, an engineer, and contractors to perform the
18   construction of the Bella Vista units. Was William
19   Mitchell involved in any way in the hiring of an
20   engineer for this project?
21       A.   No.
22       Q.   Was William Mitchell involved in any fashion
23   for the hiring of an architect for the project?
24       A.   No.

16  (Pages 58 to 61)

Fluck v. Bella Vista Development, LLC, et al.

**2**

1   APPEARANCES CONTINUED:
2       CASARINO, CHRISTMAS & SHALK
        BY: STEPHEN CASARINO, ESQUIRE
3       PO Box 1276
        Wilmington, Delaware 19899-1276
4       Attorney for Bella Vista Development, LLC.
5   THE LAW OFFICE OF CYNTHIA BEAM
        BY: CHARLES COATES, ESQUIRE
6       131 Continental Drive
        Suite 407
7       Newark, Delaware 19713
        Attorney for Defendant
8       Bella Vista Townhome Condominium Association.
9   FERRY, JOSEPH & PEARCE
        BY: ROBERT K. PEARCE, ESQUIRE
10      PO Box 1351
        Wilmington, Delaware 19899-1351
11      Attorney for Defendant RE/MAX Realty Group.
12  AKIN & HERRON
        BY: ROGER A. AKIN, ESQUIRE
13      PO Box 25047
        Wilmington, Delaware
14      Attorney for Defendant Wayne Mitchell.
15
16
17
18
19
20
21
22
23
24

**3**

```
1               WAYNE L. MITCHELL,
2       the witness herein, having first been
3       duly sworn on oath, was examined and
4       testified as follows:
5   BY MS. GREEN:
6       Q.  Okay. Mr. Mitchell, my name is Andrea
7   Green. I'm one of the attorneys handling this case for
8   the Plaintiff, Sandra Fluck.
9           Have you ever been deposed before?
10      A.  I do not believe so.
11      Q.  Okay. Now, you understand you have been
12  placed under oath, and the court reporter here is going
13  to take down all of your testimony.
14      A.  Yes.
15      Q.  Okay. So you understand that all of your
16  responses have to be verbal. You can't just nod your
17  head, shake your head, or things like that.
18      A.  Yes.
19      Q.  Okay. Good. I'm going to ask you some
20  questions about Bella Vista Townhomes, the development,
21  the plans, the building of this property. If I ask you
22  any question and you don't understand the question,
23  please let me know. If you answer the question that's
24  been asked, I'm going to assume that you understood it.
```

**4**

```
1   Fair enough?
2       A.  Yes.
3       Q.  Okay. I think in the deposition notice
4   there were some documents that were identified. Did you
5   bring anything in addition to what you have previously
6   produced?
7       A.  No.
8       Q.  Okay. Is that because you don't have
9   anything else? Everything else that you had was
10  produced when your attorney forwarded responses to the
11  Request for Production?
12      A.  Yes.
13      Q.  Okay. All right. Some personal
14  information: Can I have your home address?
15      A.  128 Glade Circle West, Rehoboth Beach,
16  Delaware 19971.
17      Q.  And your telephone number?
18      A.  302-381-0210.
19      Q.  What is your occupation?
20      A.  Self-employed real estate salesman and I
21  guess developer, if that's what you want to -- you know,
22  I get in business deals with different people.
23      Q.  Okay. And in that capacity as either a real
24  estate salesman or developer, do you operate under any
```

**5**

```
1   particular business name?
2       A.  Depending on what deal I'm in; I mean right
3   now, this one is Bella Vista, LLC.
4       Q.  Okay. What is your relationship with Bella
5   Vista, LLC?
6       A.  I'm one-third owner.
7       Q.  Who are the other owners?
8       A.  Manuel Serra.
9       Q.  Can you spell that last name?
10      A.  S-E-R-R-A, and Basilio Ciccio.
11      Q.  That's B-A-S-I-L-I-O?
12      A.  Right.
13      Q.  And how do you spell that last name?
14      A.  C-I-C-C-I-O, I think.
15      Q.  C-I-C-C-I-O?
16      A.  Yes.
17      Q.  Okay. And where do they live?
18      A.  Virginia.
19      Q.  Where in Virginia?
20      A.  I would have to look it up in my book. I'm
21  sorry. McLean, one lives in McLean, and the other lives
22  in -- I don't know. I mean when I phone them,
23  everything is all -- you just push the button.
24      Q.  So you have their phone numbers sort of on
```

9

1    Q.    Is there a particular crossroad where it can
2  be identified?
3    A.    Let me think of the name; Bay Vista Road on
4  Route 1.
5    Q.    Now, as of June of 2004, can you describe
6  what types of structures were in that development, what
7  type of housing?
8    A.    There were two six-unit buildings completed
9  and I think a third building under construction.
10    Q.    A third building under construction?
11    A.    Uh-huh.
12    Q.    So each building had six units; is that
13  correct?
14    A.    At that time, yes.
15    Q.    Can you describe the layout of the location,
16  as if when you were driving in?
17    A.    When you would drive in, you would come to a
18  driveway. And it had two buildings facing one another,
19  with a common driveway in between, I guess perpendicular
20  to where you are driving into. And then the main road
21  turns left, and you would go past those two buildings to
22  the next one.
23    Q.    Okay. In between the buildings, you said
24  there is a common area?

Anthony Reporting
302-674-8884

10

1    A.    A common drive area, a driveway.
2    Q.    What was that constructed of?
3    A.    Brick pavers.
4    Q.    Do you know who constructed the buildings on
5  the premises?
6    A.    Bella Vista, LLC is the developer and the
7  general contractors.
8    Q.    Are you familiar or do you have any
9  knowledge of any other contractors involved? Any
10  subcontractors?
11    A.    No.
12    Q.    Now, each of those buildings and units, did
13  they have steps leading up to the entrance?
14    A.    Some of the units.
15    Q.    Okay. Which units did?
16    A.    I know units 6, 5, 4, and 12.
17    Q.    The porches and the steps were completed?
18    A.    Uh-huh. The porches were completed in all
19  12 units. Those steps were only required in those
20  units.
21    Q.    When you are saying those steps, what are
22  you referring to?
23    A.    The block steps that were there, the stones.
24    Q.    And why were those block steps only required

Anthony Reporting
302-674-8884

11

1  in those units?
2    A.    From what I recall, due to the grade, how
3  the landscape was.
4    Q.    When you say grade, do you mean that the
5  sloppy or the, I guess, level from the ground up --
6    A.    I assume. I'm not familiar with all the
7  codes. But from what I know from building my own house,
8  you have to have a certain amount of inches per inch of
9  rise. And they were only required on certain units.
10    Q.    Do you know who placed those block steps?
11    A.    TerraScapes.
12    Q.    Was TerraScapes responsible, to your
13  knowledge, for the different landscaping that was there?
14    A.    Yes.
15    Q.    Is TerraScapes a company that does masonry,
16  to your knowledge?
17    A.    Not masonry that I know of.
18    Q.    Now, particularly, as of June of 2004, were
19  you involved in an open house that took place at Bella
20  Vista?
21    A.    Yes.
22    Q.    When was that open house first commenced?
23    A.    I don't recall the opening date.
24    Q.    Do you recall if it was in the summertime?

Anthony Reporting
302-674-8884

12

1    A.    Yes. We had been open in the summertime.
2  It could have been in the spring. I don't recall.
3    Q.    You don't recall the exact date --
4    A.    No, I don't.
5    Q.    -- that the premises are open to the public?
6    A.    No, I don't.
7        MR. AKIN: You are talking about the unit
8  which your client was touring that day?
9        MS. DONAHUE: Right.
10  BY MS. DONAHUE:
11    Q.    Do you recall which unit was held as an open
12  house --
13    A.    Unit 5.
14    Q.    Let me finish my question.
15    A.    I'm sorry.
16    Q.    -- as an open house on June 27, 2004?
17    A.    Unit five.
18    Q.    And it is your testimony you don't exactly
19  recall when that unit was first opened to the public?
20    A.    I don't recall the specific date.
21    Q.    Were you the only realtor that was holding
22  the open house at Bella Vista at that time?
23    A.    On that day.
24    Q.    On that day. What about the other days?

Anthony Reporting
302-674-8884

**13**

1   A.   Wayne Mitchell.

2   Q.   He's also a realtor with RE/MAX?

3   A.   Yes.

4   Q.   Now, who was the person or the entity that

5   gave you the okay, the authority to begin showing the

6   units to the public?

7   A.   Wayne Mitchell.

8   Q.   Are you related to Wayne Mitchell?

9   A.   Yes.

10  Q.   How are you related?

11  A.   He's my father.

12  Q.   Now, prior to the open house commencing, do

13  you have any knowledge as to whether Bella Vista had a

14  certificate of occupancy?

15  A.   Yes.

16  Q.   Did they?

17  A.   Yes.

18  Q.   Do you know if it was a temporary

19  certificate of occupancy?

20  A.   No.

21  Q.   You are not aware one way or the other?

22  A.   I'm not aware.

23  Q.   Okay. Were you present -- and this is prior

24  to the open house. Were you present for any inspections

Anthony Reporting

302-674-8884

**14**

1   that were done prior to getting the certificate of

2   occupancy?

3   A.   No, I was not.

4   Q.   Do you know if your father was?

5   A.   I don't know.

6   Q.   Do you have a copy of the certificate of

7   occupancy?

8   A.   I have a faxed copy.

9   Q.   Would you be willing to provide that to us?

10  A.   Yes.

11  Q.   Okay. Thank you. Now, going back for just

12  a moment -- and I apologize if I jump around -- do you

13  have any knowledge as to who prepared the blueprints for

14  the construction of this development?

15  A.   I know DC Group.

16  Q.   It's your understanding they were the

17  architects involved?

18  A.   That's my understanding.

19  Q.   Did you happen to review the plans or the

20  blueprints prior to the premises being opened?

21  A.   I don't know if I have reviewed them. I

22  looked at them, not to a -- I don't know how in depth I

23  looked at them.

24  Q.   Who did you look at them with?

Anthony Reporting

302-674-8884

**15**

1   A.   Wayne Mitchell.

2   Q.   Was Mr. Mitchell involved in the preparation

3   of the plans with the architects, to your knowledge?

4   A.   Yes.

5   Q.   Now, I'm also going back. I apologize. How

6   did RE/MAX become involved with this development? Was

7   there some sort of a listing agreement or contract

8   signed between RE/MAX and Bella Vista?

9   A.   It was a listing agreement.

10  Q.   What type of listing agreement was it?

11  A.   A residential listing agreement.

12  Q.   Do you have a copy of that in your files?

13  A.   No, I do not.

14  Q.   Were you involved in the preparation of the

15  listing agreement or the signing of it?

16  A.   No, I was not.

17  Q.   Do you know who was involved?

18  A.   Wayne Mitchell.

19       MS. ANTOFF: Jennifer, could I interrupt and

20  ask you to clarify? When Mr. Mitchell says Bella Vista,

21  are you referring to Bella Vista, LLC?

22       THE WITNESS: For?

23       MS. ANTOFF: Well, the last question was you

24  had a listing agreement with Bella Vista.

Anthony Reporting

302-674-8884

**16**

1        THE WITNESS: Bella Vista, LLC.

2        MS. ANTOFF: Thank you.

3   BY MS. DONAHUE:

4   Q.   Now, you previously testified that units 6,

5   5, 4, and 12 had those block steps, as you described

6   them.

7   A.   Uh-huh.

8        MR. AKIN: You have to say yes or no so that

9   she can accurately --

10       THE WITNESS: Yes.

11       MR. AKIN: -- record your testimony.

12       THE WITNESS: Yes, yes.

13  BY MS. DONAHUE:

14  Q.   And is it your recollection that TerraScapes

15  placed them there?

16  A.   Yes.

17  Q.   Do you know who requested them to place them

18  there?

19  A.   No.

20  Q.   How many of these block steps were in front

21  of each unit, to your knowledge?

22  A.   That was four. Oh, in front of each unit?

23  Q.   Yes.

24  A.   To my knowledge, three.

Anthony Reporting

302-674-8884

Fluck v. Bella Vista, et al.
3/16/07, Depo of William Mitchell
Case 1:06-cv-00188-GMS    Document 84    Filed 07/09/2007    Page 9 of 49

17

1   Q.   Okay.

2   A.   I'm sorry. I misunderstood the question.

3   Q.   Now, as of June of '04, which units were

4   open to the public? Was it --

5   A.   Just unit 5.

6   Q.   Okay. Now, did you keep some sort of a

7   register or some sort of a sheet for visitors that came

8   to the open house?

9   A.   Sign-in sheets, yes.

10   Q.   Do you have copies of those sign-in sheets?

11   A.   No.

12   Q.   So as of June 27, 2004, you don't have

13   copies of those sign-in sheets?

14   A.   I may have them somewhere. I just don't

15   have them with me now.

16   Q.   But if you were to look, you would be able

17   to find them?

