## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SANDRA E. FLUCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C. A. No. 06-188-GMS |
| v. | ) | |
| | ) | |
| BELLA VISTA DEVELOPMENT, LLC, | ) | |
| a Virginia corporation, BELLA VISTA | ) | TRIAL BY A JURY DEMANDED |
| TOWNHOME CONDOMINIUM | ) | |
| ASSOCIATION, INC., a Delaware | ) | |
| Corporation, RESORT REALTY GROUP, | ) | |
| INC.,a Delaware corporation, WILLIAM J. | ) | |
| MITCHELL, individually, and WAYNE | ) | |
| MITCHELL, individually, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT RESORT REALTY GROUP, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION IN LIMINE

FERRY, JOSEPH & PEARCE, P.A.


/s/Robert K. Pearce
ROBERT K. PEARCE, ESQ. (I.D. No. 191)
THOMAS R. RIGGS, ESQ. (I.D. No. 4631)
824 Market Street, Suite 904
Wilmington, DE 19899
(302) 575-1555
rpearce@ferryjoseph.com
Attorneys for Defendant
Resort Realty Group, Inc.

Dated: September 6, 2007

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................... ii

NATURE AND STAGE OF THE PROCEEDINGS ................................ iii

SUMMARY OF ARGUMENT ................................................. iv

STATEMENT OF FACTS ..................................................... 1

ARGUMENT .............................................................. 1

    A.    Plaintiff's expert should be precluded from discussing ASTM, ANSI, CPSC, and NFPA standards.. ................................................. 1

    B.    Testimony relating to the replacement of the paver step with one made from concrete is inadmissible pursuant to FRE 407.. ........................... 3

CONCLUSION ............................................................. 5

## TABLE OF AUTHORITIES

**Cases:**

*Chamberlain v. Giampapa*, 210 F.3d 154 (3rd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,4

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,4

*Haddigan v. Harkins*, 441 F.2d 844 (3rd Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Kelly v. Crown Equipment*, 970 F.2d 1273 (3d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Masemer v. Delmarva Power & Light Co.*, 723 F.Supp. 1019 (D.Del 1989). . . . . . . . . . . . . . . 6

*Miley v. Harmony Mill Ltd. Partnership*, 826 F.Supp. 824 (D.Del. 1993). . . . . . . . . . . . . . . . . 2

*Weaver v. Neidermayer-Martin Co.*, 1992 WL 394325  (E.D.Pa.) . . . . . . . . . . . . . . . . . . . . . . . 12

**Federal Rules:**

F.R.E. 407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

**State Rules:**

D.R.E. 407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## NATURE AND STAGE OF THE PROCEEDINGS

On March 20, 2006, Plaintiff Sandra E. Fluck filed a Complaint seeking damages from ReMax Realty Group, among others, for personal injuries she allegedly suffered on or about June 27, 2004. Plaintiff filed a Motion for Default Judgment against ReMax Realty Group, which was withdrawn on August 30, 2006. On or about June 16, 2006, Plaintiff filed an Amended Complaint adding Defendant Wayne Mitchell. On or about December 19, 2006 Plaintiff filed a stipulation to Amend the Amended Complaint to substitute Resort Realty Group, Inc as a Defendant in place of ReMax Realty Group. Defendant Resort Realty Group, Inc. filed a motion to dismiss the Second Amended Complaint for insufficient service of process on February 20, 2007, which is still pending. On June 21, 2007, Defendant Resort Realty Group, Inc. filed a motion for summary judgment, which is pending. This is Defendant Resort Realty Group, Inc.'s Motion in Limine to exclude portions of the expert testimony of Lawrence C. Dinoff, and evidence of subsequent remedial measures.

## SUMMARY OF ARGUMENT

I.    Plaintiff's expert should be precluded from discussing ASTM, ANSI, CPSC, and

NFPA standards.

II.    Testimony relating to the replacement of the paver step with one made from

concrete is inadmissible pursuant to FRE 407.

## STATEMENT OF FACTS

Resort hereby adopts and incorporates herein the statement of facts as set forth in Defendant Resort's Opening Brief in Support of its Motion for Summary Judgment ("Resort's Motion for Summary Judgment").

## ARGUMENT

### A.    *Plaintiff's expert should be precluded from discussing ASTM, ANSI, CPSC , and NFPA standards.*

In May 2004, a few weeks prior to Plaintiff's fall, the paver step was inspected by Charles Wheatley, a certified building inspector for Sussex County. *See* Deposition of Charles Wheatley, June 22, 2007, p.7, 18 (hereinafter, "CW-__.")(attached as Exhibit A). According to Mr. Wheatley, the paver step met all applicable code sections. CW-27-36. At the time of Mr. Wheatley's inspection, the building code that had been adopted by the Sussex County Council, and thus the code that was in effect, was the 1994 Standard Southern Building Code. CW- 22. Plaintiff has produced a report prepared by Lawrence C. Dinoff in which Mr. Dinoff opines, *inter alia*, that the paver step violated the following standards: (1)ASTM/ANSI F1637, Standard Practice for Safe Walking Surfaces; (2) ANSI Z535.1, Safety Color Coding; (3) CPSC, Guidelines for Stair Safety; and, (4) NFPA-101, The National Life Safety Code (collectively, the "Disputed Standards"). *See* Report of Lawrence C. Dinoff, April 30, 2007, attached hereto as Exhibit B (hereinafter, "the Dinoff Report"). As will be discussed more fully herein, any expert testimony regarding the Disputed Standards should be excluded since they had not been adopted by Sussex County, and Plaintiff has not introduced the requisite expert testimony required to show that a reasonable property manager in Delaware would have exceeded the statutory

1

minimum requirements.

Federal courts sitting in diversity cases are required to apply the substantive law of the state whose laws govern the action, but federal rules will apply in such cases on procedural issues. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3rd Cir. 2000). In the Third Circuit, the admissibility of expert testimony in a diversity case is ordinarily controlled by federal procedural law. *Weaver v. Neidermayer-Martin Co.*, 1992 WL 394325, *3 (E.D.Pa.)(attached hereto as Exhibit C); *Haddigan v. Harkins*, 441 F.2d 844, 851-52 (3rd Cir. 1971). The Delaware District Court has held that, where a defendant property owner or manager has met all applicable building codes, the plaintiff must offer evidence that there was a higher standard of care than the minimum mandated by the applicable building code in order to proceed with a negligence action. *Miley v. Harmony Mill Ltd. Partnership*, 826 F.Supp. 824, 825-26 (D.Del. 1993). Such evidence must be in the form of expert testimony from someone with expertise in the Delaware real estate community. *Id.* at 826.

In the case at hand, it must first be emphasized that Defendant Resort did not own, control, or manage the Property, or participate in the planning, development, maintenance, or construction of the Property. As such, it is difficult to comprehend how Resort can have been expected to adhere to any building code, whether adopted by Sussex County or not. Indeed, expecting Resort to meet these standards makes little sense when considered in this context. In any event, there is no dispute that the Property, including the paver step at issue, met all applicable building codes and standards at the time of the Plaintiff's fall. Moreover, Mr. Wheatley, a certified Sussex County building inspector, testified that only the 1994 Southern Standard Building Code was applicable at the time of his inspection; none of the Disputed

Standards had been adopted by Sussex County.

Since none of the Disputed Standards were in effect, and the Property, including the paver step, met the applicable code, Plaintiff must introduce expert testimony in order to argue that whoever was in control of the Property was required to have met some higher standard. Moreover, such an expert must have some expertise in real estate management in Delaware. There is no evidence that Mr. Dinoff, an architect, meets this criterion. Accordingly, he may not testify that a reasonable property manager in Delaware would have gone beyond the minimum building standards set forth in the Sussex County Building Code. Thus, he should be precluded from testifying that the paver step failed to meet the Disputed Standards.

**B.    Testimony relating to the replacement of the paver step with one made from concrete is inadmissible pursuant to FRE 407.**

Both William and Wayne Mitchell testified that, after the incident at issue, the paver step in front of Unit 5 of Building A was replaced with a concrete step. WaM-42-54; WiM-25. Wayne Mitchell testified that he decided to replace the paver step with a concrete one because it would have been too expensive to add paver steps to all of the other units in the property. WaM-51. Once the concrete steps were installed on the other units, Mr. Mitchell decided to change the paver step to a concrete step for the sake of uniformity. As opposed to the paver step, which was not as wide as the porch to which it led, the new concrete step extends the full width of the porch. Plaintiff contends that she would have been less likely to fall had the concrete step been in place on the day of the incident rather than the paver step. Accordingly, the replacement of the step could arguably be considered a subsequent remedial measure. As set forth more fully herein, evidence of the replacement of the paver step with a concrete one is inadmissible to prove

3

negligence, culpable conduct, or a defect in the paver step.