18   A.   Hopefully, yes. I have moved several times

19   since then, so I would have to track them down.

20   Q.   That is fine. Now, during the time that you

21   were holding the open house, did other realtors in the

22   area come to view the open house?

23   A.   Yes.

24   Q.   Do you recall who they were?

Anthony Reporting
302-674-8884

18

1   A.   No.

2   Q.   When I say other realtors, I would also

3   include other realtors from other realty companies.

4   A.   Right.

5   Q.   I'm going to draw your attention

6   specifically to the date of June 27th of '04.

7   A.   Okay.

8   Q.   You were holding the open house that day at

9   Bella Vista?

10   A.   Yes.

11   Q.   Do you recall what time the open house

12   began?

13   A.   I don't recall the exact time. Typically, I

14   was open from ten to four.

15   Q.   Do you recall what time the Plaintiff

16   arrived that day?

17   A.   Not the exact time, but I'm pretty sure it

18   was between the hours of three and four.

19   Q.   And did she come alone?

20   A.   No.

21   Q.   Was she with one other person?

22   A.   Yes.

23   Q.   Where were you when she arrived at the

24   model?

Anthony Reporting
302-674-8884

19

1   A.   I was sitting at my desk.

2   Q.   So she actually opened the door?

3   A.   She opened the door, and I greeted them in

4   the foyer.

5   Q.   Did she enter the model first, or did the

6   other person she was with enter the model first?

7   A.   I don't recall.

8   Q.   That is fine. You say when she arrived, you

9   were in the foyer?

10   A.   I greeted them in the foyer. I was in the

11   back bedroom at the desk, and I heard the door open.

12   Q.   So if you are walking into the model, where

13   was your office located?

14   A.   Straight back, the second door on the right.

15   Q.   In your Request for Production, you actually

16   did provide a floor plan. Is this a floor plan from

17   unit 5 as of June 24th of '04?

18   A.   Yes.

19   Q.   Okay. So if you were to enter this unit and

20   walk straight back, your office was located --

21   A.   Yes.

22   Q.   -- to the right? To the right back bedroom?

23   A.   Correct.

24   Q.   Okay. And this unit had three floors?

Anthony Reporting
302-674-8884

20

1   A.   Yes.

2   Q.   Now, after you greeted Ms. Fluck and her

3   friend, what happened next?

4   A.   I began to show them around.

5   Q.   Did you show them each floor?

6   A.   Yes.

7   Q.   Was this model a decorated model?

8   A.   Yes.

9   Q.   So it was fully furnished?

10   A.   Yes.

11   Q.   When Ms. Fluck entered the model home, do

12   you recall her signing the register book?

13   A.   I don't recall.

14   Q.   You actually went to each floor with her and

15   her friend?

16   A.   Yes.

17   Q.   During that period of time, was there

18   conversation exchanged?

19   A.   Yes.

20   Q.   Do you recall what the content of the

21   conversations were?

22   A.   It was a pleasant conversation. One was

23   about the weather and that they were at the beach. And

24   then they proceeded to talk about how nice the unit was.

Anthony Reporting
302-674-8884

Fluck v. Bella Vista Development, LLC, et al.

78

1  models.
2      Q.  Did you ever work selling units at building
3  A?
4      A.  If you walked in on a Tuesday at 2:00, I
5  would talk to you, yeah. If you came in on Saturday,
6  you'd better see B. J.
7      Q.  So during the week, you are there?
8      A.  Uh-huh.
9      Q.  But weekends your son did that?
10     A.  Yes.
11     Q.  Okay. Is it fair to say that most of the
12  traffic was on weekends down at Rehoboth?
13     A.  Probably not; I think in the summertime, it
14  wasn't.
15     Q.  In the summertime, it wasn't?
16     A.  Was not.
17     Q.  Okay. How many days a week were you there
18  showing? Once you got the certificate of occupancy, how
19  many days a week would you be out there showing units?
20     A.  This is a bad answer, but I'll tell you;
21  when we felt like it. We wasn't sitting on a clock. I
22  mean we wasn't on -- we're not on a clock. He was on a
23  clock. I wasn't.
24     Q.  He was on a clock, because you had him on a

79

1  clock?
2      A.  Yeah. We normally opened from ten to --
3  Sundays, we didn't open at all in the summer, because
4  that was a bad day. It's the worst day of the week.
5      Q.  I think the certificate of occupancy shows
6  you had the CO, at least for unit 5, as of May 20th of
7  2004. Would that have been the first time you did any
8  showings after that?
9      A.  Yeah. You weren't allowed to be in the
10  units without a CO. Now, what happened on weekends when
11  we weren't there, I don't know. People would stick
12  their head in there. Trust me; you would have to -- We
13  posted signs everywhere, No Trespassing. But that
14  doesn't mean nothing.
15     Q.  So you think people would walk around? They
16  wouldn't actually go into the units?
17     A.  Oh, they probably tried to. I mean I don't
18  know.
19     Q.  Okay. Between May 20, 2004 and June 27th of
20  2004, do you know how many times you were out there
21  sitting as an agent, not doing any construction work on
22  any of the units, but how many times you were out there
23  actually as a RE/MAX agent?
24     A.  Every day.

80

1      Q.  Every day, weekday?
2      A.  I didn't sit there. But if I saw somebody
3  show up, I would say: Can I help you? I wasn't in the
4  office. I wasn't ever in the model unless I walked in
5  and was talking to B. J. about something.
6      Q.  Was B. J. there during the week?
7      A.  Yes.
8      Q.  Would it be fair to say that he did most of
9  the showing?
10     A.  Most definitely, yes.
11     Q.  But you were still involved in some of the
12  construction aspects?
13     A.  Yes, daily.
14         MS. GREEN: I don't have anything further.
15  BY MR. AKIN:
16     Q.  Just one or two. One thing I forgot to ask
17  you, with regard to B. J., during the time in question,
18  back in June of '04, did B. J. have any maintenance
19  responsibilities at Bella Vista?
20     A.  No.
21     Q.  Did you have some employee or independent
22  contractor who was responsible for maintaining the site?
23     A.  Yes.
24     Q.  Who was that?

81

1      A.  Busy Bees.
2      Q.  What sorts of things did they do at Bella
3  Vista?
4      A.  He took care of cutting the grass, took care
5  of the mulching. He would, you know, take a blower and
6  blow off all the walkways and stuff. But he did that
7  from the condominium stuff. The condominium didn't pay
8  for anything. We took care of the first year until we
9  really got started.
10     Q.  So one of their jobs was to clean up if they
11  saw clutter or litter or something on the site?
12     A.  Yes. He would be there about three days a
13  week, looking around.
14     Q.  I think I know your answer to this question,
15  but I will ask it anyway. Did B. J. have any ownership
16  interest in the LLC?
17     A.  Zero, no.
18     Q.  You indicated, in response to an earlier
19  question, that B. J. did or still has some role in the
20  condominium association of Bella Vista.
21     A.  He's a member.
22     Q.  By being a member, do you mean he owns a
23  unit there?
24     A.  No. When you open up a condominium

21  (Pages 78 to 81)

A-7

Fluck v. Bella Vista Development, LLC, et al.

42

1    units at building A?
2        A.   No, I don't believe.  Let me read it.
3        Q.   Okay.
4        A.   No.
5        Q.   Okay.  So at the time you were bidding out
6    the subcontracts for this development, you were not
7    seeking anything from Terra Scapes at that point for the
8    steps?
9        A.   No.
10       Q.   Okay.  Can you just describe in lay terms
11   what it was that you were having Terra Scapes bid on?
12       A.   The pavers.
13       Q.   Okay.  The pavers forming the ground
14   surface?
15       A.   The ground surface.
16       Q.   To make it look like the cobblestones that
17   you were talking about earlier?
18       A.   Sod, retaining walls, containers, mulch,
19   grading, irrigation, everything like that.
20       Q.   So basically, landscaping and laying the
21   pavers to make it look like the cobblestones?
22       A.   Yes.
23       Q.   Okay.  The final item in that packet is an
24   invoice from Terra Scapes.  And it's an invoice dated

43

1    11/24/2004, and the description is labor for relay
2    pavers around new conc. stoops, C-O-N-C stoops.  Can you
3    explain what that was?
4        A.   When we took those out, when I got the bill
5    for the steps from them, it was just too high.  And that
6    was to put the pavers back around the new steps.
7        Q.   Okay.  Back up a little bit.  When you got
8    the bill from them for doing what?
9        A.   Putting in my steps, the paver steps for the
10   first building, putting in four sets.
11       Q.   When you say the first building, you are
12   talking about building A?
13       A.   Building A.  When we received the bill —
14   because there was never a bid on it.  It was an extra.
15   I said: We can't afford you boys.  We put the concrete
16   steps in, and that was for putting the pavers back in
17   around the concrete steps.
18       Q.   Okay.  When was it that you decided to have
19   the — Back up just a minute.  In these photographs that
20   we were looking at, we were looking at these large, flat
21   landscaping pavers.
22       A.   Yes.
23       Q.   When was it decided to place these as the
24   step instead of the poured concrete step?

44

1        A.   I'm not sure of the date; before we got our
2    CO, because it had to be done before the CO.  So if you
3    have a date before the CO, it was probably done a couple
4    of weeks before that.
5        Q.   Okay.  And are you saying that there was
6    never anything in writing about having them do that
7    work?
8        A.   No.  We were out there in the yard.  And we
9    decided: Let's do those.  They would look a lot better.
10       Q.   Who was out there in the yard?
11       A.   Me, a guy from Terra Scapes, Ronnie Baker.
12       Q.   Who is Ronnie Baker?
13       A.   Terra Scapes.
14       Q.   So he is the guy that you were referring to
15   from Terra Scapes?
16       A.   Yes.
17       Q.   And who else?
18       A.   I know I was there.  I know Ronnie was
19   there, and after that, probably six or seven guys that
20   worked for him.  I don't know who they were.  I have no
21   clue.
22       Q.   Okay.  So you were out there and talking to
23   him about what?  Are we going to put in a poured
24   concrete step?

45

1        A.   When we needed an elevation, we needed a
2    step, and we decided that was the kind of step we were
3    going to put in.
4        Q.   Okay.  Did somebody tell you you needed a
5    step, or you knew it?
6        A.   You know it by code.
7        Q.   Because what was the problem?
8        A.   It was more than probably seven and a
9    quarter inches.  I think it was seven and a quarter.
10   Don't hold me to the seven and a quarter.  I'm pretty
11   sure that's what it is.
12       Q.   Okay.  So your recollection is if it's over
13   seven and a quarter inches from the ground —
14       A.   From the ground step.
15       Q.   — from the ground surface up to the surface
16   of the porch —
17       A.   You'd never pass code.
18       Q.   Okay.  So you knew because of the
19   measurement that you needed some type of a step there?
20       A.   Yes.
21       Q.   Okay.
22       A.   Some units required it; some units did not.
23       Q.   Okay.  Because of the grade of the ground?
24       A.   Yes.

12  (Pages 42 to 45)

A-8

34

Q.    And then tell us in your words about your

stepping out of the unit, what happened?

A.    I stepped, with my left foot I stepped on the

intermediate step and when my right foot went down,

there was no step there, and that foot went down to the

pavers and I fell.  It caused me to lose my balance, I

guess, and I fell.

Q.    So that I have this correct, you walked across

the concrete little patio that was just outside the

front door --

A.    Yes.

Q.    -- and then you stepped down to that

intermediate step with your left foot?

A.    Yes.

Q.    And then your right foot went where?

A.    My right foot went down to the ground level.

Q.    What happened after that point?

A.    I fell.

Q.    What is it that caused you to fall?

A.    The fact that my right foot didn't go onto the

step, it went down further, which caused an unbalance,

an imbalance.  And I fell.

Q.    But your left foot did first, was first placed

on that intermediate step --

22

1    throughout the year.

2        Q.    In high season, what's the approximate weekly

3    rental fee for the Eagles Landing property?

4        A.    I believe it goes from 750 to 1200 during

5    summer.

6        Q.    Again, I think the date of the accident

7    alleged in this case is June 27, '04.

8                Do you remember what day of the week

9    that was?

10       A.    It was Sunday.

11       Q.    At some point in time, I assume you had

12   decided to go over to see the Bella Vista property; is

13   that correct?

14       A.    That's correct.

15       Q.    When did you make that decision?

16       A.    We were driving back to our condo that

17   afternoon, and we saw there was an open house flag out

18   front of the condominium so we just decided to go in.

19   We hadn't planned on it.  We just decided right then

20   and there.

21       Q.    The open house flag that you observed, was

22   that inside the Bella Vista property or was that out on

23   the road where the entrance to the development is?  Do

24   you understand my question?

23

1    A.    Well, the entrance is right at the road.

2    There is just a small driveway from the road to the

3    condos and it was somewhere -- I can't tell you exactly

4    where it was.

5    Q.    But it was visible to you as --

6    A.    It was visible from the road.

7    Q.    What is the name of that road going west off

8    of Route 1 there?  Is it Baya Vista, does that ring a

9    bell?