As noted, *supra,* federal courts sitting in diversity cases are required to apply the

substantive law of the state whose laws govern the action, but federal rules will apply in such

cases on procedural issues. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 (1938);

*Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3rd Cir. 2000).  The Federal Rule of Evidence 407

provides:

> When, after an injury or harm allegedly caused by an event,
> measures are taken that, if taken previously, would have made the
> injury or harm less likely to occur, evidence of the subsequent
> measures is not admissible to prove negligence, culpable conduct,
> a defect in a product, a defect in a product's design, or a need for a
> warning or instruction. This rule does not require the exclusion of
> evidence of subsequent measures when offered for another purpose,
> such as proving ownership, control, or feasibility of precautionary
> measures, if controverted, or impeachment.

F.R.E. 407; *See also Masemer v. Delmarva Power & Light Co.,* 723 F.Supp. 1019, 1021 -1022

(D.Del.1989).[1]  Thus, evidence of remedial measures taken after an accident has occurred will

not be admissible to prove negligence.

In the case at hand, and as set forth more fully in Resort's Motion for Summary

Judgment, there is no evidence whatsoever that Defendant Resort owned, controlled or possessed

the Property.  Furthermore, it is uncontroverted that Wayne Mitchell, acting as part owner of

Bella Vista LLC, decided to replace the paver step after the incident; there is no evidence that he

consulted with Resort before making this decision, or that Resort even had any knowledge that

---

[1]The Third Circuit has held that FRE 407 is "arguably procedural," such that it would
govern in diversity actions, notwithstanding conflicting state law. *See Kelly v. Crown
Equipment*, 970 F.2d 1273, 1277-78 (3d Cir. 1992).  However, even if this rule is seen as
substantive such that Delaware state law applies, the analysis contained herein would remain
unchanged as DRE 407 is nearly identical to the corresponding federal rule.

4

consulted with Resort before making this decision, or that Resort even had any knowledge that the step was replaced. *See generally* Resort's Motion for Summary Judgment. Put simply, there is no real controversy over who owned or controlled the property, and no argument has been made by any party that precautionary measures were not feasible. In short, there is no permissible purpose for which evidence of the replacement of the paver step with a concrete one could be offered, and any such evidence should be excluded from these proceedings.

## CONCLUSION

For the foregoing reasons, Defendant Resort Realty Group, Inc. respectfully requests this Court to grant summary judgment in its favor and to award such other relief as is just and proper.

FERRY, JOSEPH & PEARCE, P.A.

/s/Robert K. Pearce
ROBERT K. PEARCE, ESQ. (I.D. No. 191)
THOMAS R. RIGGS, ESQ. (I.D. No. 4631)
824 Market Street, Suite 904
Wilmington, DE 19899
(302) 575-1555
rpearce@ferryjoseph.com
Attorneys for Defendant
Resort Realty Group, Inc.

Dated: September 6, 2007

5

# EXHIBIT
# A

1

1    IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT Of DELAWARE

2

3                                    COPY

4

     SANDRA E. FLUCK,            )
5    an individual,             )
                                )
6            Plaintiff,         )       Civil Action No.
                                )
7        v.                     )         06-188GMS
                                )
8    BELLA VISTA DEVELOPMENT,)
     LLC, a Virginia            )
9    corporation, BELLA VISTA)
     TOWNHOUSE CONDOMINIUM      )
10   ASSOCIATION, INC., a       )
     Delaware corporation,      )
11   RE/MAX REALTY GROUP, a     )
     Delaware Franchise,        )
12   WILLIAM J. MITCHELL,       )
     individually, and WAYNE )
13   MITCHELL, individually,    )
                                )
14           Defendants.        )

15

16

17          Deposition of CHARLES WHEATLEY taken pursuant
     to notice at the law offices of DOROSHOW, PASQUALE,
18   KRAWITZ, SIEGEL & BHAYA, 911 S. Dupont Highway, Dover,
     Delaware, beginning at 1:05 p.m. on Friday, June 22,
19   2007, before Vera T. Sitze, Registered Professional
     Reporter and Notary Public.

20

21
     APPEARANCES:
22
             ANDREA G. GREEN, ESQ.
23           DOROSHOW, PASQUALE, KRAWITZ, SIEGEL & BHAYA
             911 S. Dupont Highway
24           Dover, Delaware  19901
             For the Plaintiff

2

```
 1   APPEARANCES: (Continued)

 2         ROGER A. AKIN, ESQ.
           AKIN & HERRON, P.A.
 3           1500 Shallcross Avenue
             Suite 1-A
 4           Wilmington, Delaware  19806
             For the Defendant, William Mitchell
 5

 6         STEPHEN P. CASARINO, ESQ.
           CASARINO, CHRISTMAN & SHALK
 7           800 North King Street
             P.O. Box 1276
 8           Wilmington, Delaware  19899
             For the Defendant, Bella Vista
 9           Development, LLC

10

           THOMAS R. RIGGS, ESQ.
11         FERRY, JOSEPH & PEARCE
             824 North Market Street
12           Suite 904
             P.O. Box 1351
13           Wilmington, Delaware  19899
             For the Defendant, Resort Realty
14           Group

15

16

17

18

19

20

21

22

23

24
```

7

1    Q.   And how long have you been employed --

2    A.   Fourteen years.

3    Q.   It's best when the attorneys are asking

4  questions here today to simply wait until the question

5  is finished and then give your response.  We will wait

6  until you finish your response before we fire the next

7  question.  Okay?

8    A.   Yes, sir.

9    Q.   All right.  What is your title or position in

10  that department?

11    A.   I'm a certified building inspector.

12    Q.   And how long have you held that position?

13    A.   Fourteen years.  It will be 14 years February

14  the 16th.

15    Q.   And when you say certified building inspector,

16  what does the word certified means?

17    A.   That means you have to go to school for a

18  certain period of time, take a test to be certified.

19    Q.   When did you take that test?

20    A.   1999.

21    Q.   Is that an annual requirement?

22    A.   No, sir.

23    Q.   So you had worked in the department for several

24  years before you took that test?

18

1    A.    Uh-huh.

2    Q.    Units two and three were June 8, '04?

3    A.    Uh-huh.

4    Q.    And, again, units one and five were --

5    A.    5/20/04.

6    Q.    All right.  And the dates you've given us are

7    the dates when the final CO inspection was made on

8    those units?

9    A.    Yes.  And there's one more.  8/24/04 for unit

10   six.

11   Q.    All right.  From my calculation, it looks like

12   the inspections went over almost a period of a year.

13   A.    Yes, sir.  We have permit renewals here for

14   that.

15              MR. AKIN:  Off the record.

16              (Discussion held off the record.)

17              MR. AKIN:  Let's go back on the record.

18   BY MR. AKIN:

19   Q.    So it's your testimony that unit five was given

20   a final CO inspection on May 20 of '04.  Is that

21   correct?

22   A.    May 20, '04, yes.

23   Q.    What does the final inspection entail?

24   A.    The final inspection entails you check the

27

1    Q.    Do you have a recollection from your

2   inspections as to how many steps that the builder had

3   installed between grade and the cement porch in front

4   of these units?

5    A.    On Building A?

6    Q.    Yes, sir.

7    A.    One.

8    Q.    One step.  In your opinion as a code inspector,

9   was one step sufficient for this construction?

10   A.    Yes, sir.

11   Q.    If no step had been installed, would that have

12   complied with code?

13   A.    No, sir.

14   Q.    So a step was required here.  Correct?

15   A.    Yes.

16   Q.    When I say here, I mean Building A, the units

17   in Building A.

18   A.    Yes, sir, Building A.

19   Q.    As you look at this drawing though, this does

20   not tell you the nature of the construction of that

21   step, is that correct, whether it's cement or wood or

22   pavers or what have you?

23   A.    No, it does not.

24   Q.    Do any of the notes on this drawing refer to

1  that step?