10   A.    Baya Vista, yes.

11   Q.    So this open house flag was out near Baya

12   Vista Road?

13   A.    Yes.

14   Q.    Could you describe the flag for us?

15   A.    I just remember seeing a flag that said

16   "open."

17   Q.    Approximately what time of the day did you see

18   that flag?

19   A.    It was about three o'clock in the afternoon.

20   Q.    Where had you been that day?

21   A.    We had been -- I can't recall specifically.

22   It was a nice day, so we might have been at the beach

23   for a while, we might have been shopping.  I honestly

24   don't know.

A-10

# Robson Forensic
INCORPORATED

April 30, 2007


Andrea G. Green, Esq.
Doroshow Pasquale Krawitz & Bhaya
213 E. Dupont Highway
Millsboro, DE 19966
VIA FAX: 302 934 8400


Re:    Sandra Fluck fall

Dear Attorney Green:

On June 27, 2004 Sandra Fluck was viewing a model home at the Bella Vista Townhome and Condominium development in Rehoboth Beach, Delaware. While exiting, she fell at the edge of the unit's exterior stair to grade, and she was injured. You asked that I determine if the building conditions were dangerous in a manner that caused Fluck's fall. I've reviewed the Amended Complaint, Sandra Fluck's deposition and photographs of the area. I understand additional material, including the deposition of the builder, will be gathered in the future. After reviewing that material, I may supplement this report.


## BACKGROUND

The front door of the model unit exited onto a concrete platform which is substantially level with the interior floor level. The platform was raised about 9" above grade and it served as the top landing of the egress stair connecting the unit to grade. When Fluck visited this model, the condominium project was still under construction. The exterior stair had not been completed, and while the model was being shown, three landscaping blocks had been placed to create a temporary two-riser stair down to grade.

Two columns flank the outer edge of the platform and define the landing width. Only three 14" wide landscaping blocks were placed, and the temporary stair was much shorter than the platform edge between the columns. The gap along the right edge was about 24" wide. There were no handrails at the stair nor were there any rails, guards, planters or other means to define and protect the parts of the platform edge where there was no stair.

Fluck was 57 years old and in good health. The weather was nice, and she was wearing shorts, a top and boat shoe loafers. She and her companion saw a sign advertising the open model and spent about 20 minutes viewing the unit. As they exited, her companion preceded her and walked across the landing and down the stair. Fluck then walked across the platform and, believing the stair extended the full width of the platform edge, she descended to the right of the

354 North Prince Street
Lancaster, PA 17603
Phone: 717.293.9050
Toll-Free: 800.813.6736
Fax: 717.293.1195
www.robsonforensic.com

A-11

platform's center. She stepped down the first riser with her left foot onto the stair tread. She intended to step down to the same tread with her right foot; however the stair didn't extend far enough. Her right foot came down unsupported, and she lost her balance. There were no handrails and she was unable to recover her balance. She fell, twisting her left foot and she was injured.

## DISCUSSION

Fluck fell because conditions at the platform led her to believe the stair was the same width as the platform edge, but it was much narrower. There were no rails, planters or other devices placed to delineate the actual safe exit width. The stair lacked handrails which, had they been present, would have unambiguously delineated the safe width of egress and would also have provided Fluck with a means to maintain her balance and avoid falling.

Short flight stairs such as the one where Fluck fell are associated with increased falls because their low height impairs the ability of users to reliably identify their presence and nature. ASTM/ANSI F1637, Standard Practice for Safe Walking Surfaces, is a nationally accepted practice for fall prevention. F1637 directs that stairs with three or fewer risers "shall be avoided where possible" and:

> In situations where a short flight stair or single step transition exists or cannot be avoided, obvious visual cues shall be provided to facilitate improved step identification. Handrails, delineated nosing edges, tactile cues, warning signs, contrast in surface colors, and accent lighting are examples of some appropriate warning cues.

In cases where owners rely on color to delineate tripping hazards, F1637 guides them to follow the national standard ANSI-Z535.1, Safety Color Coding. Z535 identifies safety yellow as the national standard color for identifying tripping hazards. There were no yellow markings where Fluck fell.

Handrails act as necessary safety equipment at stairs, and rails should have been installed at this stair. Rails delineate the location, boundaries and character of a stair, assist users to descend safely and also act as a grab bar to assist users to recover their balance when needed. Since 1978, the Consumer Product Safety Commission's Guidelines for Stair Safety cautioned:

| IF: | there are no handrails on one or both sides of an interior or exterior flight of stairs, or: |
|---|---|
| THEN: | install a properly positioned guardrail, with an attached handrail, for the entire length of the flight. |

Bella Vista's model was an attached single-family townhome. The National Life Safety Code, NFPA-101 is a nationally accepted standard that includes requirements for one and two-family dwellings. This stair was required to conform to:

A-12

Stairs and intermediate landings shall continue with no decrease in width along the direction of egress travel (7-2.2.3.2)

Stairs and ramps shall have handrails on both sides (7.2.2.4.2)

The International Residential Code for One and Two-Family Dwellings is a well established national safety standard for the design and construction of single family residences. It is also adopted by Sussex County. Section 315, Handrails, required:

Handrails... shall be provided on at least one side of stairways. All required handrails shall be continuous the full length of the stairs with two or more risers from a point directly above the top riser of a flight to a point directly above the lowest riser of a flight (R315.1).

## FINDINGS

Within the bounds of reasonable architectural certainty, and subject to change if additional information becomes available, it is my professional opinion that this stair violated applicable standards, and created a deceptive and dangerous condition that caused Fluck's fall.

If you require anything else, please let me know.

Lawrence C. Dinoff, A.I.A.

A-13

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

SANDRA E. FLUCK, an individual,                     :     **C.A. No.: 06-188-GMS**

Plaintiff,                                          :

v.                                                  :     **JURY DEMAND OF SIX**

BELLA VISTA DEVELOPMENT, LLC, a                     :
Virginia corporation, BELLA VISTA                   :
TOWNHOME CONDOMINIUM                                :
ASSOCIATION, INC., a Delaware                       :
corporation, RE/MAX REALTY GROUP, a                 :
Delaware franchise, WILLIAM J.                      :
MITCHELL, individually, and WAYNE
MITCHELL, individually,

Defendants.



## AMENDED COMPLAINT

### PARTIES

1.      Plaintiff Sandra Fluck is an individual who resides at 1421 Nectarine Road,

Danielsville, Pennsylvania 18038.

2.      Defendant Bella Vista Development, LLC (hereinafter referred to as "Bella Vista

Development"), is a foreign corporation, whose registered agent is Manuel G. Serra, 1307

Vincent Place, McLean, Virginia 22101.  [PLAINTIFFS DEMAND THAT DEFENDANT,

BELLA VISTA DEVELOPMENT, DENY THE ALLEGATIONS CONTAINED IN THIS

PARAGRAPH, IF UNTRUE, BY AFFIDAVIT IN ACCORDANCE WITH PROVISIONS OF

10 DEL. C. §3915].

3.      Defendant Bella Vista Townhome Condominium Association, Inc. (hereinafter

referred to as "Bella Vista TCA"), is a Delaware corporation, whose registered agent is Dover

Delaware Incorporators, c/o Brandon Jones, Esquire, 309 Rehoboth Avenue, P.O. Box P,

Rehoboth Beach, Delaware 19971. [PLAINTIFFS DEMAND THAT THE DEFENDANT,

BELLA VISTA TOWNHOME CONDOMINIUM ASSOCIATION, INC., DENY THE

Doroshow, Pasquale,
Krawitz & Bhaya
213 E. Dupont Highway
Millsboro, Delaware 19966
302-934-9400

A-14

ALLEGATIONS CONTAINED IN THIS PARAGRAPH IF UNTRUE, BY AFFIDAVIT IN

ACCORDANCE WITH THE PROVISIONS OF 10 <u>Del. C.</u> §3915.]

4.     Defendant RE/MAX Realty Group (hereinafter referred to as "RE/MAX Realty")

is a Delaware franchise located at 317 Rehoboth Avenue, Rehoboth Beach, Delaware 19971.

[PLAINTIFFS DEMAND THAT DEFENDANT, RE/MAX REALTY GROUP, DENY THE

ALLEGATIONS CONTAINED IN THIS PARAGRAPH, IF UNTRUE, BY AFFIDAVIT IN

ACCORDANCE WITH PROVISIONS OF 10 <u>DEL. C.</u> §3915].

5.     Defendant William J. Mitchell is the managing agent for RE/MAX Realty Group

located at 317 Rehoboth Avenue, Rehoboth Beach, Delaware 19971.

6.     Defendant Wayne Mitchell is the contractor and/or builder of the Bella Vista

Development, and an agent for RE/MAX Realty Group, whose business address is at 317

Rehoboth Avenue, Rehoboth Beach, Delaware 19971.

## JURISDICTION

7.     Paragraphs 1 through 6 are incorporated by reference.

8.     Jurisdiction is conferred pursuant to 28 U.S.C. §1332(a)(1) and § 1332(c)(1) as

the amount in controversy exceeds $75,000.00 and the action is between citizens of different

states.  Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), as this is the judicial

district in which a substantial part of the events or omissions giving rise to this claim occurred.

## FACTUAL ALLEGATIONS

9,     Paragraphs 1 through 8 are incorporated by reference.

10.     On June 27, 2004, at approximately 3:00 p.m., Plaintiff Fluck was a business

invitee at an "open house" located at the Bella Vista Townhome and Condominium development

in Rehoboth Beach, Delaware, which was constructed by Defendant Wayne Mitchell.

11.     At the aforesaid date and place, the "open house" was organized and/or managed

by Defendant RE/MAX Realty, through their managing agent, Defendant William J. Mitchell.

12.     At the aforesaid date and place, as Plaintiff Fluck exited one of the model

A-15

condominium units, she fell on defective concrete steps.

13.    At all times relevant, Defendant Wayne Mitchell, Defendant Bella Vista Development, Defendant Bella Vista TCA, Defendant RE/MAX Realty and Defendant Mitchell, were the owners, contractors, operators, and/or managers of the premises where the incident in question occurred.

14.    The direct and proximate cause of the aforesaid accident was the negligence of the aforementioned Defendants.

## COUNT I
## CLAIM AGAINST BELLA VISTA DEVELOPMENT, LLC

15.    Paragraphs 1 through 14 are incorporated by reference.

16.    Defendant Bella Vista Development, as the owner, operator, and/or manager of the premises in question, is liable for the injuries to Plaintiff Fluck, as they have a duty to maintain areas of the premises ordinarily used by customers in a reasonably safe condition for their use.

17.    The direct and proximate cause of the accident was the negligence of Defendant Bella Vista Development as follows:

(a)    They created and/or permitted a dangerous condition to exist, which Defendant knew or should have known, created an unreasonable risk of harm to others, including Plaintiff Fluck;

(b)    They improperly maintained the premises, which Defendant knew or should have known, would create an unreasonable risk of physical harm to others, including Plaintiff Fluck;

(c)    They failed to take reasonable actions to make safe the hazardous condition on their premises, namely the defective steps;

(d)    They failed to take adequate steps to prevent the dangerous condition then existing on their premises;

A-16

(e)    They failed to warn Plaintiff Fluck of the dangerous condition then existing on the premises;

(f)    They failed to properly inspect the premises before allowing individuals, including Plaintiff Fluck, to use it;

(g)    They were otherwise negligent in that they failed to fulfill their duty to protect individuals while on a premises under their control, including Plaintiff Fluck, from dangerous conditions;

(h)    They permitted a dangerous condition to exist in an area where Defendant knew or should have known individuals would be walking;

(i)    They were otherwise negligent.

## COUNT II
## CLAIM AGAINST BELLA VISTA CONDOMINIUM
## AND TOWNHOME ASSOCIATION

18.    Paragraphs 1 through 17 are incorporated by reference.

19.    Defendant Bella Vista TCA, as the owner, operator, and/or manager of the premises in question, is liable for the injuries to Plaintiff Fluck, as they have a duty to maintain areas of the premises ordinarily used by customers in a reasonably safe condition for their use.

20.    The direct and proximate cause of the accident was the negligence of Defendant Bella Vista Development as follows:

(a)    They created and/or permitted a dangerous condition to exist, which Defendant knew or should have known, created an unreasonable risk of harm to others, including Plaintiff Fluck;

(b)    They improperly maintained the premises, which Defendant knew or should have known, would create an unreasonable risk of physical harm to others, including Plaintiff Fluck;

Doroshow, Pasquale,
Krawitz & Bhaya
213 E. Dupont Highway
Millsboro, Delaware 19966
302-934-9400

A-17

(c)    They failed to take reasonable actions to make safe the hazardous condition on their premises, namely the defective steps;

(d)    They failed to take adequate steps to prevent the dangerous condition then existing on their premises;

(e)    They failed to warn Plaintiff Fluck of the dangerous condition then existing on the premises;

(g)    They failed to properly inspect the premises before allowing individuals, including Plaintiff Fluck, to use it;

(g)    They were otherwise negligent in that they failed to fulfill their duty to protect individuals while on a premises under their control, including Plaintiff Fluck, from dangerous conditions;

(h)    They permitted a dangerous condition to exist in an area where Defendant knew or should have known individuals would be walking;

(i)    They were otherwise negligent.