2    A.   No.

3    Q.   You've reviewed it before today?

4    A.   Yes, I have looked at it.

5    Q.   All right.  Now, when you went out for the

6  final CO inspection in May of '04 on Building 1 (sic),

7  do you recall observing -- do you have a recollection

8  presently of the dimensions or the makeup of the step

9  that the builder had installed there?

10   A.   It was a single step, like I said, and I

11  believe it was like four foot, and I'm just

12  speculating because it's been a long time.  I don't

13  know.  I know it was over 36 inches which met code.  I

14  cannot tell you the length, it's been so long.  But I

15  do know it was over 36 inches.

16   Q.   And when you say 36 inches, you said that met

17  code.

18   A.   Right.

19   Q.   Now, in the Standard Southern Building Code of

20  1994, is there a section that deals with the width of

21  a step such as this?

22   A.   Yes, sir, it does.

23   Q.   Could you tell us that section number?

24   A.   Yes, sir.  It's Table 1004, page 249.  You go

 1  over, all the way over to the page that says Minimum

 2  Stair Width.  It has in parentheses a ten here.  You

 3  take it and you go down to the note.  Ten is, 36

 4  inches is acceptable if the stair or corridor serves

 5  an occupant load less than 50.

 6    Q.    What does occupant load mean?

 7    A.    How many people are in the building.

 8    Q.    If this is a two- or three-bedroom townhome for

 9  code inspection purposes, is that an occupant load of

10  less than 50?

11    A.    Yes, sir, it is.

12    Q.    So it's your testimony that the Standard

13  Southern Building Code of 1994 permitted a step of a

14  minimum width of 36 inches.  Is that correct?

15    A.    That is correct.

16    Q.    Does the code specify the actual materials that

17  the step must consist of?

18    A.    No, sir.

19    Q.    All right.  As you sit here today, do you

20  remember your final CO inspection in May of '04?  Do

21  you remember looking at the steps?

22    A.    Yes, I did.

23    Q.    Or that intermediate step.

24    A.    Yes, sir, I did.

30

1  Q.   Do you recall what it consisted of; what it was
2  made of?
3  A.   They were little blocks -- I say little blocks.
4  They were blocks, I guess maybe four inches thick.
5  It's been a long time.  Maybe three-and-a-half inches.
6  I'm not sure.  But they were solidly attached and they
7  did not move because that was checked to make sure
8  that they were in place and they were sturdy.
9  Q.   With regard to being sturdy, was it part of
10  your inspection to step on those steps?
11  A.   Yes, sir.
12  Q.   And did you determine if they were sturdy in
13  your words?
14  A.   Yes, sir.
15          MR. AKIN:  Off the record.
16          (Discussion held off the record.)
17          MR. AKIN:  Back on the record.
18  BY MR. AKIN:
19  Q.   I'm going to show you, sir, a couple of
20  photographs which I can represent to you show the
21  exterior of the unit where Ms. Fluck fell.  And if
22  you'd look at the picture in the upper left corner of
23  that page, do you see that, sir?
24  A.   Uh-huh.

31

1    Q.   As you sit here today, does that photo

2   accurately depict the construction of the step when

3   the final CO inspection was performed?

4    A.   Yes, sir, it does.

5    Q.   All right.  As you look at the intermediate

6   step, can you tell us in your words what those things

7   are that comprise that step?

8    A.   We call it slab stone that they use to cut to

9   make their step with, and I remember telling

10  Mr. Mitchell that it had to be -- he couldn't set them

11  just there without any fastener or mortar or

12  something.  It had to be set in place where you could

13  step on it and it would not move or anything like

14  that.  And it was checked, and I did check that.  And

15  he did do that.

16   Q.   When you say Mr. Mitchell, what was

17  Mr. Mitchell's first name?

18   A.   Wayne Mitchell.

19   Q.   Okay.  You instructed him to have the

20  contractors anchor those blocks?

21   A.   That is correct.

22   Q.   And when you inspected it, did you determine to

23  your satisfaction that the blocks were sufficiently

24  anchored?

1    A.    Yes, they were.

2    Q.    And as you look at that, you were satisfied

3    that those three blocks covered a width of more than

4    36 inches during your inspection?

5    A.    It was a little over 36.  I can't remember the

6    exact number.

7    Q.    Okay.  As you can see in that photo, the three

8    blocks do not cover the entire width of the cement

9    platform.  Do you agree with that?

10   A.    Yes, I do agree with it.

11   Q.    Is there any requirement in the code that an

12   intermediate step such as that one run the entire

13   width of the cement porch that it leads to?

14   A.    No, sir, it does not.

15   Q.    The code does not require that.

16   A.    No, sir.

17   Q.    You can also see in that picture, and we're

18   referring now to the picture in the upper left-hand

19   corner of Fluck Deposition Exhibit 1.  It appears that

20   there are no handrails in that photo.  Would you

21   agree?

22   A.    I agree.

23   Q.    Is there a requirement in the 1994 Standard

24   Southern Building Code that a step such as this have

1  one or two handrails on the sides of the step?

2  A.   No, sir, it does not.

3  Q.   All right.  When you say that, is there a

4  requirement at some point -- in the Standard Southern

5  Building Code of 1994, is there a requirement for

6  handrails at some point?

7  A.   Yes, sir, there is.

8  Q.   Do you have access to that provision in the

9  code in front of you?

10  A.   Yes, sir.  Code Section 1007.5, Handrails.

11  Would you like for me to read that?

12  Q.   Yes, if you would, please.

13  A.   "Stairways having four or more risers above a

14  floor or a finished ground level shall be equipped

15  with handrails located not less than 30 inches nor

16  more than 38 inches above the leading edge of tread."

17  Q.   The code section you just referred to requires

18  a handrail when there are four or more risers?

19  A.   That is correct.

20  Q.   In that photo in the upper left of Fluck

21  Exhibit 1, how many risers are there?

22  A.   Two.

23  Q.   What is a riser in the building code

24  profession?

34

1    A.   A riser is how many times you take and picked

2  your foot up to step on a step or a landing.

3    Q.   One other question while we're on this subject.

4         When an intermediate step such as what you

5  see in this photo, that's the one step between grade

6  and the concrete porch, when that step does not run

7  the entire width of the porch, is there a requirement

8  in the 1994 Standard Southern Building Code that the

9  areas not covered by the step be blocked by some

10 railing or physical object?

11   A.   No, sir, it's under 30 inches.

12   Q.   Could you explain your answer?

13   A.   Yes, sir.  If this had been 30 inches or more,

14 the landing, it would have been required to have a

15 guardrail.  But it's under the 30 inch and it's not

16 required.

17   Q.   When you said 30 inches, you mean the -- let me

18 just ask you the question so the record is clear.

19        When you say 30 inches, do you mean the

20 distance between the end of the intermediate step and

21 the end of the porch?

22   A.   No, sir.  The height of the landing.

23   Q.   So when -- all right.  I think I understand

24 now.

35

1        When the vertical distance between grade

2  and the porch in this situation, if that had been more

3  than 30 inches, some sort of barrier would have been

4  required?

5    A.    Yes, sir.

6    Q.    And what kind of barriers would have satisfied

7  the code?

8    A.    It would have been a guardrail at 36 inches

9  with pickets no more than four inches apart.

10   Q.    But is it your testimony as you look at that

11 photo today that such barriers were not required in

12 this case?

13   A.    That is correct, sir.

14   Q.    The reference you just made to the 30-inch

15 vertical distance requiring a barrier, is that in the

16 1994 code?

17   A.    Yes, sir, it is.

18   Q.    Could you find that section for us and read it,

19 please?

20   A.    Okay.  Code Section 1015.1, Guardrails.  "All

21 unenclosed floors, roofs, openings, and glazed slides

22 of landings and ramps, balconies or porches which are

23 more than 30 inches above finished ground level or a

24 floor below shall be protected by a guardrail.  A

1  guardrail shall form a vertical protective barrier not

2  less than 42 inches.  Open guardrails having

3  intermediate rails or ornamental pattern shall have

4  no more than a six-inch clearance and diameter sphere

5  cannot pass through any opening.  The bottom rail of

6  the curve shall be provided that will reject a passage

7  of a two-inch diameter sphere.  Construction of

8  guardrails to be adequate in strength, durability, and

9  attachment for their purpose of as described."