## COUNT III
## CLAIM AGAINST WILLIAM J. MITCHELL

21.    Paragraphs 1 through 20 are incorporated by reference.

22.    Defendant William J. Mitchell, as the managing agent of the premises in question, is liable for the injuries to Plaintiff Fluck, as he has a duty to maintain areas of the premises ordinarily used by customers in a reasonably safe condition for their use.

23.    The direct and proximate cause of the accident was the negligence of Defendant Mitchell as follows:

(a)    He permitted a dangerous condition to exist, which Defendant knew or should have known, created an unreasonable risk of harm to others, including Plaintiff Fluck;

Doroshow, Pasquale,
Krawitz & Bhaya
213 E. Dupont Highway
Millsboro, Delaware 19966
302-934-9400

A - 18

(b)     He improperly maintained the premises, which Defendant knew or should have known, would create an unreasonable risk of physical harm to others, including Plaintiff Fluck;

(c)     He failed to take reasonable actions to make safe the hazardous condition on the premises, namely the defective steps;

(d)     He failed to take adequate steps to prevent the dangerous condition then existing on the premises;

(e)     He failed to warn Plaintiff Fluck of the dangerous condition then existing on the premises;

(h)     He failed to properly inspect the premises before allowing individuals, including Plaintiff Fluck, to use it;

(g)     He was otherwise negligent in that he failed to fulfill his duty to protect individuals while on a premises under his control, including Plaintiff Fluck, from dangerous conditions;

(h)     He permitted a dangerous condition to exist in an area where Defendant knew or should have known individuals would be walking;

(i)     He was otherwise negligent.

## COUNT IV
## CLAIM AGAINST RE/MAX REALTY GROUP

24.     Paragraphs 1 through 23 are incorporated by reference.

25.     At all times relevant to this litigation, William J. Mitchell was the agent, servant, and/or employee of Defendant RE/MAX Realty Group. [DENIAL OF THIS ALLEGATION BY THE DEFENDANT MUST BE MADE BY AFFIDAVIT, PURSUANT TO 10 DEL. C. §3116.]

26.     Defendant RE/MAX Realty is vicariously liable for the negligent acts of its agent, servant and/or employee.

Dorushow, Pasquale, Krawitz & Bhaya
213 E. Dupont Highway
Millsboro, Delaware 19966
302-934-9400

A-19

27.     The proximate cause of the aforesaid incident was the negligence of Defendant RE/MAX Realty by permitting William J. Mitchell, whom it knew or should have known, would maintain a dangerous condition on said premises likely to cause injuries to third persons, thereby acting in a manner which constituted willful and wanton disregard for the safety of others, including Plaintiff Fluck.

**COUNT V**
**CLAIM AGAINST WAYNE MITCHELL**

28.     Paragraphs 1 through 27 are incorporated by reference.

29.     Defendant Wayne Mitchell as the builder and/or contractor of the the premises in question, is liable for the injuries to Plaintiff Fluck, as he has a duty to build and/or construct the premises in a reasonably safe condition for the customer's use.

30.     The direct and proximate cause of the accident was the negligence of Defendant Wayne Mitchell as follows:

(a)     He constructed a dangerous condition, which Defendant knew or should have known, created an unreasonable risk of harm to others, including Plaintiff Fluck;

(b)     He improperly maintained the premises, which Defendant knew or should have known, would create an unreasonable risk of physical harm to others, including Plaintiff Fluck;

(c)     He failed to take reasonable actions to make safe the hazardous condition on the premises, namely the defective steps;

(d)     He failed to take adequate steps to prevent the dangerous condition then existing on the premises;

(e)     He failed to warn Plaintiff Fluck of the dangerous condition then existing on the premises;

(i)     He failed to properly inspect the premises before allowing individuals, including Plaintiff Fluck, to use it;

Dorsshow, Pasquale, Krawitz & Bhaya
213 E. Dupont Highway
Millsboro, Delaware 19966
302-934-9400

A-20

(g)   He was otherwise negligent in that he failed to fulfill his duty to protect individuals while on a premises under his control, including Plaintiff Fluck, from dangerous conditions;

(h)   He permitted a dangerous condition to exist in an area where Defendant knew or should have known individuals would be walking;

(i)   He was otherwise negligent.

## COUNT VI
## CLAIM OF SANDRA E. FLUCK

31.   Paragraphs 1 through 30 are incorporated by reference.

32.   As a direct and proximate result of Defendants' negligence, Plaintiff Fluck suffered severe personal injuries both of a temporary and permanent nature including, but not limited to: trimalleolar (three) fractures of the left ankle resulting in widening of the ankle mortise and a plantar spur; open reduction and internal fixation of the mediolateral malleolus of her left ankle utilizing a 6-hole 1/3 tibial plate with two 4 mm screws; severe pain and swelling of the left ankle; substantial weakness and limited range of motion of the left ankle; persistent pain in the left ankle; and right mid-foot sprain.

33.   As a consequence of her injuries, Plaintiff Fluck has been required to undergo prolonged medical treatment including, but not limited to: emergency medical care; medical examinations; diagnostic testing; surgery of the left ankle; hospitalization; cast immobilization; extensive physical therapy; restriction of her daily activities; work restrictions; and medication for pain management.

34.   As a further result of Defendants' negligence, Plaintiff Fluck has experienced, continues to experience, and is likely to experience in the future substantial physical pain, suffering, and discomfort, including future surgery for hardware removal.

Doroshow, Pasquale,
Krawitz & Bhaya
213 E. Dupont Highway
Millsboro, Delaware 19966
302-934-9400

A-21

35.     As a further result of her injuries, Plaintiff Fluck has experienced, continues to experience, and is likely to experience in the future emotional pain, suffering, anxiety, nervousness, and difficulty sleeping.

36.     As a further consequence of Defendants' negligence, Plaintiff Fluck has incurred, and may in the future continue to incur, medical bills for the treatment of the injuries sustained in the fall.

37.     As a further consequence of her injuries, Plaintiff Fluck has suffered a loss of earnings and may in the future suffer a loss of earnings and impairment of earning capacity.

WHEREFORE, Plaintiff Sandra E. Fluck, respectfully requests that this Court enter judgment against the Defendant Wayne Mitchell, Defendant Bella Vista Development, LLC, Defendant Bella Vista Townhome Condominium, Inc., Defendant RE/MAX Realty Group and Defendant William J. Mitchell, jointly and severally, for compensatory damages, punitive damages and special damages, and the cost of this action, along with any additional relief that this Court may deem proper.

DOROSHOW, PASQUALE,
KRAWITZ & BHAYA

BY: _____
ANDREA G. GREEN, ESQUIRE
Attorney I.D. No.: 2487
JENNIFER S. DONAHUE, ESQUIRE
Attorney I.D. No.: 4700
213 East Dupont Highway
Millsboro, DE 19966
(302) 934-9400
Attorneys for Plaintiff

Doroshow, Pasquale,
Krawitz & Bhaya
213 E. Dupont Highway
Millsboro, Delaware 19966
302-934-9400

DATED: 6/14/06

A-22

Not Reported in F.Supp.2d, 2003 WL 279561 (D.Del.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.
United States District Court,
D. Delaware.
ISCO INTERNATIONAL, INC., Plaintiff
v.
CONDUCTUS, INC., and Superconductor Technologies, Inc., Defendants.
No. C.A. 01-487 GMS.
Feb. 10, 2003.

*MEMORANDUM AND ORDER*

SLEET, J.
I. INTRODUCTION

*1 The plaintiff, ISCO International, Inc. ("ISCO"), filed the above-captioned suit against Conductus, Inc. ("Conductus") and Superconductor Technologies, Inc. ("STI") (collectively "the defendants") on July 17, 2001. In its complaint, ISCO alleges that Conductus and STI are infringing U.S. Patent No. 6,263,215 ("the '215 patent"). Presently before the court is STI's Motion for Summary Judgment of Invalidity of the '215 patent (D.I.212). For the reasons that follow, the court will deny the motion.

II. STANDARD OF REVIEW

Summary judgment is appropriate in patent suits as in other civil actions. *Rains v. Cascade Industries, Inc.,* 402 F.2d 241, 244 (3d. Cir.1968). The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Boyle v. County of Allegheny Pa.,* 139 F.3d 386, 392 (3d Cir.1998). Thus, summary judgment is appropriate only if the moving party shows there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *Boyle,* 139 F.3d at 392. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields,* 178 F.3d 170, 173-74 (3d Cir.1999).

When a party challenges a patent's validity, the court begins with the statutory presumption of validity. 35 U.S.C. § 282 ("A patent shall be presumed valid."). Accordingly, "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." *Id.* Invalidity must be shown by clear and convincing evidence. *Robotic Vision Sys., Inc. v. View Eng'g, Inc.,* 189 F.3d 1370, 1377 (Fed.Cir.1999). This evidentiary standard is relevant in the context of a motion for

A-23

summary judgment because "the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson,* 477 U.S. at 254. As the Court elaborated,

[W]here the ... 'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns [a material issue] ... the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the [movant] has shown [that material issue] by clear and convincing evidence or that the [movant] has not.

*2 *Id.* at 255-56. Thus, STI must show that there is no genuine issue as to any material fact that is necessary for a finding, by clear and convincing evidence, of invalidity. If STI makes such a showing, ISCO may withstand summary judgment by adducing "specific facts" sufficient to create a genuine issue of material fact as to an essential element of STI's defense of invalidity. FED. R. CIV. P. 56(e); *see also Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers Locan Union 42 v. Absolute Envtl. Serv., Inc., et al.,* 814 F.Supp. 392, 401-02 (D.Del.1993) (explaining summary judgment standard and burdens).

With these standards in mind, the court will describe the facts that led to the motion presently before the court.

III. BACKGROUND

The invention of the '215 patent is a "receiver front end" for receiving telecommunications signals. A receiver front end is a system including filters that transmit certain signals and attenuate others, and amplifiers, which strengthen the desired signals. Telecommunications systems divide geographic areas into "cells," each of which is supported by a base station. Each base station has preassigned radio frequency (RF) carriers for the communication channels. Wireless signals from mobile telephones arrive at these base stations, which monitor and process the incoming signals. For various reasons including safety concerns and conservation of battery power, mobile telephones transmit signals at limited power. Therefore, the signals arriving at the base stations tend to be weak, causing the cell to become "reverse link limited." Most of the known solutions to this problem are unappealing or impractical. At the same time, additional demand by mobile telephone users requires more and more frequency channels and base stations. Thus, there was a need for base station front end receivers with increased sensitivity to incoming signals (by limiting losses and noise generated in the base station receiver) and selectivity (to allow more channels to be accommodated). The invention at hand purports to meet these needs.

As the patent specification provides, the receiver front end itself includes:

(1) a plurality of filtering means for spectrally filtering a plurality of RF signals to form a plurality of filtered RF signals; (2) a plurality of amplifying means, in communication with the plurality of filtering means, for amplifying the plurality of filtered RF signals;

A -24

and (3) cooling means for cryogenically cooling the filtering means and the amplifying means.... At least one of the plurality of filtering means and plurality of amplifying means comprises a superconducting material.... Switching means can be used to bypass the RF signal around the receiver front end in the event of malfunction of [the] receiver front end. Monitoring means for monitoring remotely the operation of the various components of the receiver front end can be used to activate the switching means.

*3 (B 372, '215 col. 2, lns. 49-65, B 374, '215 col. 5, ln. 65 to col. 6, ln. 3). The invention is discussed in more detail below in the context of STI's various challenges to the patent.

## IV. DISCUSSION

ISCO alleges that the defendants are infringing Claims 10, 12 through 17, and 19 of the patent-in-suit. Of these, only claim 10 is an independent claim. STI first asserts that claim 10 is not entitled to the filing date of provisional application no. 60/002065 ("the '065 application") because that application does not satisfy the written description requirement. In addition, STI alleges that the '215 patent is invalid for lack of enablement, anticipation by prior art, obviousness, and indefiniteness. The court will address each of these issues in turn.

### A. Provisional Application '065

STI argues that the patent-in-suit is not entitled to the effective filing date of the provisional '065 application. Per 35 U.S.C. § 120,[FN1] a patent application is entitled to the effective filing date of an earlier-filed application if the earlier-filed application meets the written description requirement of 35 U.S.C. § 112. *In re Huston,* 308 F.3d 1267, *20-21 (Fed.Cir.2002) (quoting *Lockwood v. Am. Airlines Inc.,* 107 F.3d 1565, 1571 (Fed.Cir.1997)). To satisfy the written description requirement, the patent specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same...." 35 U.S.C. § 112. The policy of the requirement "is to prevent overreaching and *post hoc* claims that were not part of the original invention." *Purdue Pharma, L.P. v. F.H. Faulding & Co.,* 48 F.Supp.2d 420, 427 (D.Del.1999), *aff'd,* 230 F.3d 1320 (Fed.Cir.2000). Accordingly, if claims in the later-filed application were sufficiently described in the earlier-filed application, the later application is entitled to the filing date of its parent application. FN1. The statute reads, in relevant part:

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States ... which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application....