10     Q.    Okay.  And in the upper right-hand corner, an

11  individual is holding a tape measure.  It apparently

12  shows the vertical distance from the concrete porch to

13  grade.  If you can count the inch marks on that tape

14  measure, can you tell us the approximate vertical

15  distance there?

16     A.    It looks like eight inches to me, sir.

17     Q.    So that is not a distance which would require

18  handrails under the 1994 Standard Southern Building

19  Code.

20     A.    No, sir.

21     Q.    The various code provisions that you've been

22  citing here today, to your knowledge, did any of those

23  provisions change in the new code that Sussex County

24  adopted?

COPY                        1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SANDRA E. FLUCK, an individual,      )
    Plaintiff,                       )
                                     )
           v.                      )  C.A. No.
                                     )  06-188-GMS
BELLA VISTA DEVELOPMENT, LLC, a      )
Virginia corporation, BELLA VISTA    )
TOWNHOME CONDOMINIUM ASSOCIATION,    )
INC., a Delaware corporation,        )
RE/MAX REALTY GROUP, a Delaware      )
franchise, WILLIAM J. MITCHELL,      )
Individually, and WAYNE MITCHELL,    )
Individually,                        )
    Defendants.                      )

           Deposition of **WAYNE L. MITCHELL**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Doroshow, Pasquale, Krawitz & Bhaya,
911 South DuPont Highway, Dover, Delaware, on
Friday, May 11, 2007, beginning at 12:00 p.m.

APPEARANCES:

        DOROSHOW, PASQUALE, KRAWITZ & BHAYA
        BY:  ANDREA GREEN, ESQUIRE
        213 East DuPont Highway
        Millsboro, Delaware  19966
        Attorney for Plaintiff.


                          (Appearances Cont'd...)


**ORIGINAL RETAINED BY ANDREA GREEN, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

1    APPEARANCES CONTINUED:

2        CASARINO, CHRISTMAS & SHALK
         BY:   STEPHEN CASARINO, ESQUIRE
3        PO Box 1276
         Wilmington, Delaware  19899-1276
4        Attorney for Bella Vista Development, LLC.

5        THE LAW OFFICE OF CYNTHIA BEAM
         BY:   CHARLES COATES, ESQUIRE
6        131 Continental Drive
         Suite 407
7        Newark, Delaware  19713
         Attorney for Defendant
8        Bella Vista Townhome Condominium Association.

9        FERRY, JOSEPH & PEARCE
         BY:   ROBERT K. PEARCE, ESQUIRE
10       PO Box 1351
         Wilmington, Delaware  19899-1351
11       Attorney for Defendant RE/MAX Realty Group.

12       AKIN & HERRON
         BY:   ROGER A. AKIN, ESQUIRE
13       PO Box 25047
         Wilmington, Delaware
14       Attorney for Defendant Wayne Mitchell.

15

16

17

18

19

20

21

22

23

24

 1    units at building A?

 2         A.    No, I don't believe.  Let me read it.

 3         Q.    Okay.

 4         A.    No.

 5         Q.    Okay.  So at the time you were bidding out

 6    the subcontracts for this development, you were not

 7    seeking anything from Terra Scapes at that point for the

 8    steps?

 9         A.    No.

10         Q.    Okay.  Can you just describe in lay terms

11    what it was that you were having Terra Scapes bid on?

12         A.    The pavers.

13         Q.    Okay.  The pavers forming the ground

14    surface?

15         A.    The ground surface.

16         Q.    To make it look like the cobblestones that

17    you were talking about earlier?

18         A.    Sod, retaining walls, containers, mulch,

19    grading, irrigation, everything like that.

20         Q.    So basically, landscaping and laying the

21    pavers to make it look like the cobblestones?

22         A.    Yes.

23         Q.    Okay.  The final item in that packet is an

24    invoice from Terra Scapes.  And it's an invoice dated

Wayne Mitchell - Green                    43

1    11/24/2004, and the description is labor for relay

2    pavers around new conc. stoops, C-O-N-C stoops. Can you

3    explain what that was?

4        A.    When we took those out, when I got the bill

5    for the steps from them, it was just too high. And that

6    was to put the pavers back around the new steps.

7        Q.    Okay. Back up a little bit. When you got

8    the bill from them for doing what?

9        A.    Putting in my steps, the paver steps for the

10   first building, putting in four sets.

11       Q.    When you say the first building, you are

12   talking about building A?

13       A.    Building A. When we received the bill --

14   because there was never a bid on it. It was an extra.

15   I said:  We can't afford you boys. We put the concrete

16   steps in, and that was for putting the pavers back in

17   around the concrete steps.

18       Q.    Okay. When was it that you decided to have

19   the -- Back up just a minute. In these photographs that

20   we were looking at, we were looking at these large, flat

21   landscaping pavers.

22       A.    Yes.

23       Q.    When was it decided to place these as the

24   step instead of the poured concrete step?

1        A.    I'm not sure of the date; before we got our

2    CO, because it had to be done before the CO. So if you

3    have a date before the CO, it was probably done a couple

4    of weeks before that.

5        Q.    Okay. And are you saying that there was

6    never anything in writing about having them do that

7    work?

8        A.    No. We were out there in the yard. And we

9    decided: Let's do those. They would look a lot better.

10       Q.    Who was out there in the yard?

11       A.    Me, a guy from Terra Scapes, Ronnie Baker.

12       Q.    Who is Ronnie Baker?

13       A.    Terra Scapes.

14       Q.    So he is the guy that you were referring to

15   from Terra Scapes?

16       A.    Yes.

17       Q.    And who else?

18       A.    I know I was there. I know Ronnie was

19   there, and after that, probably six or seven guys that

20   worked for him. I don't know who they were. I have no

21   clue.

22       Q.    Okay. So you were out there and talking to

23   him about what? Are we going to put in a poured

24   concrete step?

1          A.     When we needed an elevation, we needed a

2    step, and we decided that was the kind of step we were

3    going to put in.

4          Q.     Okay.  Did somebody tell you you needed a

5    step, or you knew it?

6          A.     You know it by code.

7          Q.     Because what was the problem?

8          A.     It was more than probably seven and a

9    quarter inches.  I think it was seven and a quarter.

10   Don't hold me to the seven and a quarter.  I'm pretty

11   sure that's what it is.

12         Q.     Okay.  So your recollection is if it's over

13   seven and a quarter inches from the ground --

14         A.     From the ground step.

15         Q.     -- from the ground surface up to the surface

16   of the porch --

17         A.     You'd never pass code.

18         Q.     Okay.  So you knew because of the

19   measurement that you needed some type of a step there?

20         A.     Yes.

21         Q.     Okay.

22         A.     Some units required it; some units did not.

23         Q.     Okay.  Because of the grade of the ground?

24         A.     Yes.

1         Q.      And this was at some point before you got a

2    certificate of occupancy.  And was Ronnie Baker out

3    there anyway, doing some of the landscaping work?

4         A.      Putting the pavers in.

5         Q.      Okay.  The pavers in other areas, not the

6    steps, because you hadn't discussed with him the steps

7    yet?

8         A.      Putting these pavers in right here.

9         Q.      You are talking about --

10        A.      From one end to the other; you start from

11   the middle and work your way to the buildings.

12               MR. CASARINO:  So we are not confused, why

13   don't we refer to the pavers, as he has, as the ground

14   level, and steps, as he has, as the concrete steps?

15               MS. GREEN:  Well, he has referred to it as a

16   large landscaping paver.  And it is the same, exact kind

17   of landscaping paver that is used along the retaining

18   wall.

19   BY MS. GREEN:

20        A.      Those aren't steps along the retaining wall,

21   are they?

22               MR. CASARINO:  It wasn't for that purpose.

23   I'm just saying so we don't get confused when we are

24   saying what one thing is when another thing is --

1            THE WITNESS:  I've seen people step on them,

2   yeah.

3   BY MS. GREEN:

4        Q.    But that is a retaining wall; is that right?

5        A.    Right.

6        Q.    That is a retaining wall.

7        A.    But I've seen people step on them.  I mean

8   it's not a step.  They are not a step, maybe, but I have

9   seen people step up there.  So maybe it's a step.

10       Q.    Okay.  So the items that you utilized as

11  steps are the same kind of pavers as Terra Scapes used

12  at the top of the retaining wall?