35 U.S.C. § 120.
STI contends the '215 application is not entitled to the earlier filing date of the '065 application because the '065 application fails to provide a written description of a "switched bypass circuit around the receiver front end," a required element of claim 10 of the '215 patent. The '065 application describes only a single switch within the cold space,

A-25

STI argues, and not a switched bypass circuit around the receiver front end, *i.e.,* a bypass circuit located outside of the cold space. Therefore, the '065 application fails to provide a written description of the invention as later claimed in the '215 application.

ISCO responds that the '065 application describes a switched bypass circuit relative to its function of bypassing the cryoelectronic receiver front end circuitry, with no restriction on the bypass circuit's location. For example, the '065 application states: "[T]he invention can include a switching device to permit the RF signal received by the antenna to bypass the cryoelectronic receiver circuitry module(s) in the cryoelectronic receiver front end and thereby avoid loss of the antenna structure(s) connected to the module(s) .... " '065 provisional at 9, lns 6-12. In another part, the provisional application notes that the bypass circuit "can" pass through the cold space. '065 provisional at 15, lns. 12-16. Other language in original claim 16 of the '065 application also describes the switched bypass circuit in generic terms that do not require a particular location relative to the cold space. *See, e.g.,* '065 provisional at 23. The provisional application therefore encompasses a bypass switch that can be located in either the cold or warm space, ISCO maintains, and a person skilled in the relevant art would understand this. Therefore, the '065 specification supports claim 10 of the '215 application, and the later application is entitled do the filing date of the '065 provisional application.

*4 Based on the information before it at this juncture, the court finds a genuine issue of material fact as to whether the '065 application contains a description of the invention as later claimed in claim 10 of the '215 application. More specifically, there is a genuine issue of material fact as to what a person skilled in the art would understand each application to encompass. This is particularly significant given the highly technical nature of the particular art at issue in this case. Therefore, the court is unable to grant STI's motion for summary judgment on this issue.

## B. Lack of Enablement

STI next moves for summary judgment on the grounds that the '215 patent does not meet the enablement requirements of 35 U.S.C. § 112. As stated earlier, Section 112 requires that patent specifications include a written description of the invention "in such full, clear, concise, and exact terms" that a person skilled in the relevant art can make and use the invention. 35 U.S.C. § 112. Further, courts have concluded that to meet the enablement requirement, "the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation." ' *In re Wright,* 999 F .2d 1557, 1561 (Fed.Cir.1993) (quoting *In re Vaeck,* 947 F.2d 488, 495 (Fed.Cir.1991)). That enablement may require some experimentation is acceptable; the amount of necessary experimentation simply must not be undue. *PPG Indus. v. Guardian Indus. Corp.,* 75 F.3d 1558, 1564 (Fed.Cir.1994) ("[T]he question of undue experimentation is a matter of degree."). Factors to consider in this determination include:

(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the

predictability or unpredictability of the art, and (8) the breadth of the claims.

*In re Wands,* 858 F.2d 731, 737 (Fed.Cir.1988). Although the question of undue experimentation entails many factual considerations, enablement is a question of law. *Id.* at 735, 737.

STI asserts that the '215 patent specifications do not adequately enable a cryogenically cooled receiver front end. The defendant provides evidence that Superconducting Core Technologies ("SCT"), the original assignee of the patent-in-suit and ISCO's predecessor in interest, experienced difficulties in developing a cryogenically cooled amplifier as described in the specifications. STI maintains that the patent also fails to disclose enabling information regarding how to make or use a planar filter, although it offers no specific support for this contention. Indeed, in its briefing, STI has offered no support for its claim of lack of enablement other than SCT's difficulties in producing the cryogenically cooled amplifier. The court is unpersuaded that this evidence alone precludes any genuine issue as to any material fact that is necessary for a finding of undue experimentation. There is no evidence as to the state of the prior art; the relative skill of those in the art; or the predictability or unpredictability of the art. Although the *Wands* factors are "illustrative, not mandatory," *Amgen, Inc. v. Chugai Pharm. Co.,* 927 F.2d 1200, 1213 (Fed.Cir.1991), the court finds that some of this information is necessary for a determination of undue experimentation. For example, ISCO maintains that the work done by SCT was routine engineering and not unduly extensive experimentation. Even the movant recognizes that "[w]hile complex experimentation is not *per se* undue, this is only true up to the norm of the experimentation in the art." Reply Brief at 19. A question of fact remains, then, as to the level of experimentation typically experienced in the relevant art. *See, e.g., Wands,* 858 F.2d at 737 ("[T]he fact that experimentation may be complex ... does not necessarily make it undue, if the art typically engages in such experimentation."). STI has not carried its burden of showing that no genuine issue exists as to any material fact necessary for a finding of lack of enablement.

## C. Anticipation by Prior Art

*5 Next, STI moves for summary judgment on the ground that the invention is anticipated by prior art. A patent is not valid if the associated invention was "described in a printed publication ... more than one year prior to the date of the application for patent." 35 U.S.C. § 102(b). Each and every element of the claim must be shown, expressly or inherently, in a single publication. *In re Schreiber,* 128 F.3d 1473, 1477 (Fed.Cir.1997). To invalidate a patent, the reference also must enable someone skilled in the art to make the claimed invention. *PPG Indus.,* 75 F.3d at 1566. "Anticipation is a question of fact." *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991).

STI asserts that two publications anticipate various claims of the claimed invention. The court will address each publication in turn.

## 1. The Robertson Article

The defendant STI argues that an article [FN2] ("the Robertson article") published by Mark

A-27

A. Robertson, an engineer, contains all of the elements of claim 10 and several of the dependent claims. The Robertson article describes a military surveillance system for installation in an airplane. This system processes mircrowave frequency signals in the frequency range of 8 to 40 gigahertz. The claims of the patent-in-suit describe a "receiver front end for receiving wireless signals on a plurality of channels." [FN3] "Wireless" was construed to mean "cellular telecommunications transmitted from a source to a receiver without use of a wire." [FN4] Cellular telecommunications are transmitted via frequencies in the range of 850 to 1900 megahertz. The Robertson article, therefore, does not expressly disclose a receiver front end for receiving wireless signals. Of course, the publication may inherently disclose such a receiver. Indeed, the court may consider extrinsic evidence to understand "what the reference meant to persons of ordinary skill in the field of invention." *Scripps Clinic & Research Found., 927 F.2d at 1576.* STI, however, has presented no evidence as to whether someone skilled in the art would perceive the disclosure of a system for receiving microwave frequency signals as an inherent disclosure of a system that receives cellular telecommunications frequencies.

FN2. *Two Applications of HTS Technology on an Airborne Platform,* produced by Advanced Research Projects Agency, SPIE PROCEEDINGS 2156 (Jan.1994).

FN3. By the court's order of October 30, 2002, the preamble to claim 10 was found to be a claim limitation.

FN4. *See* the court's order of October 30, 2002 as to claim construction.

Because there exists a dispute as to at least one genuine issue of material fact necessary for a finding of anticipation by a publication, the court need not continue in this analysis as to claim 10. Furthermore, because claims 13-17 and 19 are dependent on claim 10, the court can not find, on summary judgment, that those claims are anticipated by the Robertson article. STI's motion for summary judgment is denied as to the Robertson article.

2. The ARPA Report

STI argues that a second publication [FN5] ("the ARPA Report") anticipates claims 10, 13-17, and 19 of the patent-in-suit. The ARPA Report was first presented on February 7, 1995, less than one year prior to the filing date of the '065 provisional application.[FN6] STI believes the '215 patent application is not entitled to the filing date of the provisional application because, as discussed above, the first application fails to meet the written description requirement of 35 U.S.C. § 112. The court has found a genuine issue of material fact as to whether the patent meets the written description requirement. Because STI's anticipation argument rests, in turn, on a finding as to the written description requirement, the court cannot grant summary judgment regarding anticipation by the ARPA Report.

FN5. *HTSC Dual Use Applications Survey-Progress Report: HTS Filter Applications / Cellular Telephone Base Station Equipment,* produced by Advanced Research Projects Agency (ARPA) (Feb.1995).

FN6. The '065 application was filed on August 5, 1995.

D. Obviousness

*6 STI moves for summary judgment on the basis that every asserted claim of the patent-in-suit is obvious. Section 103 renders invalid any patent whose "subject matter as a whole would have been obvious at the time the invention was made to a person of

A-28

ordinary skill in the art." 35 U.S.C. § 103. To support a finding of obviousness, there must be a showing of a suggestion or motivation to modify the teachings of a prior art reference. *TIBIA Neuroscience, Inc. v. Cadus Pharm. Corp.,* 225 F.3d 1349, 1356 (Fed.Cir.2000). This motivation may arise from the prior art, the knowledge of someone of ordinary skill in the art, or the nature of the problem to be solved. *Id.*

As the movant recognizes, a determination of obviousness necessarily rests on underlying factual issues, including the scope and content of the prior art, the level of ordinary skill in the art, and the differences between the prior art and the claimed invention. Opening Brief at 26; *see Monarch Knitting Mac. Corp. v. Sulzer Morat GmbH,* 139 F.3d 877, 81 (Fed.Cir.1998). STI has offered no evidence as to any of these issues,[FN7] beyond what can be gleaned from the references it argues anticipated the invention or render the invention obvious. Although the prior art references selected by STI may help create a selective understanding of the state of the prior art, it is not sufficient in this case to convince the court that there are no genuine issues of material fact that would permit a reasonable jury to find for ISCO regarding obviousness.[FN8] This is particularly true because "the level of skill in the art is a prism or lens through which a judge [or] jury ... views the prior art and the claimed invention. This reference point prevents these factfinders from using their own insight or, worse yet, hindsight, to gauge obviousness." *Okajima v. Bourdeau,* 261 F.3d 1350, 1355. STI's motion for summary judgment regarding obviousness is denied.

FN7. Indeed, it affirmatively "takes no position with regard to the proper level of education, training, etc. of the person of ordinary skill (POS) to whom the '215 patent is addressed." Opening Brief at 17. Later, STI argues that for the purposes of this motion the level of skill in the art is undisputed, or at least cast in the alternative. Either (1) the skilled artisan is skilled enough such that the patent is enabled, but anticipated and obvious; or (2) the artisan is so unskilled that the patent is not anticipated and obvious, but is not enabled. Reply Brief at 17. Such a position does not adequately shed light on the state of the art.

FN8. STI cites *Okajima v. Bourdeau,* 261 F.3d 1350 (Fed.Cir.2001), for the proposition that specific findings regarding the level of skill in the art are not necessary if the prior art itself reflects an appropriate level of skill. Accordingly, the movant argues that it need not produce evidence as to the level of skill in the art for purposes of its summary judgment motion. That may well be true in certain cases. However, *Okajima* may be distinguished from the instant case. In *Okajima,* the court reviewed a decision of the Board of Patent Appeals and Interferences ("Board") of the U.S. Patent and Trademark Office which held certain claims to be unpatentable for obviousness. The Federal Circuit held that "the absence of specific findings on the level of skill in the art was not *reversible error* 'where the prior art itself reflects an appropriate level and a need for testimony is not shown." ' (citation omitted) (emphasis added). *Id.* at 1355. The question of whether an absence of evidence as to the level of skill in the art rises to reversible error upon appellate review of the Board's finding of obviousness is different than whether, as here, a court may deny summary judgment in the absence of such evidence. A need for testimony has been shown in the instant case. This is particularly true given the very technical nature of the art at issue. Furthermore, a court must make findings regarding not only the level of ordinary skill in the art, but also as to the scope and content of the prior art, the differences between the prior art and the claimed invention, and certain secondary considerations including commercial success, long-felt but unresolved need, failure of others, copying, and unexpected results, before invalidating a patent for obviousness. *Ruiz v. A.B. Chance Co.,* 234 F.3d 654, 663 (citing cases). Because there is no evidence, or conflicting evidence, as to certain of these issues, summary judgment as to obviousness is inappropriate.

### E. Indefiniteness

Finally, STI argues that the patent-in-suit is invalid for indefiniteness. Section 112 of the patent statute requires that patent claims "particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, paragraph 2. In determining whether a claim is sufficiently definite, courts analyze whether 'one skilled in the art would understand the bounds of the claim when read in light of the specification.' *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1348 (Fed.Cir.2002) (quoting *Personalized Media Communs., L.L.C. v. ITC,* 161 F.3d 696, 705 (Fed.Cir.1998)).