13       A.    Yes.  A lot of people go in there without

14  falling down, too.  You want to hear that?

15            MR. CASARINO:  Let's --

16            THE WITNESS:  Sorry.  Sorry.

17  BY MS. GREEN:

18       Q.    Okay.  At some point you went out there to

19  the property as the ground level pavers or the

20  cobblestone area was being placed, and you knew that you

21  needed some type of a step; is that right?

22       A.    Yes.

23       Q.    And did you consider putting in the poured

24  concrete step?

1        A.    No.

2        Q.    Okay.  So the only thing you did was you

3    discussed with Ronnie Baker from Terra Scapes what kind

4    of a step he could put in there?

5        A.    Yes.

6        Q.    Okay.  And to the best of your recollection,

7    can you tell us the contents of your conversation with

8    Ronnie Baker about those steps?

9        A.    Let's put them in.

10       Q.    Okay.  Let's put what in?  Did you discuss

11   with him what you wanted?

12       A.    Yes.

13       Q.    Okay.  Did you say:  Do you have any

14   suggestion?  Or did you say to him:  This is what I

15   want?

16       A.    No.  I had suggestions, yes.

17       Q.    And what were your suggestions?

18       A.    Let's put in a good step that matches the

19   pavers for a nice curb appeal.

20       Q.    And was that kind of about as much design

21   work as you did, and then he said:  This is what we can

22   do?

23       A.    Yes.

24       Q.    Okay.  What did he describe to you that he

```
 1   could do?

 2        A.    Well, we did one.  And then we said:  Let's

 3   do it.

 4        Q.    You said you did one.  Do you recall which

 5   unit --

 6        A.    Six.

 7        Q.    You put in the step at unit 6 --

 8        A.    Right.

 9        Q.    -- which is one of the photographs we looked

10   at already?

11        A.    Yes.

12        Q.    And you liked the way it looked?

13        A.    Yes.

14        Q.    Did you talk to him about what size it had

15   to be?

16        A.    We had six -- We actually had the guy come

17   down and measure them, and he agreed to them, I think.

18   I think -- I'm pretty sure that's what happened.  We

19   didn't put them all in the same day.  We put in like

20   one, measured it, it passed code, let's go for it.

21        Q.    You said you measured it and it passed code.

22   What code are you talking about?

23        A.    The Sussex County Code, the building code.

24        Q.    Do you know what portion of the code it
```

1   matched?

2       A.    I have no clue.

3       Q.    Do you know who it is that came down and

4   measured it and looked at it?

5       A.    Charlie.

6       Q.    Charlie who?

7       A.    I don't know Charlie's last name.

8             MR. COATES:   Not me.

9             THE WITNESS:   No, Charlie with Sussex County

10  Code inspection.

11  BY MS. GREEN:

12      Q.    And did you discuss with Terra Scapes what

13  you would pay them for the work that they were doing?

14      A.    Unfortunately, no.

15      Q.    Okay.  So that was the genesis of the

16  problem that you had with the invoice that we have

17  discussed earlier?

18      A.    Yes.  Now, that invoice is not for the

19  steps.  You read the invoice.

20      Q.    Okay.  So that invoice is just for pavers

21  around new concrete stoops?

22      A.    Steps.  What his invoice says --

23      Q.    Okay.  I'm just reading what it says.

24      A.    -- because you have a big time differential

1    there.  This is '03 -- well, that is -- one is 2/25, and

2    the other one is 11/04.  You've got -- what is that?

3    Six months?

4          Q.    I think it's a little more than that.

5          A.    Yes.

6                MR. CASARINO:  Nine months.

7                THE WITNESS:  Nine months.  This is when he

8    came back.

9    BY MS. GREEN:

10         Q.    This is when who came back?

11         A.    Terra Scapes.  When we took these steps out,

12   the Terra Scapes steps -- because the price, they gave

13   us a price on what it cost us.  The three of us sat down

14   and said:  We aren't going to pay that much money.  We

15   had another 34 units to do -- or 32 units.  And I think

16   it was somewhere around $1,200 a step.  We said:  We

17   can't do that.  So he took that out, and then he put

18   these back around there.

19         Q.    Okay.  How many --

20         A.    It took ten hours at $10.38 an hour.  That's

21   just to put the pavers -- because you have to take the

22   whole thing of pavers out, and they brought them back in

23   again to match the other steps.  That's what that bill

24   is for.  That's not for the step.

1          Q.    Let me go back and make sure I understand

2    this.

3          A.    Okay.

4          Q.    You were out at the property.  You talked

5    with Ronnie Baker.  And he went ahead and put in these

6    paver steps at unit 6.

7          A.    Yes.

8          Q.    You liked the way it looked, right?

9          A.    Yes.

10         Q.    And you told him to go ahead and put in more

11   of them?

12         A.    At the first building.

13         Q.    So at the first building, at each entrance,

14   there was one of these --

15         A.    Four.  There were five sets of steps.

16         Q.    One unit didn't need them?

17         A.    Right.

18         Q.    So five sets of steps were put in.  And

19   there was no contract, nothing in writing for that?

20         A.    No.

21         Q.    Your answer is no?

22         A.    No, time and material.

23         Q.    Did they give you a bill?

24         A.    Yes.

```
 1         Q.    Okay.  Do you have it?

 2         A.    I'm sure I can find it.  I do not have it

 3    with me, no.

 4         Q.    Okay.  So you agree that you could find it

 5    and you would then provide that to your attorney to give

 6    to me?

 7         A.    I'll get it from them if I have to.

 8         Q.    Okay.  So they gave you a bill for those

 9    five sets of steps.  And did you pay for those five sets

10    of steps?

11         A.    Yes.

12         Q.    Do you recall how much it was?

13    '    A.    They were over a thousand dollars a piece.

14         Q.    And you paid that.  And then at some later

15    point, you decided to put in a poured concrete step?

16         A.    Yes.

17         Q.    When was that?

18         A.    Somewhere between that point and the time

19    that bill was sent out.

20         Q.    Okay.  So if your certificate of occupancy

21    was issued in mid May of 2004, sometime between May of

22    2004 and November of 2004, you decided to put in

23    concrete steps?

24         A.    Right.  Well, we were across the street,
```

 1   putting in the steps.  We did those first.

 2         Q.    Okay.  When you say across the street, you

 3   are talking about the townhomes directly across?

 4         A.    Right.

 5         Q.    So if you are coming out the door of, say,

 6   units 5 or 6 --

 7         A.    You looked across.

 8         Q.    -- you looked directly across?

 9         A.    Right.  And then we were looking and said:

10   Well, they don't look right.  So then we said we had to

11   change both sides.

12         Q.    Okay.  So it didn't look right to have

13   concrete steps across and the pavers on the building A?

14         A.    Yes.

15         Q.    Okay.  And who did you contract with to put

16   in the concrete steps?

17         A.    Fluharty.

18         Q.    How much did that cost you?

19         A.    I do not know.

20         Q.    Did you receive a bill?

21         A.    I'll guesstimate a couple of hundred bucks a

22   step, but I don't know that for a fact.  Yeah, I got a

23   bill somewhere.

24         Q.    Did you enter into a contract with Fluharty

COPY    1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SANDRA E. FLUCK, an individual,      )
     Plaintiff,                         )
                         )
          v.                             )  C.A. No.
                         )  06-188-GMS
BELLA VISTA DEVELOPMENT, LLC, a      )
Virginia corporation, BELLA VISTA    )
TOWNHOME CONDOMINIUM ASSOCIATION,    )
INC., a Delaware corporation,        )
RE/MAX REALTY GROUP, a Delaware      )
franchise, WILLIAM J. MITCHELL,      )
Individually, and WAYNE MITCHELL,    )
Individually,                        )
     Defendants.                        )

            Deposition of **WILLIAM JOSEPH MITCHELL**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Doroshow, Pasquale, Krawitz & Bhaya,
213 East DuPont Highway, Millsboro, Delaware, on
Friday, March 16, 2006, beginning at 1:00 p.m.

APPEARANCES:

     DOROSHOW, PASQUALE, KRAWITZ & BHAYA
     BY:  JENNIFER S. DONAHUE, ESQUIRE
     213 East DuPont Highway
     Millsboro, Delaware  19966
     Attorney for Plaintiff.