Claim 10 of the '215 patent encompasses "a receiver front end ... comprising ... a switched bypass circuit." The same claim also requires "a switched bypass circuit around the receiver front end." STI asserts that the claim is indefinite because these passages require a bypass circuit that is simultaneously inside and outside the receiver front end. ISCO, however, argues that the term "around" connotes the function, and not the location, of the bypass circuit. As one section of the patent specification explains, "[s]witching means can be used to bypass the RF signal around the receiver front end in the event of malfunction of receiver front end ." '215 col. 5, Ins. 65-67.

*7 STI presents no evidence as to how one skilled in the art would understand claim 10 in light of the specification. Absent such evidence, and viewing all inferences in the light most favorable to the non-movant, the court can not conclude that there is no genuine issue of material fact as to the indefiniteness of the claim. It is plausible, based on other passages from claim 10, that the claim could be understood to refer to the function of the bypass circuit and not the literal location of it. Indeed, the patent specification includes a diagram "of a cryoelectronic receiver front end with a bypass circuit." In light of such language, it is reasonable that one skilled in the art might understand the bounds of the claim. However, absent any evidence as to what someone skilled in the art would understand the claim, the court makes no finding as to the definiteness of the claim, other than to deny STI's motion for summary judgment on this ground.

### V. CONCLUSION

Based on the evidence before it, the court concludes that there remain genuine issues of material fact with regard to each of the issues presented.

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. STI's motion for summary judgment of invalidity of U.S. Patent No. 6,263,215 (D.I.212) is DENIED.

D.Del.,2003.
ISCO Intern., Inc. v. Conductus, Inc.
Not Reported in F.Supp.2d, 2003 WL 279561 (D.Del.)

Motions, Pleadings and Filings (Back to top)



• 2003 WL 25433064 (Trial Motion, Memorandum and Affidavit) Reply Brief of Plaintiff Isco in Support of Its (1) Renewed Motion Pursuant to Fed. R. Civ. P. 50(B) for Judgment as a Matter of Law and (2) Motion for a New Trial Pursuant to Fed. R. Civ. P. 59 Including the Issue of Patent Infringement Damages (May 8, 2003)

• 2003 WL 24290850 (Partial Expert Testimony) (Partial Testimony) (Apr. 1, 2003)

• 2003 WL 25445592 (Partial Expert Testimony) (Partial Testimony of Stephen B. Heppe) (Apr. 1, 2003) ⬚ Original Image of this Document (PDF)

• 2003 WL 24290855 (Expert Trial Transcript) (Transcript) (Mar. 31, 2003)

• 2003 WL 24290851 (Partial Expert Testimony) (Partial Testimony) (Mar. 28, 2003)

• 2003 WL 24290849 (Partial Expert Testimony) (Partial Testimony) (Mar. 27, 2003)

• 2003 WL 24290852 (Partial Expert Testimony) (Partial Testimony) (Mar. 25, 2003)

• 2003 WL 24290848 (Partial Expert Testimony) (Partial Testimony) (Mar. 21, 2003)

• 2003 WL 24282960 (Partial Expert Testimony) Videotaped Deposition of Raymond W. Nettleton, taken by Defendants, pursuant to notice, held at the offices of Morgan & Finnegan, LLP, 345 Park Avenue, New York, New York, before Jeffrey Benz, a Registered Professional Reporter and Notary Public with in and for the State of New York. (Jan. 23, 2003)

• 2003 WL 25432206 (Partial Expert Testimony) (Partial Testimony of Raymond W. Nettleton) (Jan. 23, 2003) ⬚ Original Image of this Document (PDF)

• 2002 WL 32991957 (Partial Expert Testimony) Videotaped deposition of H. Vincent Poor. (Dec. 18, 2002)

• 2002 WL 34106540 (Partial Expert Testimony) Videotaped deposition of H. Vincent Poor. (Dec. 18, 2002) ⬚ Original Image of this Document with Appendix (PDF)

• 2001 WL 35931101 (Trial Pleading) Complaint for Patent Infringement (Jul. 17, 2001)

• 1:01CV00487 (Docket) (Jul. 17, 2001)

• 2001 WL 35947028 (Expert Trial Transcript) (Transcript of Harold Va Poor) (2001) ⬚ Original Image of this Document (PDF)

END OF DOCUMENT

A-31

Not Reported in A.2d, 2003 WL 292168 (Del.Super.)

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
Jerome B. JOHNSON and, Synthia M. Johnson, Plaintiffs,
v.
Andrew CHUPP, Jr., t/a Country Craft Wood Specialty, Scott A. Venables, Coldwell Banker
Broadcreek Realty, Joann Conaway and Cooper Realty Associates, Inc. Defendants.
No. Civ.A. 02-C-04304JEB.
Submitted Jan. 24, 2003.
Decided Feb. 11, 2003.
Defendants Scott A. Venables' and Coldwell Banker Broadcreek Realty's. Motion for
Summary Judgment. Motion Granted.
Philip M. Finestrauss, Wilmington, Delaware, for Plaintiffs.
David B. Snyder, Dover, Delaware, for Defendants Scott Venables and Coldwell Banker
Broadcreek Realty.
James Hall, Wilmington, Delaware, for Defendant Joann Conaway and Cooper Realty
Associates, Inc.
Jeffrey Young, Wilmington, Delaware, for Defendant Andrew Chupp, Jr., t/a Country
Craft Wood Specialty.
OPINION

BABIARZ, J.

*1 This is the Court's decision on a motion for summary judgment filed by Scott A.
Venables and Coldwell Banker Broadcreek Realty ("Moving Defendants"). Plaintiffs
Jerome and Synthia Johnson have filed a suit in negligence alleging that they were both
injured when Synthia Johnson fell into a well on a piece of property being shown to them
by their real estate agent, Scott Venables. For the reasons discussed below, the motion for
summary judgment is Granted.

FACTS

The facts pertinent to this motion are not in dispute. In early 2000, Plaintiffs signed an
agreement of sale for an undeveloped parcel of land owned by Defendant Andrew Chupp.
The property, which was located in Bridgeville, Sussex County, Delaware, was
approximately 1.3 acres in size. In April 2000, while awaiting settlement, Plaintiffs and
their real estate agent Defendant Venables were inspecting the property. As they were
walking across the land, which was overgrown with weeds, Mrs. Johnson fell partly into
an open, unmarked well hidden from view by the underbrush.

Plaintiffs filed a suit in negligence against the property owner, the owner's listing agent,
and Moving Defendants. Plaintiff allege that because they were holding hands at the time
Mrs. Johnson fell, husband and wife were both injured. The complaint alleges failure to
inspect the property, failure to cure a hidden danger and failure to warn of the hidden
danger. Plaintiffs seek compensation for physical injuries, pain and suffering, loss of

A-32

enjoyment of life, medical and travel expenses, and loss of consortium on behalf of both spouses.

STANDARD OF REVIEW

Summary judgment is appropriate only where there are no genuine issues of material fact.[FN1] The Court is to examine the record in the light most favorable to the non-moving party,[FN2] and the burden is on the moving party to show that there are no genuine issues of fact.[FN3] If such a showing is made, the burden shifts to the non-moving party to demonstrate that there are issues of fact.[FN4] If the Court finds that no material fact issues exist, summary judgment is appropriate.[FN5]

FN1. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* 312 A.2d 322, 325 (Del.Super.Ct.1973).
FN2. *Id.*
FN3. *Moore v. Sizemore,* 405 A.2d 1358 (Del.1979).
FN4. *Id.*
FN5. *Pierce v. International Ins. Co. of Ill.,* 671 A.2d 1361 (Del.1996).

DISCUSSION

Moving Defendants seek judgment as a matter of law, asserting that there are no genuine issues of material fact in dispute and arguing that a buyer's real estate agent owes no a duty to the buyer to make safe the properties shown for sale. Plaintiffs assert that the condition of the property creates a fact question and argue that a duty of care attached to Moving Defendants because of the unkempt nature of the property.

In response to Moving Defendants' assertion that there are no issues of genuine fact in dispute, Plaintiffs argue that the neglected condition of the property creates fact questions, although they stop short of identifying those questions. Plaintiffs explicitly acknowledge that the property was unkempt and overgrown and contained an identified dilapidated structure. Plaintiffs assert that these conditions increased the need to inspect for hidden dangers, but they offer no precedent to show that the duty to inspect and warn rested with the buyer's agent. The Court finds that there is no dispute that the parcel of land, including the area where Mrs. Johnson fell, was overgrown with weeds, and that this fact does not raise any other questions for the jury.

*2 Moving Defendants argue that they are entitled to judgment as a matter of law because they had no duty to inspect the property or warn prospective buyers of any dangers. They assert that, while some courts recognize a seller's agent's duty to inspect a listed property, there is no support in Delaware or elsewhere for the imposition of such a duty on a buyer's agent. Plaintiffs offer no case law other an inapplicable case regarding independent contractors. [FN6]

FN6. *See Morris v. Hitchens,* 1993 WL 138690 (Del.Super.).

In certain jurisdictions, a seller's real estate agent has an affirmative duty to take reasonable care to inspect the premises and either make them safe or warn invitees of the any dangerous condition.[FN7] This proposition rests on the theory that the seller's agent is in possession of the property which s/he has undertaken to sell.[FN8] Other courts have rejected this notion. [FN9] However, in the motion at bar, the issue is whether the buyer's


A - 33

agent or his employer has any duty regarding the condition of a property being shown to a prospective buyer. The Court finds no precedent or support for such a duty.

FN7. *See, e.g., Hopkins v. Fox & Lazo Realtors,* 625 A.2d 1110 (N . J.1993); *Jarr v. Seeco Construction Co.,* 666 P.2d 392 (Wash.App .-Div. 1 1983); *Coughlin v. Harland L. Weaver, Inc.,* 230 P.2d 141 (Cal.App.-2nd Dist.1951).

FN8. *Jarr v. Seeco Construction Co.,* 666 P.2d at 393-94.

FN9. *See, e.g., Kubinsky v. Van Zandt Realtors,,* 811 S.W.2d 711 (Tex.App.-Fort Worth 1991, writ denied).

To support their position, Plaintiffs argue that Moving Defendants had a duty to inspect because of the economic benefit they derived from the relationship with Plaintiffs and because of the exclusive agency agreement between them. It is true that where a real estate firm has agreed to act on behalf of a buyer in presenting a contract for purchase of real property, an agency relationship arises.[FN10] As agents, real estate brokers and salespeople are fiduciaries, but the resulting duty is full disclosure of all material facts to those whom the agent represents,[FN11] not a duty to buyers regarding dangerous conditions on a seller's property. As Plaintiffs' real estate agents, Moving Defendants had no more control over the property than Plaintiffs themselves had. Without control of the property, Moving Defendants had no duty to inspect, warn or otherwise make the property safe for Plaintiffs. The Court concludes as a matter of Delaware law that a buyer's real estate agent has no duty for the safety of the buyer while on a seller's property.

FN10. *Heller v. Kiernan,* 2002 WL 385545 at *4 (Del.Ch.).

FN11. *Petenbrink v. Superior Home Builders, Inc.,* 1999 WL 1223786 at *8 (Del.Super.) (citations omitted).

For these reasons, the motion for summary judgment is *Granted.*

*It Is So ORDERED.*

Del.Super.,2003.
Johnson v. Chupp
Not Reported in A.2d, 2003 WL 292168 (Del.Super.)

END OF DOCUMENT

A-34

Not Reported in F.Supp.2d, 2004 WL 32940 (D.Del.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.
United States District Court,
D. Delaware.
Jami PHIFER, Plaintiff,
v.
E.I. DU PONT DE NEMOURS AND COMPANY; Defendants.
No. Civ. 03-0327-SLR.
Jan. 5, 2004.
Jeffrey S. Friedman, Silverman & McDonald, Wilmington, Delaware and Steven F.
Marino, Marino & Associates, PC, Philadelphia, Pennsylvania, for Plaintiff.
James W. Semple, Morris, James, Hitchens & Williams, LLP, Wilmington, Delaware, for
Defendant.
MEMORANDUM OPINION

ROBINSON, Chief J.
I. INTRODUCTION

*1 On March 26, 2003, Jami Phifer ("plaintiff") filed a complaint against DuPont
Country Club [FN1] ("defendant") alleging personal injuries from a fall she sustained on
club grounds. (D.I.1) Plaintiff is a resident of the Commonwealth of Pennsylvania.
Defendant is incorporated under the laws of the State of Delaware with its principal place
of business in Wilmington, Delaware. The court has original jurisdiction over the instant
suit pursuant to 28 U.S.C. § 1332. Presently before the court is the defendant's motion to
dismiss the complaint for failure to state a claim upon which relief may be granted under
Federal Rule of Civil Procedure 12(b)(6). (D.I.7) For the reasons that follow, the court
grants defendant's motion.
FN1. On June 3, 2003, the parties filed a stipulation substituting E .I. Du Pont de
Nemours and Company as the proper defendant in lieu of DuPont Country Club. (D.I.6)

II. BACKGROUND

On or about April 5, 2001, the New Castle County Chamber of Commerce organized and
sponsored a business and technology convention at the DuPont Country Club (the
"Club"). (D.I. 1 at ¶ 9) Plaintiff attended the convention and exited the main doors of the
Club around noon. ( *Id.* at ¶¶ 13, 14) She walked down a set of concrete steps leading
from the main doors to a concrete sidewalk. ( *Id.*) The stairs were crowded with many
pedestrians entering and leaving the convention. (Id. at ¶ 16) As plaintiff reached the
sidewalk, she heard a loud noise originating from the direction of a white-colored truck
parked in the Club's circular driveway adjacent to the main doors.[FN2] ( *Id.* at ¶¶ 16, 17)
Plaintiff looked in the direction of the noise and, at the same time, an unknown male
darted into her path and struck her.[FN3] ( *Id.* at ¶ 19) Plaintiff infers that the reason that the
unknown man abruptly jutted into her pathway was because he was statled by the loud
noise and sought to move away from the truck. ( *Id.* at ¶ 20) As a result of the impact,
plaintiff was thrown into the air. ( *Id.* at ¶ 21) Her body hit the concrete stairs upon
landing, thereby causing her injury. ( *Id.*)


A-35

FN2. Plaintiff does not state in her complaint whether the truck or its contents belong to defendant.