                             (Appearances Cont'd...)

**ORIGINAL RETAINED BY JENNIFER S. DONAHUE, ESQUIRE**

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

```
 1   APPEARANCES CONTINUED:

 2        CASARINO, CHRISTMAS & SHALK
          BY:  STEPHEN CASARINO, ESQUIRE
 3        PO Box 1276
          Wilmington, Delaware  19899-1276
 4        Attorney for Bella Vista Development, LLC.

 5        THE LAW OFFICE OF CYNTHIA BEAM
          BY:  CAROL J. ANTOFF, ESQUIRE
 6        131 Continental Drive
          Suite 407
 7        Newark, Delaware  19713
          Attorney for Defendant
 8        Bella Vista Townhome Condominium Association.

 9        FERRY, JOSEPH & PEARCE
          BY:  ROBERT K. PEARCE, ESQUIRE
10        PO Box 1351
          Wilmington, Delaware  19899-1351
11        Attorney for Defendant RE/MAX Realty Group.

12        AKIN & HERRON
          BY:  ROGER A. AKIN, ESQUIRE
13        PO Box 25047
          Wilmington, Delaware
14        Attorney for Wayne Mitchell.

15

16

17

18

19

20

21

22

23

24
```

```
 1          A.    Uh-huh.

 2          Q.    Does that permanent concrete step extend the

 3    length of the porch?

 4          A.    Yes.

 5          Q.    Do you know the contractor who poured those

 6    steps?

 7          A.    I assume Atlantic Concrete.

 8          Q.    I don't want you to assume.  Do you have any

 9    knowledge that it was them?

10          A.    I'm not 100 percent sure, no.

11          Q.    Okay.  So you weren't involved in any of the

12    discussions?

13          A.    No, I was not.

14          Q.    As of June of '04, did this unit have a

15    handrail leading down the steps?

16          A.    No.

17          Q.    Did the steps have any markings in any way?

18    Any painting?

19          A.    No.

20          Q.    Now, I want to go over when the Plaintiff

21    and her friend actually left the unit.  Can you explain

22    how that occurred?

23          A.    We walked to the bottom of the steps.  I

24    said:  Have a nice day.  Enjoy the rest of your weekend.
```

# EXHIBIT
# B



## Robson Forensic
INCORPORATED

April 30, 2007

Andrea G. Green, Esq.
Doroshow Pasquale Krawitz & Bhaya
213 E. Dupont Highway
Millsboro, DE 19966
VIA FAX: 302 934 8400

Re:     Sandra Fluck fall

Dear Attorney Green:

On June 27, 2004 Sandra Fluck was viewing a model home at the Bella Vista Townhome and Condominium development in Rehoboth Beach, Delaware. While exiting, she fell at the edge of the unit's exterior stair to grade, and she was injured. You asked that I determine if the building conditions were dangerous in a manner that caused Fluck's fall. I've reviewed the Amended Complaint, Sandra Fluck's deposition and photographs of the area. I understand additional material, including the deposition of the builder, will be gathered in the future. After reviewing that material, I may supplement this report.

## BACKGROUND

The front door of the model unit exited onto a concrete platform which is substantially level with the interior floor level. The platform was raised about 9" above grade and it served as the top landing of the egress stair connecting the unit to grade. When Fluck visited this model, the condominium project was still under construction. The exterior stair had not been completed, and while the model was being shown, three landscaping blocks had been placed to create a temporary two-riser stair down to grade.

Two columns flank the outer edge of the platform and define the landing width. Only three 14" wide landscaping blocks were placed, and the temporary stair was much shorter than the platform edge between the columns. The gap along the right edge was about 24" wide. There were no handrails at the stair nor were there any rails, guards, planters or other means to define and protect the parts of the platform edge where there was no stair.

Fluck was 57 years old and in good health. The weather was nice, and she was wearing shorts, a top and boat shoe loafers. She and her companion saw a sign advertising the open model and spent about 20 minutes viewing the unit. As they exited, her companion preceded her and walked across the landing and down the stair. Fluck then walked across the platform and, believing the stair extended the full width of the platform edge, she descended to the right of the

354 North Prince Street
Lancaster, PA 17603
Phone: 717.293.9050
Toll-Free: 800.813.6736
Fax: 717.293.1195
www.robsonforensic.com

platform's center. She stepped down the first riser with her left foot onto the stair tread. She intended to step down to the same tread with her right foot; however the stair didn't extend far enough. Her right foot came down unsupported, and she lost her balance. There were no handrails and she was unable to recover her balance. She fell, twisting her left foot and she was injured.

## DISCUSSION

Fluck fell because conditions at the platform led her to believe the stair was the same width as the platform edge, but it was much narrower. There were no rails, planters or other devices placed to delineate the actual safe exit width. The stair lacked handrails which, had they been present, would have unambiguously delineated the safe width of egress and would also have provided Fluck with a means to maintain her balance and avoid falling.

Short flight stairs such as the one where Fluck fell are associated with increased falls because their low height impairs the ability of users to reliably identify their presence and nature. ASTM/ANSI F1637 Standard Practice for Safe Walking Surfaces is a nationally accepted practice for fall prevention. F1637 directs that stairs with three or fewer risers "shall be avoided where possible" and:

> In situations where a short flight stair or single step transition exists or cannot be avoided, obvious visual cues shall be provided to facilitate improved step identification. Handrails, delineated nosing edges, tactile cues, warning signs, contrast in surface colors, and accent lighting are examples of some appropriate warning cues.

In cases where owners rely on color to delineate tripping hazards, F1637 guides them to follow the national standard ANSI Z535.1 Safety Color Coding. Z535 identifies safety yellow as the national standard color for identifying tripping hazards. There were no yellow markings where Fluck fell.

Handrails act as necessary safety equipment at stairs, and rails should have been installed at this stair. Rails delineate the location, boundaries and character of a stair, assist users to descend safely and also act as a grab bar to assist users to recover their balance when needed. Since 1978, the Consumer Product Safety Commission's Guidelines for Stair Safety cautioned:

| IF: | there are no handrails on one or both sides of an interior or exterior flight of stairs, or: |
|---|---|
| THEN: | install a properly positioned guardrail, with an attached handrail, for the entire length of the flight. |

Bella Vista's model was an attached single-family townhome. The National Life Safety Code NFPA-101 is a nationally accepted standard that includes requirements for one and two-family dwellings. This stair was required to conform to:

Stairs and intermediate landings shall continue with no decrease in width along the direction of egress travel (7-2.2.3.2)

Stairs and ramps shall have handrails on both sides (7.2.2.4.2)

The International Residential Code for One and Two-Family Dwellings is a well established national safety standard for the design and construction of single family residences. It is also adopted by Sussex County. Section 315. Handrails, required:

Handrails... shall be provided on at least one side of stairways. All required handrails shall be continuous the full length of the stairs with two or more risers from a point directly above the top riser of a flight to a point directly above the lowest riser of a flight (R315.1).

## FINDINGS

Within the bounds of reasonable architectural certainty, and subject to change if additional information becomes available, it is my professional opinion that this stair violated applicable standards, and created a deceptive and dangerous condition that caused Fluck's fall.

If you require anything else, please let me know.

Lawrence C. Dinoff, A.I.A.

# EXHIBIT
# C

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1992 WL 394325 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Weaver v. Neidermayer-Martin Co.
E.D.Pa.,1992.
Only the Westlaw citation is currently available.
    United States District Court, E.D. Pennsylvania.
    Barry WEAVER and Cleo Weaver, Individually
    and Barry Weaver as Parent and Guardian of
        Andrea Weaver, a Minor, Plaintiffs,
                            v.
        NEIDERMAYER-MARTIN COMPANY,
        Defendant, Third-Party Plaintiff,
                            v.
    TREBY-HOWARD-PHILIPS, Third-Party
                    Defendant.
                **Civ. A. No. 87-1557.**

                    Dec. 29, 1992.

Robert J. Magee, Worth Law Offices, Allentown,
Pa., for plaintiffs.
Barbara L. Hollenbach, Holland, Taylor &
Sorrentino,      Bethlehem,      Pa.,      for
Neidermayer-Martin Co.
Edward C. McCardle, King McCardle Herman &
Fruend, Allentown, Pa., for City of Allentown.