FN3. Plaintiff does not identify the man who contacted her or assert that he was employed by defendant in her complaint.

## III. STANDARD OF REVIEW

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc .,* 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

## IV. DISCUSSION

Plaintiff's claims rests solely upon Delaware common law. Plaintiff alleges that defendant violated its duty to exercise reasonable care to anticipate, inspect, and discover danagerous conditions on its property and to protect its business invitees from such conditions. ( *Id.* at ¶ 24) More specifically, plaintiff contends (1) that defendant knew or should have known that unloading a truck presented an unreasonable risk of harm to her as a business invitee, [FN4] (2) that defendant knew or should have known that she would not discover or realize the danger posed by the truck, and (3) that defendant should have warned her of this danger. ( *Id.* at ¶¶ 25, 27, 28) Plaintiff further alleges that she suffered emotional distress directly and proximately as a result of plaintiff's negligence.

FN4. The parties do not dispute that plaintiff was a busines invitee when she entered defendant's property.

### 1. Negligence

*2 The Delaware Supreme Court has set forth the legal standard applicable for business invitees as follows:

A possessor of property who invites others onto his property to conduct business must exercise due care to keep his property in a reasonably safe condition and warn of any unreasonable risks which he knows about, or with the exercise of reasonable care would have known about, and which the other would not be expected to discover for himself.

*Robelen Piano Co. v. DiFonzo,* 169 A.2d 240, 244 (Del.1961) (citing the Restatement (Second) of Torts § 343 (1965)). The Delaware courts have also recognized that a landowner is not an insurer of his business invitees' safety. *Id.; Hess v. United States,* 666 F.Supp. 666, 670 (D.Del.1987). In light of these standards, a business invitee must establish the following three elements to hold a landowner liable for negligence under Delaware law: (1) an unreasonably dangerous condition; (2) known to the possessor of property or which he would have known if he had exercised reasonable care; and (3) not

A -34

discoverable by the invitee. *Id.* at 671. Additionally, a business invitee must establish that her injuries were proximately caused by the unreasonably dangerous condition. *Duphily v. Delaware Elec. Coop., Inc.,* 662 A.2d 821, 828 (Del.1995). Delaware law recognizes the traditional "but for" test for proximate cause. *Id.* at 828-829. To satisfy this test, "a proximate cause must be one 'which in natural and continuous sequence, unbroken by any intervening cause, produces the injury and without which the result would not have occurred." ' *Emerson v. United States,* 1998 U.S. Dist. LEXIS 6461, *16 (D.Del.1998) (citing *Laws v. Webb,* 658 A.2d 1000, 1007 (Del.1995)). "Proof of nothing more than the occurrence of a fall is insufficient to show negligence." *Hess,* 666 F.Supp. at 671.

Construing the facts alleged in the complaint and all reasonable inferences drawn therefrom in favor of plaintiff, the court finds that plaintiff has failed to state a claim for negligence upon which relief can be granted. Plaintiff has not explained how unloading a truck parked in the circular drive outside defendant's facilities constituted an unreasonably dangerous condition. In fact, plaintiff cannot say with certainty that the unloading truck emitted the loud noise. Plaintiff merely stated that she "believed" this to be the case.

Assuming, *arguendo,* that the truck was an unreasonably dangerous condition, plaintiff also fails to show that it proximately caused her injuries. Plaintiff instead alleges that her injuries were caused when an unknown man bumped into her. Even if this contact were triggered because the unknown man moved from his path to avoid the unloading truck as alleged by plaintiff, the court finds this connection too tenuous to satisfy the "but for" test for proximate cause. The action of the unknown man constitutes an intervening cause, thereby breaking the natural and continuous sequence of events from loud noise to plaintiff's fall. Accordingly, the court grants defendant's motion to dismiss plaintiff's negligence claim.

## 2. Negligent Infliction of Emotional Distress

*3 To recover for the tort of negligent infliction of emotional distress, the Delaware Supreme Court has mandated that two requirements be satisfied. *Robb v. Pennsylvania R.R. Co.,* 210 A.2d 709, 714-15 (Del.1965). First, a plaintiff must have been in "the immediate area of physical danger" of the negligent conduct. *Id.* Second, the plaintiff's emotional distress stemming from the negligent conduct must result in "physical consequences." *Id.* The court finds that plaintiff is not entitled to relief under a negligent infliction of emotional distress cause of action because the court has concluded that defendant did not engage in any negligent conduct. Even if the court were to have found such negligence, plaintiff has not averred that her emotional injuries culminated in any physical consequences. Rather, plaintiff merely alleges that she suffered "emotional distress, grief, humiliation, anger and chagrin to a degree that no reasonable person should be expected to endure." (See D.I. 1 at ¶ 35) The court, consequently, grants defendant's motion to dismiss plaintiff's negligent infliction of emotional distress claim.

## V. CONCLUSION

A-37

For the reasons stated, defendant's motion to dismiss the complaint (D.I.7) is granted. An order shall issue.

D.Del.,2004.
Phifer v. E.I. Dupont De Nemours and Co.
Not Reported in F.Supp.2d, 2004 WL 32940 (D.Del.)


Motions, Pleadings and Filings (Back to top)

• 1:03CV00327 (Docket) (Mar. 26, 2003)
END OF DOCUMENT

A-38

Not Reported in A.2d, 2005 WL 4040247 (N.J.Super.A.D.)

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.
John SACHS, Plaintiff-Appellant,
v.
Margaret McCONNELL, Defendant-Respondent.
Argued Nov. 9, 2005.
Decided May 26, 2006.

SYNOPSIS

On appeal from the Superior Court of New Jersey, Law Division, Essex County, L-
12007-02.
Anthony C. DiLella argued the cause for appellant (Anthony Scordo, on the brief).
Keith G. Von Glahn argued the cause for respondent (Wilson, Elser, Moskowitz, Edelman
& Dicker, attorneys; Michael J. Slocum, on the brief).

Before Judges R.B. COLEMAN and SELTZER.

PER CURIAM.
*1 Plaintiff, John Sachs, appeals from an order granting summary judgment in favor of
defendant, Margaret McConnell, and denying plaintiff's cross-motion for summary
judgment. The court ruled that plaintiff was a social guest or licensee and not a business
invitee when he sustained an injury as a result of a slip and fall at a two-family home
owned by defendant.

For approximately fifteen years, plaintiff and defendant were involved in a sporadic
romantic relationship. On January 3, 2001, while he was residing with her, plaintiff was
injured on defendant's premises. Defendant lived on the first floor and rented the second
floor to a tenant, Paulette. While plaintiff lived with defendant, he paid no rent, but he
would perform small maintenance chores for defendant, both in her apartment and in the
tenant's apartment.

The front porch of the house was the entry way for both living units. However, there were
separate entrances to the respective floors. As such, Paulette could gain access to her
upstairs apartment without entering defendant's private living space.

The accident occurred in the front porch area as plaintiff was exiting Paulette's apartment.
On the date of the accident, the weather was cold and there was snow on the ground from
a recent storm. Roughly seven inches of snow remained. The water company visited
Paulette's apartment to inspect the plumbing. Plaintiff and defendant dispute whether it
was one or two water company employees who came to the premises, but defendant
accompanied the water company employee(s) into Paulette's apartment. After the

A-39

inspection, defendant was told the toilet required repair. She called plaintiff to come into Paulette's apartment to hear what was necessary to make the repairs to the toilet.

On his way to Paulette's bathroom, plaintiff noticed that the doormat, which was usually placed directly in front of the door to Paulette's apartment, was sitting several feet away from the doorway, under the windowsill. The doormat was made of rubber and was roughly one inch thick. Plaintiff saw water either on or near the doormat. Plaintiff also observed water build-up under the steps leading to Paulette's doorway.

Plaintiff entered Paulette's apartment with no incident and ascended to her bathroom. The water company employee(s) advised plaintiff on how to proceed with the maintenance of the toilet. Specifically, plaintiff was told which new parts were needed to make the repairs. Defendant drove to Home Depot, purchased the necessary repair parts and returned to Paulette's bathroom with the parts plaintiff needed to complete the repairs.

After plaintiff completed the repairs, he descended the stairs, opened the front door leading to the porch area and with his left foot he stepped out onto the doormat which was back in its usual location. Plaintiff was wearing his bedroom slippers, which had a thin rubber sole, and he was not wearing any socks. The doormat slipped out from under him, causing plaintiff to fall backward onto the stairs. As a result, he sustained a serious injury.

*2 Plaintiff claims he saw no snow, ice or water in the area of the mat when he stepped out to exit Paulette's apartment. He contends, however, that the next day he inspected the area and found that underneath the mat it was wet. Plaintiff surmises the hidden moisture caused the mat to slip out when he stepped on it. Plaintiff also conjectures that the only person who could have moved it in front of the door was defendant, because by his recollection, after the water company employee(s) left the premises, the mat was still under the windowsill.

Plaintiff contends the trial court erred by not recognizing his status as a business invitee instead of a social guest. Alternatively, plaintiff contends that the "more fluid" approach articulated in *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426 (1993), should be applied since defendant is a landlord, thereby making the premises commercial. Under *Hopkins,* "[w]hether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all the circumstances in light of considerations of public policy." *Id.* at 439 (citation omitted). "That inquiry involves identifying, weighing and balancing several factors-the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care and the public interest in the proposed solution." *Ibid.* As an additional alternative, plaintiff asserts that, even if he was a social guest, there are genuine issues of material fact remaining that require a jury trial. We disagree and affirm.

Under the common law of premises liability, a landowner owes increasing care depending on whether the visitor is a trespasser, licensee or social guest, or business invitee. *Parks v. Rogers,* 176 *N.J.* 491, 497 (2003); *Hopkins, supra,* 132 *N.J.* at 433-34; *Snyder v. I. Jay Realty Co.,* 30 *N.J.* 303, 311-12 (1959). Here, the motion judge

A-40

considered plaintiff to be defendant's social guest or gratuitous licensee because he lived with defendant, if only on a part-time basis. According plaintiff that status under the common law, defendant was required to warn plaintiff of any dangerous condition known to defendant and unknown to plaintiff. *Hopkins, supra,* 132 *N.J.* at 434; *Campbell v. Hastings,* 348 *N.J.Super.* 264, 267 (App.Div.2002); *Hanna v. Stone,* 329 *N.J.Super.* 385, 389 (App.Div.2000). In other words, "a homeowner has a duty to warn the unwary social guest of a condition of the premises that the homeowner knows or has reason to know creates an unreasonable risk of injury." *Parks, supra,* 176 *N.J.* at 494; *Sussman v. Mermer,* 373 *N.J.Super.* 501, 505 (App.Div.2004). Of course, "[i]f the guest is aware of the dangerous condition or by a reasonable use of his faculties would observe it, the host is not liable" because of the guest's failure to use due care. *Berger v. Shapiro,* 30 *N.J.* 89, 99 (1959) (citations omitted).

*3 The common law on premises liability in New Jersey, however, has undergone transition toward "a broadening application of a general tort obligation to exercise reasonable care against foreseeable harm to others." *Hopkins, supra,* 132 *N.J.* at 435 (quoting *Butler v. Acme Mkts., Inc.,* 89 *N.J.* 270, 277 (1982)); *Campbell, supra,* 348 *N.J.Super.* at 268. Although the common law premises liability rules continue to "provide guidance in determining whether a duty of reasonable care should be imposed in particular circumstances," *Ocasio v. Amtrak,* 299 *N.J.Super.* 139, 149 (App.Div.1997), "[t]he issue [now] is whether, 'in light of the actual relationship between the parties under all of the surrounding circumstances' the imposition of a duty on the landowner is 'fair and just.' " *Brett v. Great Am. Rec., Inc.,* 144 *N.J.* 479, 509 (1996) (quoting *Hopkins, supra,* 132 *N.J.* at 438).