                MEMORANDUM
TROUTMAN, Senior District Judge.
**\*1** At age four, the minor plaintiff in this case fell or
jumped from a playground climber located in
Roosevelt Park in Allentown, Pennsylvania, which
was manufactured and sold by defendant
Neidermayer-Martin. The impact resulted in
severe injury to the child's left leg, with permanent
residual effects and continuing physical limitations.

Plaintiffs tried the case solely on the theory of strict
liability, alleging that the pyramid-shaped wooden
climber with attached sliding board was defectively
designed in that (1) the climbing beams were spaced
too far apart, allowing the child to pass between
them; (2) the climbing surface was not treated with
slip-resistant material; (3) there were no handrails.

Plaintiffs also alleged that the lack of warnings
concerning appropriate use of the climber rendered
it defective.

During the trial of the case, in ruling on motions
interposed by the defendant and third-party
defendant, the Court (1) struck the testimony of
plaintiffs' expert with respect to his opinions that the
climber was defective for lack of non-slip materials
on the climbing members and for lack of handrails;
(2) dismissed the third-party complaint against
Treby-Howard-Philips; (3) granted a directed
verdict on the warnings claim; (4) precluded
plaintiffs from examining defendant's expert
concerning a statement in her expert report which
was purportedly inconsistent with her testimony and
the opinion expressed at trial that the climber was
not defective.

The jury was provided with interrogatories to guide
its deliberations and returned a verdict in favor of
the defendant by finding, in response to Question 1,
that the climber was not defective when it left
defendant's control. (See, Verdict Slip, Doc. # 92).

Plaintiffs subsequently moved for a new trial,
asserting that the Court erred in striking portions of
the testimony of plaintiffs' expert and in limiting
plaintiffs' examination of defendant's expert witness
with respect to what plaintiffs characterized as a
prior inconsistent statement. We will address these
issues *seriatim*.

                *I. Testimony of Paul Hogan*

As noted, plaintiffs sought to demonstrate that the
climber was defectively designed because of three
features: the distance between the timbers; the
failure of defendant to treat the climbing members
in some way in order to render them slip-resistant
and the lack of handrails.

Defendant objected generally to the testimony of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1992 WL 394325 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

plaintiffs' expert witness, Paul Hogan, contending that he was not qualified to offer opinions on the proper design of playground equipment. We determined, however, that the witness met the minimal standards set forth in Fed.R.Evid. 703 and permitted him to testify completely concerning the design of the climber.

Defendant subsequently requested that Hogan's testimony concerning two of the purported design defects, lack of a slip-resistant surface and lack of handrails, be stricken. Such request was based upon the lack of any evidence concerning how or why the minor plaintiff precipitously exited the climber and came to rest on the ground inside and under the pyramid.

*2 The expert witness noted that if the climber had included handrails, the child could have used them to assist her ascent to the top of the pyramid and might have prevented her from losing her balance.
He further testified that if the wooden climbing members had been treated with a non-slip material, such feature might have prevented her from slipping while she climbed. He maintained that the combination of three factors contributed to the accident, *i.e.,* if she slipped, the lack of non-slip treatment; if she lost her balance, the lack of handrails; and, in any event, the spacing of the climbing members, which permitted her body to pass between them and strike the ground inside and under the pyramid.

On cross-examination, however, the witness admitted that neither he nor anyone else knew whether the child had, indeed, either slipped or lost her balance. (*See,* Doc. # 97 at 70-71). Upon questioning by defendant's counsel, the witness agreed that it would be speculative to assume that the child slipped, and, hence, that a non-slip surface treatment would have prevented the accident. (*Id.*). Likewise, he agreed that it would be speculative to assume that the child lost her balance and, therefore, that handrails might have prevented the accident. (*Id.*). Later, on re-cross-examination, the witness further admitted that if the child decided to jump to the ground toward the center interior of the pyramid, neither the presence of handrails nor a slip-resistant surface would or could have prevented

the accident. (*Id.,* at 94, 95).

Upon inquiry by the Court during an earlier conference in chambers, held to discuss defendant's motion to preclude the expert testimony entirely, plaintiffs' counsel stated that the child had no memory of the accident, and, therefore, could not testify how and why she came to be on the ground beneath the climber. (*Id.,* at 57a).

Moreover, both the plaintiff mother and Donald Weiss, the only witnesses present at the scene, had testified earlier in the trial that, although they had been observing the child's climb just prior to the accident, their attention was diverted at the moment she exited the climber.

The child's mother testified that she was watching while Andrea ascended the climber toward the top. When Andrea reached the fifth level from the ground, Andrea's sister called out to her mother from another area of the park and the mother looked away for a few seconds to converse with that child. When she looked at the climber again, Andrea was no longer on it. (*See,* Testimony of Cleo Weaver, Doc. # 95 at 78, 79). The mother subsequently saw Andrea under the climber, directly in the center, on her knees and sitting back. (*Id.,* at 80, 81).

Similarly, Donald Weiss, another person who had brought children to the park that day, testified that he noticed Andrea on the climber, at about the sixth level from the ground, when he turned away to light a cigarette. When he looked back at the climber, a minute or two later, he likewise did not see her on the equipment any longer. (*See,* Doc. # 96 at 9, 10).

*3 Since no one could testify concerning the manner in which Andrea had exited the climber, *i.e.,* by slipping and falling, by losing her balance and falling, or by jumping down, we concluded that defendant's motion to strike the expert's testimony with respect to the danger posed by lack of a non-slip surface on the climbing members and by lack of handrails should be granted and instructed the jury accordingly.

Plaintiffs' argument that such decision was an error entitling them to a new trial is based upon their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1992 WL 394325 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

contention that the expert's opinion with respect to the handrails and non-slip surface was not speculative in that the jury could properly infer that the child could have slipped or could have lost her balance.

Plaintiffs rely on the case of *Beary v. Container General Corp.,* 533 A.2d 716 (Pa.Super.1987), to support their argument, contending that the *Beary* trial court permitted expert testimony concerning conditions which could have distracted the plaintiff at the work-site and, thus, could have contributed to the accident in which plaintiff was injured. Plaintiffs assert that their expert's testimony concerning the possibilities that lack of handrails and/or slip-resistant surface on the climber in this case is of a similar nature and, therefore, the jury should have been permitted to consider it.

Plaintiffs' reliance on *Beary,* however, is misplaced for several reasons. First, the **admissability of expert testimony**, albeit in a **diversity** case in which Pennsylvania law governs the **substantive** issues, is ordinarily controlled by federal procedural law. *See, Stepney v. Dildy,* 128 F.R.D. 77 (D.Md.1989).

Second, the *Beary* court noted that, in general, even expert testimony must have some basis in the facts, and is not competent if based upon "mere possibilities". 533 A.2d at 722.

The exception to that general rule, which was present and was the basis for certain evidentiary rulings in *Beary,* but was here absent, involves matters within the specialized knowledge of the expert. In *Beary,* the court noted that the expert witness's testimony with respect to what the plaintiff could, and likely would, have seen at the time of the accident was based upon his personal observations of the site under conditions similar to those existing at the time of the accident and his specialized knowledge as an engineering expert.

Finally, contrary to plaintiffs' representation as to the nature and extent of the expert testimony admitted by the trial court concerning factors which might have contributed to the accident in *Beary,* the Superior Court noted that defendants' objection to

the expert's testimony concerning likely noise distractions at the accident scene was sustained by the trial court. Thereafter, the trial judge permitted the expert to testify only as to "noise-producing machines known through previous testimony to be in operation at the time of the accident." *Id.,* at 723. The Superior Court concluded that the limitations imposed by the trial court on the noise-level testimony had eliminated the speculation problem, and, therefore, that the witness's opinions on that issue, based upon other facts in evidence and upon his specialized knowledge, constituted competent evidence.