Measured by this standard, we conclude that, under either standard, there was not sufficient evidence presented to raise a jury question regarding defendant's breach of a duty owed to plaintiff. Plaintiff's injury did not occur in the tenant's apartment, but rather in the common area where he had earlier observed wet surfaces. Plaintiff was, in effect, a member of defendant's household. As such, he was familiar with the porch area and the entry way to the tenant's apartment. Though defendant owned the property, she had no greater opportunity than plaintiff to discover the condition which plaintiff claims caused his injuries. Thus, defendant did not have an enhanced duty to make a reasonable inspection to discover the allegedly defective conditions in the common areas for the benefit of a person such as plaintiff, who was, in effect, a member of her household.

Under the historical common law label, plaintiff was a social guest or licensee. *See, e.g., Longo v. Aprile,* 374 *N.J. Super* . 469, 473-75 (App.Div.2005) (observing that a neighbor working alone on landowners' roof did not raise neighbor's status to that of a business invitee even though the neighbor was performing a benefit for the landowners). A homeowner "does not have a duty actually to discover latent defects." *Hopkins, supra,* 132 *N.J.* at 434 (citations omitted). "[T]he owner must warn a social guest of any dangerous conditions of which the owner had actual knowledge and of which the guest is unaware." *Ibid.* Plaintiff admitted in his deposition that there was water on the linoleum flooring on the porch and light water underneath the tenant's doorstep from which he assumed the water company had shaken off their boots. Plaintiff failed to take any steps to eliminate the water and he continued to wear thin rubber soled slippers while walking

A-41

in an area he knew was wet and, therefore, possibly dangerous.

Here, there is no evidence that defendant had actual knowledge of the moisture underneath the mat that plaintiff alleges as the cause of his slip and fall. On the other hand, plaintiff observed the wet condition near the mat and on the floor in front of the entrance to the tenant's apartment when he ascended. In other words, plaintiff knew of the existence of the potential hazard. That knowledge-even if one assumes defendant had the same knowledge-precludes plaintiff from any recovery. *See, e.g., Endre v. Arnold,* 300 *N.J. Super* .136, 143 (App.Div.) (determining that the alleged defects in the stairway were obvious and, even if the conditions were dangerous, "no reasonable fact finder could conclude that the decedent was unaware of those conditions"), *certif. denied,* 150 *N.J.* 27 (1997).

*4 Assuming defendant knew of the water on the porch, she had no duty to warn plaintiff since he already had knowledge of the same hazard. For these reasons it would be unfair and unjust to impose upon defendant any duty to warn plaintiff as to the hazard presented in the common area. *See Brett, supra,* 144 *N.J.* at 509 (quoting *Hopkins, supra,* 132 *N.J.* at 438).

Affirmed.

N.J.Super.A.D.,2006.
Sachs v. McConnell
Not Reported in A.2d, 2005 WL 4040247 (N.J.Super.A.D.)

END OF DOCUMENT
Not Reported in S.W.3d, 2000 WL 621263 (Tex.App.-Amarillo)

Only the Westlaw citation is currently available.

NOTICE: NOT DESIGNATED FOR PUBLICATION. UNDER TX R RAP RULE 47.7, UNPUBLISHED OPINIONS HAVE NO PRECEDENTIAL VALUE BUT MAY BE CITED WITH THE NOTATION "(not designated for publication)."

Court of Appeals of Texas, Amarillo.
Betty WHITE and David White, Appellants,
v.
RICK CANUP REALTORS, INC. d/b/a Coldwell Bankers Rick Canup Realtors and Margaret Williams Realtors, Inc., d/b/a McDougal Realtors and Marilyn Parramore, Appellees.
No. 07-99-0381-CV.
May 15, 2000.
From the 137th District Court of Lubbock County, No. 98-503,552; Cecil G. Puryear, Judge.

Before BOYD, C.J., and QUINN and REAVIS, JJ.


BOYD.
*1 Appellants Betty and David White challenge a take-nothing summary judgment in favor of appellees Rick Canup Realtors, Inc. d/b/a Coldwell Banker Rick Canup Realtors,

A -42

Margaret Williams Realtors, Inc ., d/b/a McDougal Realtors, Inc., and Marilyn Parramore (a McDougal real estate agent) [hereinafter Canup].[FN1] In asserting their challenge, the Whites raise three points of error, claiming that 1) Canup owed a duty to the Whites, even though Canup was not their agent, 2) Canup did not inspect the property or warn them about dangerous conditions on the property, and 3) a fact question existed as to whether Betty's injuries were proximately caused by Canup's failure to use reasonable care. Disagreeing that reversal is required, we affirm the judgment of the trial court.

FN1. For the sake of simplicity, we will refer to appellees generically. Under our analysis, the difference between the two parties is one without a distinction.

Rule of Civil Procedure 166a(i) permits the filing of a "no-evidence" summary judgment motion where there is no evidence of one or more essential elements of a claim or defense upon which an adverse party has the burden of proof. Tex.R.Civ.P. 166a(i) (Vernon Pamph.2000). Because a no-evidence summary judgment is essentially a pretrial directed verdict, we apply the same legal sufficiency standard to both. *Roth v. FFP Operating Partners, L.P .*, 994 S.W.2d 190, 194 (Tex.App.-Amarillo 1999, writ denied). That is, we must determine whether the non-movant produced any evidence of probative force to raise a fact issue on material questions. We consider all the evidence in the light most favorable to the party against whom summary judgment was rendered, and we must do so while disregarding all contrary evidence and inferences. *Id.* If the non-movant presents more than a scintilla of probative evidence, summary judgment should not have been granted. *Id.* More than a scintilla of evidence exists when the evidence rises to a level such that reasonable and fair-minded people could differ in their conclusions. *Id.* Alternatively, less than a scintilla of evidence exists when the evidence does no more than create a mere suspicion of a fact. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

The elements of a common law negligence action are 1) a legal duty owed by a defendant to a plaintiff, 2) breach of that duty, and 3) damages proximately resulting from the breach. *Roth,* 994 S.W.2d at 195. The determination of duty is a question of law. *Id.* Because the Whites complain that Canup was negligent in failing to comply with its duty of care, our initial task is to determine what duty, if any, Canup owed to the Whites. A brief recitation of the facts is thus necessary to our discussion.

On May 24, 1995, Parramore, in the course of her employment, showed Betty White and her son a rural Idalou residence. To gain entry, Parramore intended to access the key from a lock box on the property. However, the lock box was not located on the front door. As a result, Parramore walked to the back of the property to see if the lock box was there or, alternatively, if she could find a way into the house. After waiting for several minutes, White decided to follow. In making her way toward the back, White encountered a wooden and steel twin door gate. The gate had no handles, no signs, no instructions as to open it, and was unsecured on one side. White pulled one side of the gate open and, as she did so, the other side of the gate shut. As the gate closed, White's right ankle was caught between the gate sides. Parramore then took White to a Lubbock hospital, where it was determined that she had a broken ankle, and torn ligaments and tendons.

*2 At the time of the incident, the property was owned by David Arthur Bradshaw, was

A-43

listed for sale through Rick Canup Realtors, and was shown by Parramore, a McDougal employee. As a result of her injuries, White filed the underlying suit against all concerned which gave rise to the summary judgment being appealed.

In their first issue, the Whites argue that Canup was Bradshaw's agent and, as such, owed White a duty to protect her from unsafe conditions on the land because she was an invitee on the property. They reason that "[r]eal estate agents owe a duty to persons they bring onto property." That argument is derived from article 6573a § 15C(c) of the Revised Civil Statutes, which provides that a licensed real estate salesman or broker who is representing a party to a real estate transaction is that party's agent. Tex.Civ.Stat.Ann. art. 6573a § 15C(c) (Vernon 2000). Although the Whites do not cite any Texas authority for that position, they do cite and rely upon four out-of-state decisions which, they say, support that position.

In *Hopkins v. Fox & Lazo Realtors,* 625 A.2d 1110 (N.J.1993), the New Jersey Supreme Court addressed a broker's duty of care, specifically, whether that duty is the same as is imposed upon owners and possessors, or whether it is determined by general tort principles. The New Jersey court held that in the context of an open house, the relationship between a real estate broker and a potential buyer is substantial. *Hopkins,* 625 A.2d at 1117. Based upon that holding, the court determined that "a broker is under a duty to conduct a reasonable broker's inspection when such an inspection would comport with the customary standards governing the responsibilities and functions of real-estate brokers with respect to open-house tours." *Id.* at 1118. Thus, in limiting the duty to open houses, the court required a broker to conduct a reasonable inspection when such an inspection would be undertaken by a reasonable broker attempting to sell the house, and only when the broker had a reasonable opportunity to inspect the house. *Id.* at 1120.

In *Coughlin v. Harland L. Weaver, Inc.,* 230 P.2d 141, 144 (Cal.App.-2nd Dist.1951), the court recognized a realtor's duty to take reasonable care to discover the condition of the premises, and either make them safe or warn invitees of the dangerous conditions. The Whites rely upon this case as establishing the proposition that brokers are in possession of the property which they contract to sell or rent for the owner.

In *Jarr v. Seeco Construction Co.,* 666 P.2d 392, 393-94 (Wash .App.-Division 1 1983), the court held that "[a] possessor of land owes a duty of reasonable care for invitees with respect to dangerous conditions on the land, including 'an affirmative duty to discover dangerous conditions.' " Finally, in *Turner v. Carneal,* 150 S.E. 72, 74 (Va.1931), the appellate court held that the trial court's jury charge which stated a realtor is liable for injuries to prospective purchasers or tenants if that realtor is negligent while visiting the property was correct.

*3 Under the applicable standard of review, we must determine if the Whites presented more than a scintilla of probative evidence sufficient to raise a material fact question on the issue of duty. *Roth,* 994 S.W.2d at 195. Although out-of-state authority might be persuasive, this court is only bound by decisions of our court of last resort. As long ago as 1938, in *Gropotte v. Adams,* 111 S.W .2d 690, 691 (Tex.1938), our supreme court held that a defendant's duty to protect a plaintiff from premises defects arises only from his

A-49

control or ownership of those premises, and the duty does not extend beyond those limits. *See also LaFleur v. Astrodome Astrohall Stadium Corporation,* 751 S.W.2d 563, 565 (Tex.App.-Houston [1st Dist.] 1988, no writ).

As Canup correctly notes, the existence of a duty is a threshold inquiry in any negligence case. *Isbell v. Ryan,* 983 S.W.2d 335, 339 (Tex.App.-Houston [14th Dist.] 1998, no writ). While an owner or occupier of land owes a duty to invitees to exercise ordinary care to protect them from risks of which the owner is aware or should be aware after reasonable inspection, *Motel 6 G.P., Inc. v. Lopez,* 929 S.W.2d 1, 3 (Tex.1996), the duty only arises for an "occupier" who has control of the premises. *Gunn v. Harris Methodist Affiliated Hospitals,* 887 S.W.2d 248, 251 (Tex.App.-Fort Worth 1994, writ denied). A party controls a premises if he is a "possessor" and: (a) is in occupation of the land with intent to control it, (b) has been in occupation of the land with intent to control it, if no other person has subsequently occupied it with intent to control it, or (c) is entitled to immediate occupation of the land, if no other person is in possession under clauses a and b. *Gunn,* 887 S.W.2d at 251 (quoting Restatement (Second) of Torts, § 328E). Canup argues that it did not exercise the requisite "control" over the property, and posits that "the duty owed by a landowner/occupier to invitees simply does not transfer through a chain of real estate agents."

In *Kubinsky v. Van Zandt Realtors,* 811 S.W.2d 711 (Tex.App.-Fort Worth 1991, writ denied), the court addressed an issue concerning a realtor's liability to prospective buyers. In that case, the appellants bought a house which they later discovered had foundation problems. Before the purchase, the appellants' inspector noted there was "[e]vidence of minor [foundation] movement noted on East Side of House. No major movement noted at this time." Later, the appellants found out that the previous owners had done extensive foundation work on the house about three months before they sold it. In their suit, the appellants sought to hold the listing realtors responsible, which presented a question for the court as to whether a listing agent has a legal duty to inspect the listed property for defects, aside from merely asking the sellers if defects exist. Declining to follow California authority cited by the appellants, the Fort Worth court held that a real estate agent has no duty to inspect property in order to discover defects. *Id.* at 715.

*4 Considering the above authority, we hold the trial court did not err in concluding the Whites failed to establish that Canup owed them a duty. The Whites' first issue is overruled.

Because resolution of this issue is dispositive of the appeal, a discussion of the Whites' remaining two issues is unnecessary. Accordingly, the judgment of the trial court is affirmed.

Tex.App.-Amarillo,2000.
White v. Rick Canup Realtors, Inc.
Not Reported in S.W.3d, 2000 WL 621263 (Tex.App.-Amarillo)