\*4 Here, the expert witness's opinion that the injured child either fell or jumped from the climber is not a matter within his specialized knowledge, *i.e.,* the design of playgrounds and playground equipment. Rather, it is a matter of common and logical inference that if, as established by the testimony, the child was seen by two people to be several feet off the ground and climbing on a piece of equipment, was unobserved for only a few seconds, and was next seen on her knees inside and below the structure, she would not have been able to climb down and crawl under the pyramid. Obviously, therefore, she must have passed quickly between the climbing members and struck the ground. No amount of expertise, however, with or without later observation of the scene, could reveal how or why she left the climber and dropped to the ground. Thus, expert testimony suggesting that she might have slipped or might have lost her balance, and, in addition, that if she slipped and/or if she lost her balance, design features tending to reduce the possibility of slipping or to provide a means for regaining balance, and/or to otherwise reduce the possibility of a fall, might have prevented the accident in this case is itself a pyramid of speculation, with no basis in the facts of the case or reasonable inferences therefrom. Hence, an opinion that the climber was defectively designed because it had no handrails and was not treated for slip-resistance, and that the accident might have been caused by the absence of such features, was not competent expert testimony and our decision to strike such testimony is entirely consistent with *Beary.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 4

Not Reported in F.Supp., 1992 WL 394325 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

In addition, the situation presented by the expert testimony in this case is strikingly similar to *Stepney v. Dildey,* in which, as here, the Federal Rules of Evidence were applicable. As there noted, federal evidentiary rules require that "an expert's opinion on causation must be based on facts established by independent evidence properly introduced." 128 F.R.D. at 80. (Citations omitted). The Magistrate Judge who tried the *Stepney* case further noted that some of the expert's proffered testimony, to which defendant objected, was based upon "assumed facts not supported by the evidence" , and, on that basis, granted the defendant's motion in limine to preclude testimony that illumination of the premises where the plaintiff was injured was inadequate and that the plaintiff slipped on a small patch of ice. The expert had admitted that he did not know how much light there was at the premises at the time of the accident, or whether there had been any precipitation in or around the premises on the day of the accident. Consequently, the court determined that the witness's opinion as to these possible causes of, or factors contributing to, the accident was not competent evidence and the jury was not permitted to consider it.

Thus, we conclude that our decision not to permit the jury to consider whether handrails and/or slip-resistant surfaces on the climbing members of the equipment might have prevented the accident was proper, and, indeed, required by the rules of evidence. To find that the climber was defective for lack of either or both of such features, and that such defect(s) proximately caused the child's injury, the jury would have had to rely upon an expert opinion based only upon conjecture, since there was no evidence as to how and why the child exited the climber and since such a determination was not a matter upon which the expert witness could render an opinion based upon his specialized knowledge and training.

*II. Cross-Examination of Frances Wallach*

**\*5** Plaintiffs also assert that the Court erroneously limited their cross-examination of defendant's expert witness, Frances Wallach, concerning an opinion expressed in her expert report, which was not introduced into evidence, that the top level of the climber appeared to be incorrectly installed, and, that if it had not been properly installed, the climber was thereby defective because of the angle and distance between the last climbing member and the top platform of the pyramid-shaped structure.

Plaintiffs contend that their purpose in attempting to examine the witness concerning that opinion was to cast doubt on her credibility by demonstrating that she had previously expressed an opinion contrary to her trial testimony that the climber was not defective. Plaintiffs argue that our conclusion that such examination would have been both irrelevant and beyond the scope of the direct examination is belied by the testimony of Cleo Weaver and Donald Weiss that, when last seen on the climber, Andrea was ascending to the very area in which the witness had previously stated there might have been a defect in the product. Thus, plaintiffs ultimately contend that the Court erroneously denied them the opportunity to attack the credibility of the defendant's principal witness, and that such error must be corrected by granting them a new trial.

Although plaintiffs acknowledge that the examination of defendant's expert concerning her report and the statement therein purportedly inconsistent with her trial testimony could not be used to prove a defect in the equipment, but could be used only to suggest that the witness had previously expressed an opinion contrary to that to which she testified at trial, and, therefore, to diminish her credibility, their own arguments on this matter highlight the virtual impossibility of maintaining such a distinction, as well as the nature of the prejudice and jury confusion which would likely have resulted had the Court permitted the inquiry to go forward.

As noted, plaintiffs emphasized, both at trial and in their argument in support of their motion for a new trial, that the witnesses who saw Andrea climbing on the equipment just prior to the accident placed her close to the area thereof which had been characterized as "defective" in the defendant's expert witness report. Plaintiffs contend, therefore, that Andrea's location on the climber at that time supports their position that the expert witness's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 394325 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

opinion concerning a potential defect in that area was relevant to the issues in the case and, thus, that cross-examination concerning that statement of opinion would have been proper impeachment of the expert witness, although the direct examination had not touched upon that portion of her report. Notwithstanding plaintiffs' reference to use of that statement of opinion for impeachment purposes only, however, it appears that plaintiffs are suggesting that the jury might have considered whether the possible "defect" identified by the defendant's witness contributed to the accident, arguing in their Supplemental Brief in Support of Motion for a New Trial, (Doc. # 98 at 7, 8), that testimony concerning the purported inconsistency would have been appropriate since,

\*6 Dr. Wallach was not being asked about an exposed concrete footer at the bottom of the sliding board that had no bearing on the occurrence in this case or the injuries suffered by the child. Rather, **the Defendant's expert identified a hazardous design that related directly and specifically to the area and to the mechanism responsible for the child's injury.**

(Emphasis added). (*See also,* Argument In Chambers concerning defendant's objection, Doc. # 95, pp. 55-64).

That the jury might have considered and credited the possibility that Andrea was attempting to climb to the top platform when she fell, and that the " hazardous design" identified by defendant's expert witness was the "mechanism responsible for the child's injury", *i.e.,* might have caused Andrea to fall from the climber, confirms the correctness of the ruling at trial that cross-examination on that matter would have been confusing and misleading to the jury, as well as irrelevant to the issues in the case.

In the first instance, the purported inconsistency upon which plaintiffs wanted to cross-examine the defendant's expert witness simply does not exist with respect to a genuine issue in the case. Even if we assume the accuracy of the statement in the expert report that a potential barrier to a child's access to the top platform of the climber was created by the possible improper installation of the

top platform, such statement does not touch upon the only opinion concerning a defect in the climber, or absence thereof, to which the expert witness could testify in light of the testimony concerning how the child was injured. As noted, because there was no evidence as to how and why the child left the climber, the only possible defect therein which the jury could have found was that the distance between the climbing members, which undoubtedly was large enough to permit the child's body to pass between them, was too large and thereby rendered the climber unsafe for its intended use. Had the distance between the members been too small for Andrea to pass between them, she obviously would not have landed on the ground beneath the structure. The defendant's expert testified, however, that the danger presented by a child passing freely between the members was less than the danger of having a child become caught between the beams, which could result in strangulation, and, therefore, that the climber was not defective by reason of the distance between the climbing members. Such opinion has absolutely nothing to do with the danger of falling presented by a greater distance, and/or inappropriate angle, between parts of the equipment, thereby requiring, perhaps, a longer reach or the possibility of having to jump toward the final level of the climber. Yet a statement which could relate only to such potential dangers is the statement which plaintiffs contend is inconsistent with the witness's opinion that there was no defect in the climber because the spacing between the climbing members was wide enough to permit the child's body to pass between them.

\*7 Moreover, setting aside all considerations concerning whether the expert witness's prior statement is actually inconsistent with her opinion that the climber was not defective, and concerning the appropriate use of prior inconsistent statements for impeachment purposes, the danger that the jury might have speculated as to how and why Andrea left the climber and, therefore, that the accident might have resulted from some defect in the climber unsupported by the factual evidence in the case far outweighs whatever minimal relevance the purportedly inconsistent prior statement had as an impeachment tool. Consequently, we conclude that our decision to preclude cross-examination of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Robert K. Pearce, Esquire do hereby certify that on September 6, 2007 I electronically filed the foregoing *Defendant Resort Realty Group, Inc.'s Opening Brief in Support of its Motion in Limine* with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Jennifer S. Donahue, Esquire
Andrea G. Green, Esquire
Doroshow, Pasquale, Krawitz & Bhaya
213 E. DuPont Highway
Millsboro, DE 19966

Stephen P. Casarino, Esquire
Casarino, Christman & Shalk, P.A.
800 N. King Street
Wilmington, DE 19801

Roger A. Akin, Esquire
Akin & Herron, P.A.
1500 Shallcross Avenue
Suite 1-A
Wilmington, DE 19806

Carol J. Antoff, Esquire
Christiana Executive Campus
131 Continental Drive, Suite 407
Newark, DE 19713

/s/Robert K. Pearce
ROBERT K. PEARCE, ESQUIRE
I.D. No. 191

Dated: September 6, 2007